## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

REPUBLICAN NATIONAL
COMMITTEE, JORDAN JORRITSMA,
and EMERSON SILVERNAIL,

    *Plaintiffs*,

v.

JOCELYN BENSON, *in her official capacity as Michigan Secretary of State*; JONATHAN BRATER, *in his official capacity as Director of the Michigan Bureau of Elections*,

    *Defendants*.

**COMPLAINT**

Case No. 1:24-cv-00262

---

Plaintiffs, the Republican National Committee, Jordan Jorritsma, and Emerson Silvernail, bring this action under the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. §20507, against Defendants for declaratory and injunctive relief. Plaintiffs allege as follows:

### INTRODUCTION

1.    Section 8 of the NVRA requires States to maintain clean and accurate voter registration records.

2.    Michigan has failed to live up to the NVRA's requirements.

3.    At least 53 Michigan counties have more active registered voters than they have adult citizens who are over the age of 18. That number of voters is impossibly high.

4.     An additional 23 counties have active-voter registration rates that exceed 90 percent of adult citizens over the age of 18. That figure far eclipses the national and statewide voter registration rate in recent elections.

5.     This is not the first time Michigan has failed to abide by the NVRA's requirements. In 2020, Michigan election officials were sued in this Court for violating the NVRA. *See Daunt v. Benson*, Doc. 1, No. 1:20-cv-522 (W.D. Mich. June 9, 2020).

6.     At the time, Michigan had one county with registration rates in excess of 100% of the voting-age population, and 15 counties with rates above 90%. The state defendants moved to dismiss the case, but this Court denied the motions.

7.     Soon after the Court denied the motions to dismiss, the Secretary of State publicly announced that election officials would cancel the registration of 177,000 former voters who either surrendered a Michigan driver's license to another state or had election mail returned undeliverable to an election official before the 2018 election. *See* Doc. 58, No. 1:20-cv-522. In addition, the Bureau of Elections declared it would provide local election clerks the absentee ballot applications returned undeliverable to the Bureau for the 2020 election, and it would mail additional notifications requiring verification to voters listed as registered in other states by the Electronic Registration Information Center. Based on these representations, the plaintiffs voluntarily dismissed the case.

8.     But since *Daunt*, Michigan's voter rolls have gotten exponentially worse. In 2020, Michigan had one county with registration rates above 100% of the voting-age population. Now it has 53.

9.     Based on this and other evidence, Defendants are failing to make a reasonable effort to conduct appropriate list maintenance as required by the NVRA.

## JURISDICTION AND VENUE

10.    The Court has subject-matter jurisdiction because this case alleges violations of the NVRA. *See* 28 U.S.C. §1331; *Ex parte Young*, 209 U.S. 123 (1908).

11.    Venue is proper because a substantial part of the events or omissions giving rise to the claims occurred in this District and because some Defendants "reside" here. 28 U.S.C. §1391.

## PARTIES

12.    Plaintiff, the Republican National Committee, is the national committee of the Republican Party, as defined by 52 U.S.C. §30101(14), with its principal place of business at 310 First Street S.E., Washington, DC 20003.

13.    The RNC represents over 30 million registered Republicans in all 50 states, the District of Columbia, and the U.S. territories. It is comprised of 168 voting members representing state Republican Party organizations, including three members who are registered voters in Michigan.

14.    The RNC works to elect Republican candidates to state and federal office. In November 2024, its candidates will appear on the ballot in Michigan for numerous federal and state offices.

15.    The RNC has vital interests in protecting the ability of Republican voters to cast, and Republican candidates to receive, effective votes in Michigan elections and elsewhere. The RNC brings this suit to vindicate its own rights in this regard, and in a

representational capacity to vindicate the rights of its members, affiliated voters, and candidates.

16.     The RNC and its members are concerned that Defendants' failure to comply with the NVRA's voter-list maintenance obligations undermines the integrity of elections by increasing the opportunity for ineligible voters or voters intent on fraud to cast ballots. The RNC thus monitors state and local election officials' compliance with their NVRA list maintenance obligations through publicly available records from jurisdictions across the nation.

17.     In addition, the RNC relies on voter registration lists to determine its plans and budgets. The RNC relies on registration lists to estimate voter turnout, which informs the number of staff the RNC needs in a given jurisdiction, the number of volunteers needed to contact voters, and how much the RNC will spend on paid voter contacts. If voter registration lists include names of voters who should no longer be on the list, the RNC may spend more resources on mailers, knocking on doors, and otherwise trying to contact voters, or it may misallocate its scarce resources among different jurisdictions.

18.     Plaintiff Jordan Jorritsma is a registered Michigan voter who lives in Ottawa County. Mr. Jorritsma is a legislative director for the Michigan House of Representatives, and he currently serves on the Ottawa County Land Bank Authority. Mr. Jorritsma regularly votes in Michigan's primary and general elections. He plans to vote in Michigan's upcoming elections, including for U.S. President, U.S. Senate, and other federal, local, and statewide offices and ballot measures.

19.     Because Defendants do not maintain accurate voter rolls, Mr. Jorritsma reasonably fears that ineligible voters can and do vote in Michigan elections. Those votes will dilute his legitimate vote. And Michigan's inaccurate rolls undermine Mr. Jorritsma's confidence in the integrity of Michigan elections, which also burdens his right to vote.

20.     Mr. Jorritsma is an active member of the Republican Party. He is running for election as county commissioner for District 2 in Ottawa County this November. Mr. Jorritsma works in Michigan to advance conservative policies and to help elect Republican candidates.

21.     Plaintiff Emerson Silvernail is a registered Michigan voter. Mr. Silvernail is a legislative director in the Michigan House of Representatives who regularly votes in Michigan's primary and general elections. He plans to vote in Michigan's upcoming elections, including for U.S. President, U.S. Senate, and other federal, local, and statewide offices and ballot measures.

22.     Because Defendants do not maintain accurate voter rolls, Mr. Silvernail reasonably fears that ineligible voters can and do vote in Michigan elections. Those votes will dilute his legitimate vote. And Michigan's inaccurate rolls undermine Mr. Silvernail's confidence in the integrity of Michigan elections, which also burdens his right to vote.

23.     Because Defendants do not maintain accurate voter rolls, all Plaintiffs must deploy their time and resources to spend more of them monitoring Michigan elections for fraud and abuse, mobilizing voters to counteract it, educating the public

about election-integrity issues, and persuading elected officials to improve list maintenance.

24.     The RNC has expended substantial time and resources investigating Defendants' failure to comply with their list-maintenance obligations. It has communicated with Michigan officials and concerned members about Defendants' failures, and it has researched statements made by Defendants in their correspondence.

25.     Were it not for Defendants' failure to comply with their list-maintenance obligations, the RNC would have expended those resources on other activities or would not have expended them at all. Instead, it diverted its resources to counteract Defendants' noncompliance and to protect its members' rights.

26.     Defendant Jocelyn Benson is Michigan's Secretary of State. She is the State's chief election officer, Mich. Comp. Laws §168.21, and is responsible for coordinating the statewide list maintenance required by the NVRA, 52 U.S.C. §20509. Secretary Benson is sued in her official capacity.

27.     Defendant Jonathan Brater is Michigan's Director of Elections. He is responsible for "perform[ing] the duties of the secretary of state under his or her supervision, with respect to the supervision and administration of the election laws." Mich. Comp. Laws §168.32. Director Brater is sued in his official capacity.

## BACKGROUND

**I.    Federal law requires States to maintain accurate voter rolls.**

28.     Congress enacted the NVRA "to protect the integrity of the electoral process." 52 U.S.C. §20501(b)(3). Specifically, section 8 was enacted "to ensure that accurate and current voter registration rolls are maintained." *Id.* §20501(b)(4).

29.     Retaining voter rolls bloated with ineligible voters harms the electoral process, heightens the risk of electoral fraud, and undermines public confidence in elections. "Confidence in the integrity of our electoral processes is," in turn, "essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).

30.     Section 8 obligates States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" due to death or change of residence. 52 U.S.C. §20507(a)(4). "[F]ederal law makes this removal mandatory." *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1842 (2018).

31.     Each State's program for maintaining voter-registration lists must be "uniform, non-discriminatory, and in compliance with the Voting Rights Act." 52 U.S.C. §20507(b)(1).

32.     Specifically, section 8 requires States to "remove the names of ineligible voters from the official lists of eligible voters by reason of (A) the death of the registrant or (B) a change in the residence of the registrant" to outside her current voting jurisdiction. 52 U.S.C. §20507(4)(A)-(B).

33.     The Help America Vote Act (HAVA) also mandates that states adopt computerized statewide voter registration lists and maintain them "on a regular basis" in accordance with the NVRA. 52 U.S.C. §21083(a)(2)(A).

34.     States must "ensure that voter registration records in the State are accurate and are updated regularly," an obligation that includes a "reasonable effort to remove

registrants who are ineligible to vote from the official list of eligible voters." 52 U.S.C. §21083(a)(4).

35.     HAVA's list-maintenance requirements include coordination with "State agency records on death" and "State agency records on felony status" to facilitate the removal of individuals who are deceased or rendered ineligible under state law due to a felony conviction. 52 U.S.C. §21083(a)(2)(A)(ii)(I)-(II).

36.     According to the bipartisan Carter-Baker Commission, "registration lists lie at the root of most problems encountered in U.S. elections." Comm. on Federal Election Reform, *Building Confidence in U.S. Elections* 10 (Sept. 2005) (Carter-Baker Report). Inaccurate voter rolls that contain "ineligible, duplicate, fictional, or deceased voters" invite "fraud." *Id.* Although voter fraud is often difficult to detect, "the risk of voter fraud [is] real," and can "affect the outcome of a close election." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (op. of Stevens, J.). And regardless of whether fraud is detected, "the perception of possible fraud contributes to low confidence in the system." Carter-Baker Report, *supra*, at 18. The Supreme Court agrees. *See Crawford*, 553 U.S. at 193-97.

37.     Other courts and experts have likewise recognized that voter fraud is both real and notoriously "difficult to detect and prosecute." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 396 (5th Cir. 2020); *see also Griffin v. Roupas*, 385 F.3d 1128, 1130-31 (7th Cir. 2004) ("Voting fraud is a serious problem in U.S. elections … and it is facilitated by absentee voting."); *Veasey v. Perry*, 71 F. Supp. 3d 627, 641 (S.D. Tex. 2014) (finding broad "agreement that voter fraud actually takes place in abundance in connection with absentee balloting"); *Tex. Democratic Party*, 961 F.3d at 414 (Ho, J., concurring)

("[C]ourts have repeatedly found that mail-in ballots are particularly susceptible to fraud.").

38.    Voter fraud is very real in Michigan. Several recent elections have suffered from voter fraud. *See, e.g.*, Kara Berg, *Oak Park Guardian Pleads Guilty to 7 Counts of Voter Fraud in 2020 Election*, Detroit News (July 3, 2023), https://perma.cc/C8C4-6ZLP; Lynsey Mukomel, *Macomb County Nursing Home Employee Pleads Guilty in Attempted Election Fraud Case*, Mich. Dep't Att'y Gen. (Feb. 24, 2022), https://perma.cc/3L3F-3N47; Jameson Cook, *Former Sterling Heights Candidate Admits to Falsifying Absentee-Voter Ballots*, Macomb Daily (Oct. 16, 2023), https://perma.cc/MR65-STJ7.

39.    To help address voter fraud and ensure compliance with federal election law, the NVRA includes a private right of action. It empowers any "person who is aggrieved by a violation" to "provide written notice of the violation to the chief election official of the State involved." 52 U.S.C. §20510(b)(1). "If the violation is not corrected within 90 days after receipt of a notice, … the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief." *Id.* §20510(b)(2).

## II.    Defendants have specific obligations under the NVRA.

40.    Federal and state law make Michigan's Secretary of State primarily responsible for list maintenance.

41.    The NVRA requires each State to "designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under" the law. 52 U.S.C. §20509.

42.    Michigan law designates the Secretary of State as the State's chief election officer. Mich. Comp. Laws §168.21. It further instructs the Director of Elections to

"perform the duties of the secretary of state under his or her supervision, with respect to the supervision and administration of the election laws." *Id.* §168.32.

43.     Ultimate responsibility for coordinating and overseeing all list maintenance activities rests with the Secretary. A chief election official "may not delegate the responsibility to conduct a general program to a local official and thereby avoid responsibility if such a program is not reasonably conducted." *United States v. Missouri*, 535 F.3d 844, 850 (8th Cir. 2008).

44.     Indeed, "the NVRA's centralization of responsibility counsels against ... buck passing." *Scott v. Schedler*, 771 F.3d 831, 839 (5th Cir. 2014). Courts have rejected the view that, "once the state designates" a local entity to assist with complying with federal law, "her responsibility ends." *Harkless v. Brunner*, 545 F.3d 445, 452 (6th Cir. 2008). "[I]f every state passed legislation delegating" their responsibilities "to local authorities, the fifty states would be completely insulated from any enforcement burdens." *Id.*

45.     When Michigan officials were sued for these same violations in 2020, the Secretary and Director of Elections stipulated to the dismissal of the county defendants in recognition of the fact that "the Secretary of State has the ultimate responsibility for maintaining Michigan's voter rolls." *Daunt*, Doc. 27, No. 1:20-cv-522.

**III.     Defendants have failed to comply with their list-maintenance obligations.**

46.     Just a decade ago, "24 million voter registrations in the United States— about one in eight—[were] either invalid or significantly inaccurate." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 760 (2018) (citing Pew Center on the States, Election

Initiatives Issue Brief (Feb. 2012)). Michigan is no exception, and the evidence underscores the *in*accuracy of Michigan's registration records.

47.     Based on data gathered from the U.S. Census Bureau's 2022 American Community Survey and the most up-to-date count of registered active voters available from the Michigan Bureau of Elections, 53 counties have more active registered voters than voting-eligible citizens, and 23 other counties have suspiciously high rates of active voter registration.

48.     Comparing the registered active voter count to the 2022 Census data reveals that these 53 counties have active voter registration rates at or above 100 percent of their citizen voting-age populations: Alcona (112%), Allegan (104%), Alpena (101%), Antrim (111%), Arenac (104%), Barry (102%), Benzie (108%), Berrien (102%), Calhoun (101%), Cass (101%), Charlevoix (105%), Cheboygan (104%), Crawford (110%), Delta (104%), Dickinson (100%), Emmet (104%), Genesee (104%), Gladwin (103%), Gogebic (101%), Grand Traverse (101%), Huron (100%), Iosco (104%), Iron (106%), Kalkaska (115%), Kent (100%), Keweenaw (114%), Lapeer (102%), Leelanau (108%), Livingston (102%), Mackinac (114%), Macomb (101%), Mason (104%), Menominee (101%), Missaukee (106%), Monroe (100%), Montmorency (110%), Muskegon (101%), Newaygo (103%), Oakland (101%), Oceana (105%), Ogemaw (106%), Ontonagon (101%), Osceola (101%), Oscoda (110%), Otsego (111%), Presque Isle (107%), Roscommon (110%), Schoolcraft (107%), Shiawassee (102%), St. Clair (102%), Van Buren (104%), Wayne (101%), and Wexford (105%).

49.     An additional 23 counties purport to have more than 90 percent of their citizen voting-age populations registered and active: Alger (98%), Baraga (95%), Bay

(99%), Branch (96%), Clinton (98%), Eaton (98%), Hillsdale (95%), Jackson (94%), Kalamazoo (95%), Lake (98%), Lenawee (95%), Luce (99%), Manistee (99%), Marquette (93%), Mecosta (91%), Midland (100%), Montcalm (95%), Ottawa (98%), Saginaw (99%), Sanilac (97%), St. Joseph (99%), Tuscola (98%), and Washtenaw (93%).

50.     These voter registration rates are abnormally or, in the case of counties with greater than 100 percent registration, impossibly high.

51.     According to the U.S. Census Bureau, only 69.1% of the citizen voting-age population was registered nationwide in the November 2022 election.

52.     Similarly, only 72.7% of the citizen voting-age population was registered nationwide in the November 2020 election.

53.     The U.S. Census Bureau further reported that Michigan's statewide voter registration rates for the 2022 and 2020 elections were 77.1% and 73.8% of the citizen voting-age population, respectively.

54.     Thus, these 76 counties are significant outliers, touting voter registration rates 17 to 54 percentage points higher than the national figures from 2022 and 2020, and 13 to 41 percentage points above the State figures for the same period.

55.     There is no evidence that these counties experienced above-average voter participation compared to the rest of the country or State. The only explanation for these discrepancies is substandard list maintenance.

56.     "[S]ignificantly high registration rates" such as these "give rise to the inference" that election officials are "not properly implementing a program to maintain an accurate and current voter registration roll, in violation of the NVRA." *Am. C.R. Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 791 (W.D. Tex. 2015).

57.     Other methodologies show that several Michigan counties have inordinately high inactive registration rates, indicating that the State's general program does not make a reasonable effort to remove outdated registrations.

58.     In 2023, the U.S. Election Assistance Commission published its biannual report covering the registration period between the 2020 and 2022 general elections. *See* U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2022 Comprehensive Report* (June 2023), https://perma.cc/28SQ-T24L.

59.     Among other things, the EAC's survey requests data concerning the number of registrations removed for voters' failure to respond to an address confirmation notice.

60.     The EAC report indicates that in 2022 Michigan reported 928,845 inactive registrations, representing 11.3% of the total registrations. The number is slightly above the national average of 11.1%.

61.     Several Michigan counties have inactive registration rates of 15% or greater, well above the state and national averages. Those counties are Gogebic (20%), Washtenaw (20%), Dickinson (17%), Isabella (16%), St. Joseph (16%), Berrien (15%), Baraga (15%), Cass (15%), Menominee (15%), and Ingham (15%).

62.     Having a high percentage of inactive registrations is an indication that a state or jurisdiction is not removing inactive registrations after two general federal elections.

63.     Michigan's maintenance efforts are especially deficient when it comes to removing voters who have changed residence. *See* 52 U.S.C. §20507(d)(1).

64.     In response to the EAC's survey for the 2020-2022 period, 10 Michigan counties reported cancelling less than 2% of their registration lists for residency changes during that period. That is, registrations that were cancelled because the voter moved away or failed to respond to an address confirmation notice represented just 2% of the total number of registrants in those counties. And those cancellations are spread out over a two-year period, which means that these counties cancelled on average less than 1% of their registration lists per year for residency changes. Those counties are Alcona, Bay, Huron, Ionia, Missaukee, Montcalm, Newaygo, Presque Isle, Sanilac, and Shiawassee.

65.     The most recent census data shows that more than 12% of Michigan's residents were not living in the same house as a year ago. For the 10 counties listed in paragraph 64, the percentage of those changing residences each year ranges from 7.4% (Presque Isle County) to 12.8% (Missaukee County).

66.     Other counties experiences even higher relocation rates with still relatively few cancellations. In Isabella County, for example, 23.5% of residents moved within the last year, but the county removed on average only about 1.4% of its registered voters for residency changes during that time.

67.     Despite the frequent moves, the entire State sent out only 590,172 confirmation notices during the two-year reporting period, representing just 8.1% of active voters. More than 30% of those notices were returned as undeliverable. Another 14% were returned as invalid. Only 0.1% of confirmation notices sent out to Michigan voters were confirmed as valid.

68.     Compounding the problem, Michigan removed only 485,916 registrations during that period, representing just 5.9% of registered voters. Nearly half of those cancellations were deceased voters.

69.     Michigan's impossibly high registration rates, large rates of inactive registered voters, low numbers of address confirmations, and low numbers of removals indicate an ongoing, systemic problem with its voter list maintenance efforts.

70.     Defendants' failure to maintain accurate voter rolls violates federal law and jeopardizes the integrity of the State's upcoming elections.

71.     Similarly bloated voter rolls in other States have led to litigation that exposes these NVRA violations.

72.     For example, the United States sued Indiana for violating the NVRA in 2006, noting in its complaint that "25 counties had registration totals of 90-95%" of their voting-age population. Indiana quickly confessed to violating the NVRA in a consent decree.

73.     Private organizations sued Indiana in 2012, explaining that "26 counties … have voter registration rolls that contain between 90% and 100% of TVAP." Indiana agreed to conduct a significant, statewide process to clean up its voter rolls.

74.     Ohio was sued on the same grounds, and it ultimately agreed to implement heightened review of the accuracy of its voter rolls.

75.     In December 2019, another organization sued Detroit under the NVRA, alleging that "Detroit has more registered voters than adult citizens of voting age (106%)." The suit was dismissed on June 29, 2020, because Detroit removed substantial numbers of invalid registrations.

76.     In September 2021, voters sued North Carolina, alleging that "40 counties in North Carolina have registration rates that far eclipse the national and statewide voter-registration rate in recent elections." The district court denied the defendants' motion to dismiss, and the case is now in discovery.

77.     Michigan is also no stranger to these proceedings. In June 2020, Tony Daunt sued Michigan's Secretary of State and Direct of Elections in this Court for violating the NVRA. *See Daunt v. Benson*, No. 1:20-cv-522 (W.D. Mich. June 9, 2020). The complaint alleged that one county had more registered voters than adult citizens over the age of 18, and an additional 15 counties had voter registration rates that exceeded 90 percent of adult citizens over the age of 18.

78.     This Court denied the defendants' motions to dismiss, holding that the complaint stated a claim for an NVRA violation.

79.     The suit was voluntarily dismissed in February 2021 because the Secretary agreed to slate 177,000 erroneous registrations for cancellation and implement other list-maintenance reforms.

80.     Yet Michigan's rolls are even more inflated now. In *Daunt*, one county showed more registered voters than voting-eligible citizens. That number has swelled to 53 counties. Michigan represented in 2021 that it would improve the accuracy of its voter rolls. It has failed to live up to that promise.

81.     Michigan also received criticism for its efforts in removing deceased voters from rolls in *Public Interest Legal Foundation v. Benson*, No. 1:21-cv-929 (W.D. Mich.). This Court ruled on summary judgment that the record in that case "demonstrate[d] that deceased voters are removed from Michigan's voter rolls on a

regular and ongoing basis," and thus the state officials did not violate the NVRA as a matter of law.

**IV.     Plaintiffs provided Defendants notice of their statutory violations.**

82.     Under the NVRA, "Plaintiffs have [statutory] standing assuming they provided proper notice within the meaning of 52 U.S.C. §20510(b)(1)." *Bellitto v. Snipes*, 221 F. Supp. 3d 1354, 1362 (S.D. Fla. 2016).

83.     On December 8, 2023, Plaintiffs mailed a statutory notice letter to Secretary of State Jocelyn Benson and Director of Elections Jonathan Brater, notifying them of 78 Michigan counties that are in violation of section 8 and formally requesting that they correct the violations within 90 days. *See* Exh. A.

84.     Plaintiffs have since received updated comparisons based on recently available data, revealing that nearly all Michigan counties are in violation of section 8. Those numbers are reflected in the allegations above.

85.     The notice stated that Plaintiffs "hope[d] to avoid litigation and would welcome immediate efforts by your office to bring Michigan into compliance with Section 8."

86.     Plaintiffs asked that Defendants ensure they have a "comprehensive, nondiscriminatory" list maintenance program in place that complies with federal law, and to "identify and remove" several categories of ineligible individuals "from the official lists of eligible voters."

87.     Plaintiffs also asked that Defendants "respond in writing within 45 days of the date of this letter," "fully describ[ing] the efforts, policies, and programs [they] are taking, or plan to undertake before the 2024 general election to bring Michigan into

compliance with Section 8," as well as when they "plan to begin and complete each specified measure and the results of any programs or activities [they] have already undertaken."

88.     Additionally, asked Defendants to state "what policies are presently in place, or will be put in place, to ensure effective and routine coordination of list maintenance activities," and "a description of the specific steps [Defendants] intend to take to ensure routine and effective list maintenance on a continuing basis beyond the 2024 election."

89.     Finally, Plaintiffs requested that Defendants take steps to preserve documents as required by section 8(i) of the NVRA, 52 U.S.C. §20507(i)(1)-(2), and other federal law. *See, e.g.*, *In re Enron Corp. Sec., Derivative & Erisa Litig.*, 762 F. Supp. 2d 942, 963 (S.D. Tex. 2010) ("The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.").

90.     The notice letter stated that Plaintiffs would file a lawsuit under 52 U.S.C. §20510(b)(2) if the identified violations were not corrected within 90 days of receipt of the letter.

91.     Defendants have failed to correct the violations of the NVRA identified in the notice letter and this complaint.

92.     Plaintiffs Jordan Jorritsma, Emerson Silvernail, and all individual members of the RNC who are lawfully registered to vote in Michigan, have rights under both the U.S. Constitution and the Michigan Constitution to vote in federal and state

elections, as well as statutory rights under both federal and state law to the safeguards and protections set forth in the NVRA.

93.     Defendants' failure to comply with their NVRA voter list maintenance obligations burdens the right to vote of Mr. Jorritsma, Mr. Silvernail, and the individual members of the RNC who are lawfully registered to vote in Michigan by undermining their confidence in the integrity of the electoral process, discouraging their participation in the democratic process, and instilling in them the fear that their legitimate votes will be nullified or diluted by unlawful votes.

94.     Defendants' failure to satisfy their list-maintenance obligations also infringes the federal and state statutory rights of Mr. Jorritsma, Mr. Silvernail, and the individual members of the RNC who are lawfully registered to vote in Michigan. These individuals have a statutory right to vote in elections for federal office that comply with the procedures and protections required by the NVRA.

95.     Defendants' NVRA violations have also caused economic, financial, and political injury to the Plaintiffs. Defendants' inaccurate voter rolls have forced Plaintiffs to allocate additional resources and misallocate their scarce resources in ways they otherwise would not have.

## COUNT
## Violation of the NVRA

96.     Plaintiffs reallege each of the prior allegations in this complaint.

97.     Defendants have failed to make reasonable efforts to conduct voter-list maintenance as required by 52 U.S.C. §20507(a)(4).

98.     Plaintiffs have suffered irreparable injuries as a direct result of Defendants' violation of section 8 of the NVRA.

99.     Plaintiffs will continue to be injured by Defendants' violations of the NVRA until Defendants are enjoined from violating the law.

100.    Plaintiffs have no adequate remedy at law.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Defendants and provide the following relief:

A.     A declaratory judgment that Defendants are in violation of section 8 of the NVRA;

B.     A permanent injunction barring Defendants from violating section 8 of the NVRA;

C.     An order instructing Defendants to develop and implement reasonable and effective registration list-maintenance programs to cure their failure to comply with section 8 of the NVRA and to ensure that ineligible registrants are not on the voter rolls;

D.     Plaintiffs' reasonable costs and expenses of this action, including attorneys' fees; and

E.     All other further relief that Plaintiffs may be entitled to.

Respectfully submitted,

Dated: March 13, 2024

*/s/ Thomas R. McCarthy*

Thomas R. McCarthy
Gilbert C. Dickey
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com

*Counsel for Plaintiffs*