## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

REPUBLICAN NATIONAL COMMITTEE,
JORDAN JORRITSMA, and EMERSON
SILVERNAIL,

                Plaintiffs,

    v.

JOCELYN BENSON, in her official capacity as
Michigan Secretary of State; and JONATHAN
BRATER, in his official capacity as Director of
the Michigan Bureau of Elections,

                Defendants.

CIVIL ACTION

Case No. 1:24-cv-262-JMB-RSK

Hon. Jane M. Beckering

**PROPOSED INTERVENOR-
DEFENDANTS' MOTION TO
INTERVENE**

ORAL ARGUMENT REQUESTED

       Proposed Intervenor-Defendants Detroit Disability Power and the Michigan Alliance for

Retired Americans (together, "Proposed Intervenors") seek to intervene as defendants in the

above-captioned lawsuit to safeguard their and their members' substantial and distinct legal

interests, which will otherwise be inadequately represented. For the reasons discussed in the

memorandum in support, filed herewith, Proposed Intervenors are entitled to intervene in this case

as a matter of right under Federal Rule of Civil Procedure 24(a)(2). In the alternative, Proposed

Intervenors request permissive intervention under Rule 24(b).

       Proposed Intervenors respectfully request that the Court set a schedule regarding this

motion to intervene that allows for their participation in any future briefing or hearings. Otherwise,

Proposed Intervenors' fundamental constitutional rights are at risk of being severely and irreparably harmed, as described more fully in the memorandum in support of this motion.

Pursuant to Local Rule 7.1(d) and Section III(B) of this Court's Information and Guidelines for Civil Practice, counsel for Proposed Intervenors conferred with counsel for Plaintiffs and Defendants about their positions on this motion. On March 21, 2024, counsel for Defendants confirmed that they neither oppose nor concur with the relief requested. On March 22, 2024, counsel for Plaintiffs confirmed that they will state their position after reviewing the filed motion and memorandum.

WHEREFORE, Proposed Intervenors request that the Court grant them leave to intervene in the above-captioned matter and to file their proposed motion to dismiss (Ex. 1).

Dated: March 22, 2024.               Respectfully submitted,

                               /s/ *Sarah S. Prescott*
                               Sarah S. Prescott (P70510)
                               SALVATORE PRESCOTT
                               PORTER & PORTER, PLLC
                               105 East Main Street
                               Northville, Michigan 48167
                               (248) 679-8711
                               sprescott@spplawyers.com

                               Aria C. Branch
                               Christopher Dodge*
                               Jyoti Jasrasaria
                               Tina Meng Morrison*
                               Samuel T. Ward-Packard
                               ELIAS LAW GROUP LLP
                               250 Massachusetts Ave, NW, Ste 400
                               Washington, DC 20001
                               (202) 968-4490
                               abranch@elias.law
                               cdodge@elias.law
                               jjasrasaria@elias.law
                               tmengmorrison@elias.law
                               swardpackard@elias.law

                               *Counsel for Proposed Intervenor-Defendants*

                               *Admission pending

**CERTIFICATE OF SERVICE**

I certify that on this 22nd day of March 2024, I caused to be served a copy of the above document on all counsel of record and parties via the ECF system.

/s/ *Sarah S. Prescott*
Sarah S. Prescott

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

REPUBLICAN NATIONAL COMMITTEE,
JORDAN JORRITSMA, and EMERSON
SILVERNAIL,

                    Plaintiffs,

     v.

JOCELYN BENSON, in her official capacity as
Michigan Secretary of State; and JONATHAN
BRATER, in his official capacity as Director of
the Michigan Bureau of Elections,

                 Defendants.

CIVIL ACTION

Case No. 1:24-cv-262-JMB-RSK

Hon. Jane M. Beckering

**PROPOSED INTERVENOR-DEFENDANTS' AMENDED
MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE**

ORAL ARGUMENT REQUESTED

**TABLE OF CONTENTS**

CONCISE STATEMENT OF REASONS ................................................................................. iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

    I.     Michigan's Obligations under the NVRA ................................................ 2

    II.    Proposed Intervenors ............................................................................... 2

ARGUMENT ..................................................................................................................... 5

    I.     Proposed Intervenors are entitled to intervene as of right. ..................... 5

           A.     The motion to intervene is timely. ............................................... 6

           B.     Proposed Intervenors have substantial interests that Plaintiffs' claims threaten to impair. ............................................................ 6

           C.     The existing parties may not adequately represent Proposed Intervenors' interests. ..................................................................... 10

    II.    Alternatively, Proposed Intervenors should be granted permissive intervention. ...... 13

CONCLUSION ................................................................................................................... 14

## CONCISE STATEMENT OF REASONS

I.      Proposed Intervenors are entitled to intervene as of right. *See* Fed. R. Civ. P. 24(a).

II.     Alternatively, Proposed Intervenors should be granted permissive intervention. *See* Fed. R.

Civ. P. 24(b).

## INTRODUCTION

This case is of a sort that is increasingly—and unfortunately—common. The National Voter Registration Act ("NVRA") is a federal law enacted to make it *easier* for qualified voters to register and *remain* registered. Yet by bringing this case, Plaintiffs aim to weaponize the NVRA against the very voters it is meant to protect. Plaintiffs thus add themselves to a long list of litigants who, spinning spurious tales of voter fraud, have attempted to enlist the federal courts in a coordinated effort to purge qualified voters nationwide. Courts, however, have stood firm against such lawsuits. Indeed, this Court rejected a similar claim brought under Section 8 of the NVRA just three weeks ago. *Pub. Int. Legal Found. v. Benson*, No. 1:29-cv-929-JMB-SJB, 2024 WL 1128565 (W.D. Mich. Mar. 1, 2024) ("*PILF*").

Although they borrow many tactics from the plaintiffs in *PILF* and other recent, failed purge lawsuits, Plaintiffs' case is unusual in two respects: scope and timing. As to scope, Plaintiffs' vague yet capacious allegations sweep far beyond the comparatively modest claims the Court found lacking earlier this month in *PILF*. And as to timing, Plaintiffs demand drastic intervention in state election administration in the spring of a presidential election year, when voters' and pro-voter organizations' preparations for November are already underway.  For those two reasons, in particular, Detroit Disability Power and the Michigan Alliance for Retired Americans ("Proposed Intervenors"), move under Rule 24 to intervene as defendants in this lawsuit. The scope and timing of Plaintiffs' lawsuit mean that if they succeed in obtaining a court-ordered purge, Proposed Intervenors' members, constituents, and resources all will be harmed. For that reason, and because Defendants, as state officials, do not adequately represent Proposed Intervenors' interests, intervention of right is warranted. Alternatively, the Court should grant permissive intervention.

## BACKGROUND

### I.    Michigan's Obligations under the NVRA

The NVRA imposes strict restrictions on whether, when, and how a state may cancel a voter registration. *See* 52 U.S.C. § 20507(a)(3)–(4), (b)–(d). A state may *immediately* cancel a registration only in rare circumstances, such as express requests or disenfranchising felonies. *See id.* § 20507(a)(3)(A)–(B). Otherwise, a state may not remove voters from the rolls without first complying with prescribed procedural minimums that Congress has mandated to minimize the risk of erroneous cancellation. *See id.* § 20507(a)(3)(C), (c)–(d). As this Court recognized just a few weeks ago in its well-reasoned opinion resolving *PILF*, "the NVRA does not require states to immediately remove every voter who may have become ineligible." 2024 WL 1128565, at *11.

Plaintiffs' lawsuit largely ignores these mandatory safeguards and focuses instead on the NVRA's affirmative list-maintenance obligations. Those obligations, however, are very limited. The NVRA requires only that each state make "a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of [] the death of the registrant; or [] a change in the residence of the registrant." 52 U.S.C. § 20507(a)(4). As this Court recently explained, "Congress did not establish a specific program for states to follow for removing ineligible voters," *PILF*, 2024 WL 1128565, at *10; it just required states to undertake reasonable measures.

### II.    Proposed Intervenors

Detroit Disability Power is a membership organization whose mission is to build the political power of the disabled community in the Detroit region. Ex. 2, Decl. of Dessa Cosma ("Cosma Decl.") ¶ 3. Detroit Disability Power has approximately 300 members—both people with disabilities and their allies—and regularly reaches another 2,000 to 3,000 supporters and constituents through its email list and events. *Id.* ¶ 4. Detroit Disability Power's members and

constituents are particularly vulnerable when voting rolls are purged. *See id.* ¶¶ 9–14. Some of Detroit Disability Power's members have disabilities that limit their capacity to access written information, such as blindness, impaired vision, and reading disabilities. *Id.* ¶ 10. And overall, 4% of adults in Michigan have vision-related disabilities. *Id.* Voter purges, which rely on written notice to inform registered voters that their registrations will be cancelled absent corrective action, *see* 52 U.S.C. § 20507(d)(1)(B)(i), (2); Mich. Comp. Laws § 168.509aa(5), necessarily expose such voters to an elevated risk of erroneous cancellation, Cosma Decl. ¶ 11. And mailed written notice—such as Michigan's notices of registration cancellation—is particularly inaccessible, because although accessibility technology provides a number of options for accessing written materials online or in digital form, tools for accessing print mail are far more limited. *Id.* ¶ 12. More broadly, voters with disabilities face elevated rates of poverty, unemployment, and—consequentially—housing insecurity, which further increases the risk of erroneous registration cancellation. *Id.* ¶ 13. All told, any voter purge conducted in 2024 is likely to result in the erroneous removal from the rolls of some of Detroit Disability Power's members or constituents. *Id.* ¶ 14.

A rushed voter purge would also harm Detroit Disability Power's organizational mission, by diverting its scarce resources away from other crucial election-year work. *Id.* ¶ 15. Each election, Detroit Disability Power organizes to turn its members and constituents out to vote, ensures that they know how disability-rights law protects their access to the franchise, and encourages them to vote with their disability experience at the forefront of their decision-making. *Id.* ¶ 16. But conveying these messages and preparing related materials and presentations consumes significant staff and volunteer time. *Id.* ¶ 17. And organizing around the 2024 election cycle will be particularly time-consuming for Detroit Disability Power because Michigan has recently enacted a number of new voting rights laws that will impact the ways in which its

members can access the franchise. *Id.* ¶ 18. If Plaintiffs obtain the rushed purge they seek, Detroit

Disability Power will need to direct leadership, staff, and volunteer time and effort away from the

above mission-critical activities to inform people of the purge, help them confirm their

registrations, and assist if registrations are cancelled. *Id.* ¶ 19. That diversion of its scarce resources

will hinder Detroit Disability Power's efforts to further its broader mission. *Id.*

       The Alliance for Retired Americans is a membership organization with over 4.4 million

members nationwide. Ex. 3, Decl. of James R. Pedersen ("Pedersen Decl.") ¶ 3. Its mission is to

ensure the social and economic justice and full civil rights that retirees have earned after a lifetime

of work, with a particular emphasis on safeguarding the right to vote. *Id.* ¶ 4. The Alliance's

Michigan chapter, the Michigan Alliance for Retired Americans, has more than 200,000 members

comprising retirees from 23 public and private sector unions, members of community

organizations, and individual activists. *Id.* ¶ 6. Because Alliance members are, overwhelmingly,

retirees, and are registered to vote at extremely high rates, they are disproportionately vulnerable

when voting rolls are purged. *Id.* ¶¶ 7–8. In particular, retirees are disproportionately burdened by

voter purges because many retirees move within Michigan after retiring, and because retirees often

travel out of state for long periods. *Id.* ¶¶ 12–16. Michigan uses returned election mail and mailed

notices to determine whether a voter is still a Michigan resident. *Id.* ¶ 15. As a consequence,

moving and traveling increase a voter's risk of wrongful removal. *Id.* ¶¶ 15–16. For instance, a

retiree who travels south for winter may miss a crucial mailed notice of cancellation if that notice

is sent only to the retiree's Michigan address. *Id.* ¶¶ 14, 16. Beyond that, the Alliance's sheer size

gives it a rightful stake in this case: Given the Alliance's over 200,000 members, it is statistically

inevitable that a rushed purge process would put many of those members' voter registrations in

jeopardy. *Id.* ¶ 17.

A purge of Michigan's election rolls would also cause the Alliance to divert its scarce resources, harming its mission. *Id.* ¶ 18. In a presidential year such as 2024, the Alliance has a wide range of organizational goals to achieve: registering new voters, getting out the vote, educating its members and constituents about where candidates stand on the Alliance's key issues, and organizing around those issues. *Id.* ¶¶ 23–25. A purge would undermine those efforts in several ways. *Id.* ¶¶ 26–31. Alliance leadership would need to devote time and effort to preparing materials and presentations about the purge, and would then need to use scarce meeting time and organizing resources to walk members through how to confirm their registrations. *Id.* ¶¶ 28–29. Alliance leadership and volunteers would also need to assist any members whose registrations are cancelled. *Id.* ¶ 30. All this would divert the Alliance's resources from other essential organizing tasks, and thereby frustrate its mission. *Id.* ¶ 31.

## ARGUMENT

### I.    Proposed Intervenors are entitled to intervene as of right.

"Under Federal Rule of Civil Procedure 24(a)(2), district courts must permit anyone to intervene who, (1) in a timely motion, shows that (2) they have a substantial legal interest in the case, (3) their absence from the case would impair that interest, and (4) their interest is inadequately represented by the parties." *Wineries of the Old Mission Peninsula Ass'n v. Township of Peninsula*, 41 F.4th 767, 771 (6th Cir. 2022) (*"Wineries"*) (citation omitted). The Sixth Circuit instructs that "Rule 24 should be 'broadly construed in favor of potential intervenors.'" *Stupak-Thrall v. Glickman*, 226 F.3d 467, 472 (6th Cir. 2000) (quoting *Purnell v. City of Akron*, 925 F.2d 941, 950 (6th Cir. 1991)). In election law cases, this is doubly true, "and for good reason—the right to vote 'is regarded as a fundamental political right, because [it is] preservative of all rights.'" *Serv. Emps. Int'l Union Loc. 1 v. Husted*, 515 F. App'x 539, 543 (6th Cir. 2013) (per curiam) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)).

### A.    The motion to intervene is timely.

This motion is indisputably timely: The motion comes just a week after Plaintiffs filed their complaint and before any other action in the case. *See Priorities USA v. Benson*, 448 F. Supp. 3d 755, 763 (E.D. Mich. 2020) (suggesting that it would be "difficult to imagine a more timely intervention" than one filed within a few weeks of the complaint). Intervention will inflict no prejudice on the other parties. Proposed Intervenors are prepared to follow any briefing schedule the Court sets and to participate in any future hearings or oral arguments, without delay. And unlike in *PILF*, where the Court denied a motion to intervene on timeliness grounds among others, the parties are not "already briefing" a motion to dismiss. *PILF v. Benson*, No. 1:21-cv-929, 2022 WL 21295936, at *11 (W.D. Mich. Aug. 25, 2022).

### B.    Proposed Intervenors have substantial interests that Plaintiffs' claims threaten to impair.

This case threatens Proposed Intervenors' substantial interests. The Sixth Circuit describes the requirement of an impaired interest as "rather expansive," *Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1245 (6th Cir. 1997), and one that "is to be construed liberally," *Bradley v. Milliken*, 828 F.2d 1186, 1192 (6th Cir. 1987). And the Sixth Circuit has explained that an intervenor need not have the standing necessary to initiate a lawsuit and rejected the notion that Rule 24(a)(2) requires a "specific legal or equitable interest." *Mich. State AFL–CIO*, 103 F.3d at 1245 (quoting *Purnell*, 925 F.2d at 948). Rather, the burden of establishing impairment of a protectable interest is "minimal," *id.* at 1247, and the alleged impairment need only be possible, not certain, *see Purnell*, 925 F.2d at 948. Courts should resolve "close cases" "in favor of recognizing an interest under Rule 24(a)." *Mich. State AFL-CIO*, 103 F.3d at 1247.

Proposed Intervenors have two interests which this lawsuit threatens to impair: ensuring that their members and constituents remain on the rolls and avoiding the need to divert resources

to protect their members and constituents from unlawful cancellations of registration. First, Proposed Intervenors indisputably have a substantial interest in ensuring that their members, as well as the broader communities they serve, are able to register to vote and to remain registered. That interest is a well-established basis for intervention in voter purge cases brought under NVRA Section 8. *See Bellitto v. Snipes*, No. 16-cv-61474, 2016 WL 5118568 (S.D. Fla. Sept. 21, 2016) (granting organization intervention of right in Section 8 case); *see also Pub. Int. Legal Found., Inc. v. Winfrey*, 463 F. Supp. 3d 795, 799 (E.D. Mich. 2020) (granting organization permissive intervention in Section 8 case); Order Granting Mot. to Intervene, *Daunt v. Benson*, No. 1:20-cv-522 (W.D. Mich. Sept. 28, 2020), ECF No. 30 (same). In *Bellitto*, for example, the district court permitted a union with tens of thousands of members in Florida to intervene because "the interests of its members would be threatened by [any] court-ordered 'voter list maintenance' sought by Plaintiffs," a "potential harm" the court found "particularly great in light of the upcoming 2016 General Election." *Bellitto*, 2016 WL 5118568, at *2. Proposed Intervenors' interests here are the same.

The NVRA itself confirms the importance of Proposed Intervenors' interests: It creates a cause of action to challenge improper *removal* of registered voters. 52 U.S.C. § 20510(b). And organizations like Proposed Intervenors often bring successful claims under that provision to *prevent* the very sort of statewide voter purge Plaintiffs here seek to *compel*. *See, e.g.*, *Common Cause/N.Y. v. Brehm*, 344 F. Supp. 3d 542, 558–59 (S.D.N.Y. 2018) (holding that plaintiff adequately alleged as-applied NVRA Section 8 claim challenging New York's registration removal policy); *Common Cause Ind. v. Lawson*, 327 F. Supp. 3d 1139, 1156 (S.D. Ind. 2018) (similar), *aff'd*, 937 F.3d 944 (7th Cir. 2019). Where Congress has recognized that groups like Proposed Intervenors have an interest in *asserting* rights under the very statute on which Plaintiffs

rely, there can be little question that the same interest satisfies the "minimal" showing required for defensive intervention. *Mich. State AFL–CIO*, 103 F.3d at 1247. Indeed, the Sixth Circuit has held that an organization's interest in preserving its members' access to the franchise satisfies the higher burden for Article III standing. *See Am. C.L. Union of Ohio, Inc. v. Taft*, 385 F.3d 641, 646 (6th Cir. 2004).

This lawsuit threatens to impair Proposed Intervenors' interest in defending their members' and constituents' access to the franchise because a statewide voter purge is statistically certain to result in the removal of some of their members from the rolls. As explained above, *supra* Background, Part II., this threat is particularly acute for the Alliance, given its 200,000 members in Michigan and the propensity of retirees to move and travel for extended periods. *See* Pedersen Decl. ¶¶ 12–17. The threat to Detroit Disability Power's membership and the broader Detroit disabled community it serves is similarly grave—mailed notice is often ineffective when sent to blind voters or voters with disabilities that affect the accessibility of written information. *See* Cosma Decl. ¶¶ 9–12. And Detroit Disability Power's constituents also suffer from housing instability at elevated rates, multiplying the risk that notice will prove ineffective. *Id.* ¶ 13.

Moreover, the nature and breadth of Plaintiffs' allegations and the timing of their lawsuit mean that some such removals are likely to be illegal. As one Court of Appeals has put it, in a decision cited favorably by this Court in *PILF*, "a maximum effort at purging voter lists could minimize the number of ineligible voters, but those same efforts might also remove eligible voters." *Bellitto v. Snipes*, 935 F.3d 1192, 1198 (11th Cir. 2019). For that reason, the NVRA requires that any registration-cancellation program be based on individualized evidence that the voter is no longer qualified to vote at the address of registration. 52 U.S.C. § 20507(d)(1). Yet Plaintiffs do not cite a *single* example of a Michigan voter they say is subject to removal under

8

those criteria. *See* Compl. ¶¶ 46–81, ECF No. 1, PageID.10-17. So, although Plaintiffs purport to seek "reasonable" list maintenance efforts, they nowhere identify which voters they believe should be removed or on what grounds they are ineligible. Instead, they rely on conclusory allegations about aggregate population data, *id.*—precisely the sort of evidence the NVRA prohibits using as the basis for a voter purge, *see* 52 U.S.C. § 20507(d)(1) (requiring an individualized process). Any voter purge program enacted to vindicate Plaintiffs' claims would thus expose Proposed Intervenors' members and constituents to a substantial risk of illegal cancellation of registration.

It follows that intervention is particularly necessary because such illegal cancellation would, itself, be actionable under the NVRA's private right of action. 52 U.S.C. § 20510(b). Yet if Proposed Intervenors are denied participation in this litigation and Plaintiffs are granted relief, the *stare decisis* or preclusive effect of this Court's action may render the NVRA's private right of action a dead letter as an option for Proposed Intervenors to protect their members' interests. *See Wineries*, 41 F.4th at 774; *Mich. State AFL-CIO*, 103 F.3d at 1247.

Plaintiffs' requested relief also threatens Proposed Intervenors' interests in a second manner, by requiring them to divert time and resources away from other essential election-year activities, harming their missions in the process. A sweeping, statewide registration-roll purge in the summer of a presidential year will require pro-voter organizations, including Proposed Intervenors, to alert members, monitor cancellations, and assist cancelled members. Pedersen Decl. ¶ 29–31; Cosma Decl. ¶ 19. All these tasks will consume Proposed Intervenors' scarce resources, diverting those resources away from other key election-year activities, such as registering members in the first instance, engaging in issue advocacy, and getting out the vote. Pedersen Decl. ¶ 31; Cosma Decl. ¶ 19. As with Proposed Intervenors' interest in protecting their members' access to the franchise, an organization's interest in avoiding impairment of its mission

due to a need to divert resources suffices to confer standing—a higher burden than that required for defensive intervention. *See, e.g.*, *Miami Valley Fair Hous. Ctr. v. Metro Dev. LLC*, No. 2:16-cv-607, 2018 WL 1229841, at \*3 (S.D. Ohio Mar. 7, 2018).

Several considerations make the threat to Proposed Intervenors' interests here far more grave than in *PILF. See* 2022 WL 21295936, at \*11. First, Plaintiffs do not limit their requested relief to removal of deceased voters from the rolls. Instead, they seek comprehensive, statewide judicial intervention in Michigan's list-maintenance practices. Given that scope, given the Alliance's 200,000 members in Michigan, and given Detroit Disability Power's hundreds of particularly vulnerable members and thousands of constituents, it is a statistical certainty—rather than a matter of "some amount of increased risk," *id.*—that Proposed Intervenors' members and constituents will be affected if full relief is granted. And the associated diversion of Proposed Intervenors' resources is similarly guaranteed to be substantial if Plaintiffs prevail. Second, unlike in *PILF*, Secretary Benson has taken no position on Proposed Intervenors' motion and so does not dispute that Plaintiffs' lawsuit threatens Proposed Intervenors' interests. And third, as explained above, the *stare decisis* and preclusive effects of the Court's decisions may mean that Proposed Intervenors will not "retain options for protecting their interests," *id.*, if they are denied intervention and Plaintiffs are granted relief.

### C.    The existing parties may not adequately represent Proposed Intervenors' interests.

Proposed Intervenors will not be assured adequate representation in this matter if they are denied intervention. "Rule 24(a) is satisfied if the applicant shows that representation of his interest '*may be*' inadequate; and the burden of making that showing should be treated as minimal." *Wineries*, 41 F.4th at 774 (alteration accepted; emphasis added by Sixth Circuit) (quoting *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)). Accordingly, courts are "liberal

10

in finding" this requirement to be met because "there is good reason in most cases to suppose that the applicant is the best judge of the representation of the applicant's own interests." 7C Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civ.* § 1909 (3d ed.). Here, neither Plaintiffs nor Defendants are assured to adequately represent Proposed Intervenors' interests. As to Plaintiffs, little needs to be said: Plaintiffs seek a rushed purge of Michigan's voter rolls in a presidential election year. Proposed Intervenors strongly oppose that result.

As to Defendants, although they are likely to defend Michigan's list maintenance practices and oppose relief, it does not follow that they adequately represent Proposed Intervenors. To the contrary, "[t]he Sixth Circuit has recognized that the interests of election officials in voting roll maintenance are sufficiently distinct from those of . . . their constituents to warrant intervention by those who could be impacted by the results of the maintenance process." *Winfrey*, 463 F. Supp. 3d at 799 (citing *League of Women Voters of Mich. v. Johnson*, 902 F.3d 572, 579 (6th Cir. 2018)). As the state officials who administer Michigan's elections, Secretary Benson and Director Brater are charged with "protecting electoral integrity and the maintenance of accurate voter rolls." *Bellitto*, 935 F.3d at 1198. In contrast, Proposed Intervenors have "[t]he mission and interest . . . explicitly to pursue the second of the expressly recognized interests that motivated Congress to enact [the NVRA]," *Winfrey*, 463 F. Supp. 3d at 801, *i.e.*, to eliminate "barriers to registration and voting," *Bellitto*, 935 F.3d at 1198. Because this goal "naturally create[s] some tension" with Defendants' administrative obligations, *id.*, Defendants' representation of Proposed Intervenors cannot be presumed to be adequate.

In particular, Defendants may elect to resolve this case by settlement, as Secretary Benson previously did in *Daunt*—a similarly broad Section 8 challenge lodged shortly before the 2020 presidential election. *See* Stipulation of Dismissal, *Daunt v. Benson*, No. 1:20-cv-522-RJJ-RSK

(W.D. Mich. Feb. 16, 2021), ECF No. 58. And any settlement is sure to entail list-maintenance measures that jeopardize Proposed Intervenors' interests—Proposed Intervenors and their members will be harmed by any sweeping cancellation program imposed just months before a presidential election. That potential conflict in litigation objectives between Defendants and Proposed Intervenors is all that is required to create "substantial doubt," *PILF*, 2022 WL 21295936, at *11, as to inadequate representation at this juncture: "In assessing whether a proposed intervenor has fulfilled this requirement, *courts must remember* that certainty about future events is not required." *Wineries*, 41 F.4th at 774 (emphasis added).

Just two terms ago, the Supreme Court made clear that state executive officers will not often be adequate representatives for partisan or private actors who seek to intervene under Rule 24. *See Berger v. N.C. State Conf. of the NAACP*, 142 S. Ct. 2191, 2203–04 (2022). Notably, *Berger* was decided six months after intervention briefing in *PILF* concluded, and the Court's order denying intervention did not address it. In *Berger*, the Supreme Court reiterated its longstanding instruction that even when state agents pursue "related" interests to political actors, those interests are not properly considered "identical." *Id.* at 2204 (quoting *Trbovich*, 404 U.S. at 538–39). The Court then explained that "[w]here 'the absentee's interest is similar to, but not identical with, that of one of the parties,' that normally is not enough to trigger a presumption of adequate representation." *Id.* (quoting Wright & Miller § 1909). And the Court warned against "presum[ing] a full overlap of interests when state law more nearly presumes the opposite." *Id.* By the same logic, this Court should not presume a full overlap of interests between Proposed Intervenors and Defendants in an NVRA Section 8 action. Congress has "presume[d] the opposite" by giving organizations like Proposed Intervenors a private right of action—Section 8—to sue

state actors like Defendants when their list-maintenance practices violate the NVRA's protections for voters.

## II.    Alternatively, Proposed Intervenors should be granted permissive intervention.

Permissive intervention is warranted under Rule 24(b). "Permissive intervention has a less exacting standard than mandatory intervention and courts are given greater discretion to decide motions for permissive intervention." *Priorities USA*, 448 F. Supp. 3d at 759–60 (citing *Grubbs*, 870 F.2d at 345). "On timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1). "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). The interest of the intervenors, for the purposes of permissive intervention, needs only to be "different" from the defendants, regardless of whether it is "substantial." *League of Women Voters of Mich.*, 902 F.3d at 579.

Proposed Intervenors easily meet these requirements. First, their motion is timely, and intervention will not unduly delay or prejudice the adjudication of the original parties' rights. *See supra* Section I.A. Second, Proposed Intervenors' interests plainly are different from those of existing litigants: Neither Plaintiffs nor Defendants are pro-voter nonprofit organizations, nor do they share any of Proposed Intervenors' substantive political goals or resource-diversion concerns. *See supra* Section I.B. And Proposed Intervenors will raise common questions of law in opposing Plaintiffs' suit—in particular, whether the relief Plaintiffs seek would itself violate the NVRA.

The Court also has good reason to exercise its discretion to grant Proposed Intervenors' motion. Plaintiffs seek sweeping judicial intervention in Michigan's voter registration regime in an election year. In adjudicating Plaintiffs' claims, the Court will benefit from hearing from the voters—the ones who will be most directly affected by the case's resolution. In *Daunt*, which

presented similarly broad claims, the court granted pro-voter organizations permissive intervention. If the Court is not inclined to grant intervention of right, it should do the same here.

## CONCLUSION

Proposed Intervenors request that the Court grant their motion to intervene.

Dated: March 22, 2024.                          Respectfully submitted,

/s/ *Sarah S. Prescott*
Sarah S. Prescott (P70510)
SALVATORE PRESCOTT
PORTER & PORTER, PLLC
105 East Main Street
Northville, Michigan 48167
(248) 679-8711
sprescott@spplawyers.com

Aria C. Branch
Christopher Dodge*
Jyoti Jasrasaria
Tina Meng Morrison*
Samuel T. Ward-Packard
ELIAS LAW GROUP LLP
250 Massachusetts Ave, NW, Ste 400
Washington, DC 20001
(202) 968-4490
abranch@elias.law
cdodge@elias.law
jjasrasaria@elias.law
tmengmorrison@elias.law
swardpackard@elias.law

*Counsel for Proposed Intervenor-Defendants*

*Admission pending

14

**CERTIFICATE OF SERVICE**

I certify that on this 22nd day of March 2024, I caused to be served a copy of the above

document on all counsel of record and parties via the ECF system.

/s/ *Sarah S. Prescott*
Sarah S. Prescott