UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

REPUBLICAN NATIONAL COMMITTEE,
JORDAN JORRITSMA and EMERSON
SILVERNAIL,

        Plaintiffs,

v

JOCELYN BENSON, in her official capacity
as Michigan Secretary of State and
JONATHAN BRATER, in his official
capacity as Director of the Michigan Bureau
of Elections,

        Defendants.

No. 1:24-cv-00262

HON. JANE M. BECKERING

_____

| | |
|---|---|
| Thomas R. McCarthy | Heather S. Meingast (P55439) |
| Gilbert C. Dickey | Erik A. Grill (P64713) |
| Conor D. Woodfin | Assistant Attorneys General |
| 1600 Wilson Blvd, Suite 700 | PO Box 30736 |
| Arlington, Virginia 22209 | Lansing, Michigan 48909 |
| 703.243.9423 | 517.335.7659 |
| tom@consovoymccarthy.com | meingasth@michigan.gov |
| gilbert@consovoymccarthy.com | grille@michigan.gov |
| conor@consovoymccarthy.com | |

_____/

**DEFENDANTS SECRETARY OF STATE JOCELYN BENSON AND
DIRECTOR OF ELECTIONS JONATHAN BRATER'S BRIEF IN SUPPORT
OF MOTION TO DISMISS**

Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Defendants
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659
Email:  grille@michigan.gov
(P64713)

Dated:  April 15, 2024

# TABLE OF CONTENTS

Page

Table of Contents ........................................................................................... i

Index of Authorities .................................................................................... iii

Concise Statement of Issues Presented .................................................... vii

Introduction ................................................................................................. 1

Statement of Facts ....................................................................................... 2

    A.    Overview of the National Voter Registration Act's list maintenance requirements. ..................................................... 2

    B.    Michigan's general program for the removal of ineligible voters from the official list of registered voters. ................................. 7

        1.    Program for removing deceased voters ........................................ 7

        2.    Program for removing voters who have changed address .......... 9

        3.    Michigan's program will remove over one million voters from its registration list. ...................................................... 12

    C.    Plaintiffs' notice of violation ................................................... 13

    D.    Defendants' response to Plaintiffs' notice ............................. 14

Standard of Review ................................................................................... 17

Argument .................................................................................................... 19

I.    Plaintiffs lack standing to bring their claim that Defendants are in violation of the National Voter Registration Act. ........................... 19

    A.    The individual Plaintiffs' alleged election integrity and vote dilution injuries are speculative, generalized non-cognizable grievances. ........................................................................ 20

    B.    Plaintiff Republican National Committee has not alleged a cognizable diversion-of-resources injury. ............................. 23

II.    Plaintiffs fail to state a claim against Defendants for a violation of the National Voter Registration Act's list maintenance requirements. .............. 26

i

A.    Plaintiffs fail to state a viable claim that Michigan has failed to conduct a general program that makes a reasonable effort to remove the names of ineligible voters from official lists. ..................... 26

B.    Defendants' response letter shows that Plaintiffs fail to state a plausible claim for a violation of the National Voter Registration Act. .................................................................................................. 31

Conclusion and Relief Requested ................................................................ 35

# INDEX OF AUTHORITIES

Page

**Cases**

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242 (11th Cir. 2005)...... 19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)........................................................................ 18

*Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426 (6th Cir. 2008) ............. 31, 32

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................... 18

*Bellitto v. Snipes*, 935 F.3d 1192 (11th Cir. 2019)..................................................... 28

*Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855 (6th Cir. 2020) ........................... 25

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ................................................. 25

*Coal Operators and Assocs., Inc. v. Babbitt*, 291 F.3d 912 (6th Cir. 2002) .............. 19

*Coyne v. Amer. Tobacco Co.*, 183 F.3d 488 (6th Cir. 1999) ....................................... 19

*Daunt v Benson*, 1:20-cv-522 (W.D. Mich. 2020) ....................................................... 13

*Diamond v. Charles*, 476 U.S. 54 (1986)..................................................................... 21

*Donald J. Trump for President, Inc., v. Boockvar*, 493 F. Supp. 3d 331 (W.D.
   Pa. 2020)................................................................................................................ 22

*Glennborough Homeowners Ass'n v. United States Postal Serv*, 21 F.4th 410
   (6th Cir. 2021) ....................................................................................................... 21

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)............................................. 23

*Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587 (2007) ........................... 21

*Hotze v. Hudspeth*, 16 F.4th 1121 (5th Cir. 2021) ...................................................... 22

*Husted v. A. Philip Randolph*, 138 S. Ct. 1833 (2018) ................................................ 5

*Johnson v. Bredesen*, 356 F. App'x 781 (6th Cir. 2009)............................................. 22

*Ladies Mem'l Ass'n, Inc. v. City of Pensacola, Fla.,* 34 F.4th 988 (11th Cir.
   2022) ...................................................................................................................... 21

*Lance v. Coffman*, 549 U.S. 437 (2007) ....................................................... 21

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ................................... 19, 23

*Lyshe v. Levy*, 854 F.3d 855 (6th Cir. 2017) ................................................. 17

*O'Rourke v. Dominion Voting Sys. Inc.*, No. 20-CV-03747-NRN, 2021 WL
    1662742 (D. Colo. Apr. 28, 2021) ............................................................ 23

*Online Merchants Guild v. Cameron*, 995 F.3d 540 (6th Cir. 2021) .......... 25

*Public Int. Legal Found. v. Benson*, __ F. Supp. 3d __ (W.D. Mich., 2024) .......... 9, 27

*Public Interest Legal Foundation v. Boockvar*, 495 F. Supp. 3d 354 (M.D.
    Penn., Oct. 20, 2020) ................................................................................ 28

*RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125 (6th Cir. 1996) ......... 18

*Rogers v. Stratton Indus.*, 798 F.2d 913 (6th Cir. 1986) ............................. 18

*Rondigo, LLC v. Twp. of Richmond*, 641 F.3d 673 (6th Cir. 2011) ............. 31

*Santos v. Dist. Council of N.Y.C. & Vicinity of United Brotherhood of
    Carpenters & Joiners of Am., AFL-CIO*, 547 F.2d 197 (2d Cir. 1977) .......... 21

*Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208 (1974) ............. 20, 23

*Shelby Advocates for Valid Elections v. Hargett,* 947 F.3d 977 (6th Cir. 2020) ........ 24

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ........................................... 19

*Taylor v. KeyCorp.*, 680 F.3d 609 (6th Cir. 2012) ...................................... 19

*Total Benefits Planning Agency v. Anthem Blue Cross & Blue Shield*, 552
    F.3d 430 (6th Cir. 2008) ..................................................................... 18, 31

*Valley Forge Christian College v. Americans United for Separation of Church
    & State, Inc.*, 454 U.S. 464 (1982) ......................................................... 20

*Weiner v. Klais & Co.*, 108 F.3d 86 (6th Cir. 1997) ................................... 31

*Whitmore v. Arkansas,* 495 U.S. 149 (1990) ............................................... 20

*Wood v. Raffensperger*, 981 F.3d 1307 (11th Cir. 2020) ........................... 23

**Statutes**

Mich. Comp. Laws § 168.1 ................................................................................ 7

Mich. Comp. Laws § 168.492a ................................................................................ 3

Mich. Comp. Laws § 168.509 ................................................................................... 6

Mich. Comp. Laws § 168.509aa ............................................................. 10, 15, 33

Mich. Comp. Laws § 168.509aa(1) ..................................................................... 10

Mich. Comp. Laws § 168.509aa(4) ..................................................................... 10

Mich. Comp. Laws § 168.509aa(5) ............................................................... 10, 15

Mich. Comp. Laws § 168.509dd(1) ..................................................................... 12

Mich. Comp. Laws § 168.509dd(3) ..................................................................... 12

Mich. Comp. Laws § 168.509m .............................................................................. 7

Mich. Comp. Laws § 168.509o ........................................................................... 6, 7

Mich. Comp. Laws § 168.509o(5) .......................................................................... 9

Mich. Comp. Laws § 168.509p ............................................................................... 6

Mich. Comp. Laws § 168.509q ............................................................................... 6

Mich. Comp. Laws § 168.509r ............................................................................... 6

Mich. Comp. Laws § 168.509r(5) ........................................................................ 11

Mich. Comp. Laws § 168.509r(6) ........................................................................ 11

Mich. Comp. Laws § 168.509r(7) ........................................................................ 11

Mich. Comp. Laws § 168.509r(8) ........................................................................ 11

Mich. Comp. Laws § 168.509z(a) .......................................................................... 9

Mich. Comp. Laws § 168.509z(b) .......................................................................... 9

Mich. Comp. Laws § 168.510 ................................................................................. 8

Mich. Comp. Laws § 333.2815 ............................................................................... 8

Mich. Comp. Laws § 333.2833 ............................................................................... 8

Mich. Comp. Laws § 333.2804(4) .......................................................................... 8

Mich. Comp. Laws, § 168.509n ........................................................................ 7

**Other Authorities**

52 U.S.C. § 20507(a)(2) ................................................................................... 3

52 U.S.C. § 20507(a)(3) ................................................................................... 3

52 U.S.C. § 20507(b)(1) ................................................................................... 3

52 U.S.C. § 20507(b)(2) ................................................................................... 4

52 U.S.C. § 20507(c)(1) ................................................................................... 5

52 U.S.C. § 20507(d)(1) ................................................................................... 5

52 U.S.C. § 20507(d)(3) ................................................................................... 5

52 U.S.C. § 20510(b)(1) ................................................................................. 20

52 U.S.C. § 21083(a)(2)(B)(ii) ........................................................................ 6

**Rules**

Fed. R. Civ. P. 12(b)(6) .................................................................................. 31

**Constitutional Provisions**

Mich. Const. 1963, Art. II, § 2 ......................................................................... 3

**CONCISE STATEMENT OF ISSUES PRESENTED**

1.     Whether Plaintiffs have failed to allege an injury in fact sufficient to support standing under Article III?

2.     Whether Plaintiffs have failed to state a claim for a violation of the National Voter Registration Act?

## INTRODUCTION

Filed on the heels of this Court's opinion in *Public Interest Legal Foundation v. Benson*, this suit is yet another claiming that Michigan's program for removing ineligible voters from the state's voter registration list is not "reasonable" as required by the National Voter Registration Act (NVRA).  But Plaintiffs, two individual voters and the Republican National Committee, do not dispute that Michigan has a general program for removing ineligible voters, and they do not even dispute that Michigan's program has removed nearly one million registrations since 2019.  Instead, Plaintiffs vaguely allege that Michigan's program has failed to remove some unknown quantity of ineligible voters, and that Michigan simply should be cancelling more registrations.  Plaintiffs' claims lack merit.

As a threshold matter, Plaintiffs do not have standing to bring their claims because they have not alleged an actual or imminent injury that is concrete and particularized, rather than speculative.  But regardless, Plaintiffs do not allege that they are able to identify even one single ineligible voter who should have been cancelled under the NVRA.  Instead, their claims are based upon a questionable interpretation of federal Census data to calculate percentages of total registered voters in Michigan counties versus the voting-age population in those same counties.  Plaintiffs' complaint, however, fails to articulate any specific defect in Michigan's program, and does not demand that this Court require Defendants to implement any particular improvements to the program.  In short, Plaintiffs' complaint fails to say what is wrong with Michigan's program, or how they think it could be improved to capture more ineligible registrants.

Perhaps most alarmingly, Plaintiffs' complaint fails to address—let alone refute—the specific responses Defendants provided to Plaintiffs notice letter.  In that response, Michigan's Director of Elections specifically addressed Plaintiffs' concerns, explained the components and processes of Michigan's program for removing ineligible voters, and provided more accurate and precise information on the percentages of active voter registrations in each of the counties Plaintiffs identified in their letter.  Plaintiffs have not disputed the Director's responses in their allegations, and they have made no apparent effort to reconcile their claims with the information provided by Defendants.

For these reasons, Plaintiffs' complaint should be dismissed based on lack of standing and Plaintiffs failure to state a viable claim under the NVRA.

## STATEMENT OF FACTS

### A.   Overview of the National Voter Registration Act's list maintenance requirements.

The NVRA was enacted "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," "to make it possible for Federal, State and local governments to implement this Act in a manner that enhances the participation of eligible citizens as voters for Federal office," "to protect the integrity of the electoral process," and "to ensure that accurate and current voter registration rolls are maintained."  52 U.S.C. § 20501(b). Section 8 of the NVRA, codified in 52 U.S.C. § 20507, provides several procedures or other requirements to be carried out by participating states with respect to the

administration of voter registration.  This includes efforts aimed at insuring "each eligible applicant" is registered to vote in an election and taking precautions against hasty removals of registrants from voter rolls.

Section 8 of the NVRA requires a state to notify voters of the disposition of an application for registration, 52 U.S.C. § 20507(a)(2), and prohibits the removal of a name of a registrant except in narrow circumstances, i.e., at the registrant's request, "by reason of criminal conviction or mental incapacity,"[1] or through a "general program that makes reasonable efforts to remove" the names of voters rendered ineligible by death or upon a change of address.  52 U.S.C. § 20507(a)(3), (4).

The NVRA does not require states to comply with any particular program or to immediately remove every voter who may have become ineligible.  Rather, a state must "conduct a general program that makes a *reasonable effort* to remove the names of ineligible voters from the official lists of eligible voters by reason of: (A) the death of the registrant; or (B) a change in the residence of the registrant, in accordance with subsections (b), (c), and (d) [of]"  52 U.S.C. § 20507(a)(4)(A)-(B) (emphasis added).

Subsection (b) requires that the program implemented to remove voters under subsection (a)(4) be a "nondiscriminatory" program, 52 U.S.C. § 20507(b)(1),

---

[1] Michigan law prohibits both registering to vote and voting by persons while serving sentences of imprisonment, Mich. Const. 1963, Art. II, § 2, Mich. Comp. Laws §§ 168.492a, 168.758b, but does not require that previously existing registrations be canceled upon incarceration.

and "shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote" except:

> (i)    (2) . . . that nothing in this paragraph may be construed to prohibit a State from using the procedures described in subsections (c) and (d) to remove an individual from the official list of eligible voters if the individual) has not either notified the applicable registrar . . . or responded during the period described in subparagraph (B) to the notice sent by the applicable registrar; and then

> (B) has not voted . . . in 2 or more consecutive general elections for Federal office. [52 U.S.C. § 20507(b)(2).]

With respect to any removal program, however, a state must generally complete any program to remove voters from official lists not later than 90 days before a primary or general election for Federal office[2]:

> (2)(A) A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to *systematically remove* the names of ineligible voters from the official lists of eligible voters.

> (B) Subparagraph (A) shall not be construed to preclude

> (i) the removal of names from official lists of voters on a basis described in paragraph (3)(A) or (B) or (4)(A) of subsection (a); . . . . [Emphasis added.]

Subsection (c)(1) sets forth an example of a program for the removal of ineligible voters from the registry that is based on using "change-of-address

---

[2] For this election cycle, the ninetieth day before the August 6, 2024, primary is May 8, 2024, and the ninetieth day before the November 5, 2024, general election is August 7, 2024.  Given these dates, systematic removals must cease by May 8 until after the November election.

information supplied by the Postal Service[.]"  52 U.S.C. § 20507(c)(1).  A state *may* comply by utilizing change-of-address information from the United States Postal Service; however, this is not the only way by which a state can achieve compliance. *Husted v. A. Philip Randolph*, 138 S. Ct. 1833, 1847 (2018).  Thus, under subsection (c), a state may implement a program described in subsection (c)(1), or a state may craft its own voter removal program in order to comply with subsection (a)(4).

Subsection (d) addresses the removal of names from the official registration list. Subsection (d)(1) sets forth a prohibition with two exceptions. The statute prohibits a state from removing the name of a registrant on the grounds of a change of residence unless one of two situations exists:  *First*, where the registrant confirms in writing that the registrant has moved out of the registrar's jurisdiction. *Second*, where the registrant fails to respond to a specific type of notice sent by the registrar in conformity with subsection (d)(2), and the registrant has not voted in the previous two general elections following the transmission of the notice to the registrant.  52 U.S.C. § 20507(d)(1)-(2).  If a registrar receives change of residence information under (d)(1) and (2), the registrar "shall correct" the voter registration list.  52 U.S.C. § 20507(d)(3).  But if confirmation is not received, there is a time-lag built into the statute before a voter's name may be removed.  Specifically, a state must have either written confirmation that the registrant has changed residence to a location outside of his/her jurisdiction, or two federal elections have passed without the registrant voting during this period of time, the registrant received

notice that s/he would be removed from the official voter file if s/he did not confirm an accurate address and registration information.  52 U.S.C. § 20507(d)(1)-(2).

In addition to NVRA, the federal Help America Vote Act (HAVA) of 2002 provides that "each State . . . shall implement, in a uniform and nondiscriminatory manner, a single, uniform, official, . . . computerized statewide voter registration list . . . that contains the name and registration information of every legally registered voter in the State. . . ."  52 U.S.C. § 21083(a)(1)(A).  Moreover, § 21083(a)(1)(A)(viii) states that "the computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State."  Michigan complied with these requirements long ago when it created the qualified voter file (QVF) as the State's electronic statewide voter registration list.  Mich. Comp. Laws §§ 168.509m(1)(a), 168.509o, 168.509p, 168.509q, 168.509r.  Michigan currently has over 8 million total registered voters (including inactive voters) in the QVF.[3]  HAVA further requires that "the list maintenance performed . . . shall be conducted in a manner that ensures that . . . only voters who are not registered or who are not eligible to vote are removed from the computerized list."  52 U.S.C. § 21083(a)(2)(B)(ii).  Additionally, § 21083(a)(4)(B) of HAVA provides that "the State election system shall include provisions to ensure that voter registration records are accurate and are updated regularly, including . . . safeguards to ensure that eligible

---

[3] *See* Michigan Department of State, Bureau of Elections, Voter registration statistics, available at Voter registration statistics (state.mi.us).

voters are not removed in error from the official list of eligible voters."  The HAVA
provisions essentially parallel or incorporate NVRA.

> **B.  Michigan's general program for the removal of ineligible voters from the official list of registered voters.**

After NVRA was enacted, Michigan made a significant number of
amendments to the Michigan Election Law, Mich. Comp. Laws § 168.1 *et seq*., to
incorporate or come into compliance with its requirements.  Most of these changes
to the law originated in 1994 P.A. 441.[4]  Section 509n makes the Secretary of State
responsible for coordinating the requirements under NVRA.  Mich. Comp. Laws §
168.509n.  The Department of State's website includes a comprehensive description
of Michigan's list maintenance activities.[5]

> **1.  Program for removing deceased voters**

With respect to the removal of deceased voters, section 509o requires the
Secretary of State to "develop and utilize a process by which information obtained
through the United States Social Security Administration's death master file that is
used to cancel an operator's or chauffeur's license . . . or an official state personal
identification card . . . of a deceased resident of this state is also used at least once a
month to update the qualified voter file to cancel the voter registration of any
elector determined to be deceased."  Mich. Comp. Laws § 168.509o(4).  The

---

[4] *See generally*, Mich. Comp. Laws §§ 168.509m, 509n, 509o, 509p, 509q, 509r, 509t, 509u, 509v, 509w, 509x, 509z, 509aa, 509bb, 509cc, 509dd, 509ee, 509ff, and 509gg.
[5] *See* Michigan Department of State, Voter registration cancellation procedures, available at Voter registration cancellation procedures (michigan.gov) (accessed April 15, 2024).

Secretary must also "make the canceled voter registration information . . . available to the clerk of each city or township to assist with the clerk's obligations under section 510." (*Id.*)  Under section 510, "[a]t least once a month, the county clerk shall forward a list of the last known address and birth date of all persons over 18 years of age who have died within the county to the clerk of each city or township within the county.  The city or township clerk shall compare this list with the registration records and cancel the registration of all deceased electors."  Mich. Comp. Laws § 168.510.  County clerks act as the local registrar for purposes of maintaining vital records and statistics, such as deaths.  Mich. Comp. Laws §§ 333.2804(4), 333.2815, 333.2833.  Based on these laws, each week the Michigan Department of State uses information from the Social Security Death index to cancel the records of individuals in the QVF who have died.[6]  The state also uses death information received from the Electronic Registration Information Center (ERIC), a bipartisan group of states and Washington, DC, who share voter registration data with each other for the purpose of keeping voter rolls complete, up to date, and accurate.[7]

This Court recently reviewed Michigan's program for removing deceased voters from the QVF, concluding that it was reasonable and rejecting a challenge that it violated the NVRA.  *See Public Int. Legal Found. v. Benson*, __ F. Supp. 3d __

---

[6] *See* Michigan Department of State, Bureau of Elections, Voter registration cancellation procedures (michigan.gov) (accessed April 15, 2024.)
[7] *Id.*

(W.D. Mich., 2024); 2024 WL 1128565 (March 1, 2024), appeal filed, *Public Int.*

*Legal Found. v. Benson*, 6th Circuit Case No. 24-1255.

> ### 2.      Program for removing voters who have changed address

As to changes of address, section 509z requires the Secretary to "notify each
clerk of the following information regarding residents or former residents of the
clerk's city or township . . . [d]river license or state personal identification card
changes of address received by the secretary of state, and whether the person
submitted an application for the new address."  Mich. Comp. Laws § 168.509z(a).
The Secretary must also provide the "names and addresses in this state of persons
who have been issued a driver license in another state."  Mich. Comp. Laws §
168.509z(b).  These sections are consistent with section 509o(5), which requires the
Secretary to "participate with other states in 1 or more recognized multistate
programs or services . . . to assist in the verification of the current residence and
voter registration status of electors."  Mich. Comp. Laws § 168.509o(5).  The
Secretary must then "follow the procedures under section 509aa(5) with regard to
any electors affected by information obtained through any multistate program or
service."  (*Id.*)  As with deceased voters, the Department of State receives
information from ERIC that a voter has registered in another state, which
information is used to commence the cancellation process for that voter.[8]

---

[8] *See* Michigan Department of State, Bureau of Elections, Voter registration
cancellation procedures (michigan.gov) (accessed April 15, 2024.)

Under section 509aa, a "clerk may use change of address information supplied by the United States postal service or other reliable information received by the clerk that identifies registered voters whose addresses may have changed as provided in this section."  Mich. Comp. Laws § 168.509aa(1).  Section 509aa goes on to provide for how a clerk must proceed if the clerk receives "reliable information" that a voter has "moved his or her residence" either "within the city or township," § 509aa(2)(a)-(c), or "to another city or township," § 509aa(3)(a)-(c). In both cases, the voter must be sent a notice that requests the voter to verify or correct the address information within 30 days before the next election.  If notices are returned as undeliverable to the issuing clerk under either § 509aa(2) or (3), "the clerk shall identify the registration record of a voter as challenged[.]"  Mich. Comp. Laws § 168.509aa(4).  Similarly, subsection 509aa(5) provides that "[i]f the department of state receives notice that a registered voter has moved out of state by receiving a surrendered Michigan driver license of that registered voter, the secretary of state shall send" to the voter notice that requests the voter to verify or correct the address information within 30 days before the next election.  Mich. Comp. Laws § 168.509aa(5).  For voters who receive notices under § 509aa(3) (in-state move to another jurisdiction) or § 509aa(5) (out-of-state move), the voters must receive information that their registrations will be cancelled after the second November

general election after which the notice was sent.[9]  The sending of these notices to these voters starts the cancellation countdown clock running.[10]

Section 509r(5) further provides that the Secretary must create and maintain "an inactive voter file."  Mich. Comp. Laws § 168.509r(5).  Section 509r provides that voters who fail to vote for 6 years or confirm residency information must be placed in the inactive file:

> (6) If an elector is sent a notice under section 509aa to confirm the elector's residence information or if an elector does not vote for 6 consecutive years, the secretary of state shall place the registration record of that elector in the inactive voter file. The registration record of that elector must remain in the inactive voter file until 1 of the following occurs:
>
>   (a) The elector votes at an election.
>
>   (b) The elector responds to a notice sent under section 509aa.
>
>   (c) Another voter registration transaction involving that elector occurs. [Mich. Comp. Laws § 168.509r(6).]

However, "[w]hile the registration record of an elector is in the inactive voter file, the elector remains eligible to vote and his or her name must appear on the precinct voter registration list."  Mich. Comp. Laws § 168.509r(7).  But if a voter on the inactive voter file "votes at an election by absent voter ballot, that absent voter ballot must be marked in the same manner as a challenged ballot . . . ."  Mich. Comp. Laws § 168.509r(8).

---

[9] A list of voters who have received notices under section 509aa must be made available for inspection by the Secretary and/or local clerks.  Mich. Comp. Laws § 168.509ff(1)-(2).

[10] *See* Election Officials' Manual, Chapter 2, Voter Registration, pp 15-22, available at  https://www.michigan.gov/documents/sos/II_Voter_Registration_265983_7.pdf, (accessed April 15, 2024).

In addition, local clerks are authorized to conduct programs to remove names from the QVF.  Section 509dd provides that a "clerk may conduct a program . . . to remove names of registered voters who are no longer qualified to vote in the city or township from the registration records of that city or township."  Mich. Comp. Laws § 168.509dd(1).  Such a program must be uniformly administered and comply with the NVRA, including the requirement that any program be concluded 90 days or more before a federal election, except for removals done at the request of the voter, upon the death of a voter, or upon notice that the voter has moved and registered in a different jurisdiction.  Mich. Comp. Laws § 168.509dd(1), (2)(a)-(c).  To conduct a removal program, a local clerk may conduct a house-to-house canvass, send a general mailing to voters for address verifications, participate "in the national change of address program established by the postal service," or "other means the clerk considers appropriate."  Mich. Comp. Laws § 168.509dd(3).

### 3.   Michigan's program will remove over one million voters from its registration list.

Since 2019 the Bureau of Elections, in conjunction with local clerks, have engaged in rigorous list maintenance practices under the Secretary of State's supervision.[11]  As a result, as of March 2024, more than 800,000 voter registrations have been cancelled.[12] This includes 532,513 registrations of deceased voters, 273,609 registrations of voters who received the required notice under NVRA, and

---

[11]  *See* Department of State, Voter registration cancellation procedures (michigan.gov) (accessed April 15, 2024).

[12] *Id.*

12

16,716 registrations of voters who requested to have their own records cancelled.[13]
And as of the date of this filing, another 360,228 voters are slated for cancellation in
2025, and 201,805 voters are slated for cancellation in 2027.[14]  These numbers will
continue to climb upward as more voters are added to the cancellation lists.  The
large numbers of cancellations slated for 2025 are largely attributable to a
statewide election mailing conducted by Secretary Benson in 2020—the first such
effort by a Secretary of State in over a decade.[15]  Indeed, in recognition of the
Secretary's commitment to robust list maintenance, the plaintiff in a similar NVRA
lawsuit filed in 2020 agreed to dismiss his case.  (Ex. 1, 2/16/21 Stipulation of
Dismissal, *Daunt v. Benson*, 1:20-cv-522 (W.D. Mich. 2020)).

### C.   Plaintiffs' notice of violation

In the complaint, Plaintiffs identify the purported notice provided to
Defendants under NVRA as a letter they sent on December 8, 2023.  (ECF 1,
PageID.17-18, ¶83-90.)  Plaintiffs attached a copy of the letter as Exhibit A to their
complaint.  (ECF 1, PageID.17, ¶83; ECF 1-1, PageID.22-28.)  The complaint alleges
that the letter notified Defendants of "78 Michigan counties that are in violation of
section 8," and requested that the Defendants "correct the violations within 90
days."  (ECF 1, PageID.17, ¶83.)  In Section II of their letter, Plaintiffs stated that

---

[13] *Id.*

[14] *See* Department of State, Voter registration statistics (state.mi.us) (accessed April
15, 2024.)

[15] *See* Department of State, Voter registration cancellation procedures
(michigan.gov) (accessed April 15, 2024).

"Comparing the registered active voter count to the 2021 Census data reveals that these 55 counties have voter registration rates at or above 100 percent," and then listed each of the 55 counties with purported percentages of voter registration at or over 100 percent.   (ECF 1-1, PageID.25-26.)  Later in the letter Plaintiffs further claimed that an additional 23 counties had "registration rates of 90 percent or greater," and similarly listed 23 counties with registration rates supposedly no less than 95 percent.  (ECF 1-1, PageID.26.)  Plaintiffs' letter concluded that, "Discrepancies on this scale cannot be attributed to above-average voter participation and instead point to a deficient list maintenance."  (ECF 1-1, PageID.26.)  Plaintiffs' letter asked that the Defendants, "respond in writing within 45 days of the date of this letter."  (ECF 1-1, PageID.26.)

### D.   Defendants' response to Plaintiffs' notice

On December 28, 2023—only twenty days after Plaintiffs' letter, and more than three months before Plaintiffs filed this lawsuit—Defendants responded to Plaintiffs' letter.  (Ex. 2, 12/28/23 NVRA Response Letter).  In that letter, Defendants provided a detailed description of Michigan's general program for the removal of ineligible voters from the state's voter registration list.  (Ex. 2, p 2-3.)  In addition, Defendants' response provided specific discussion of steps taken to cancel the registrations of hundreds of thousands of registrations since 2019, including sending absentee ballot applications to every registered voter in Michigan—the first statewide mailing in at least a decade. (Ex. 2, p 3).  This mailing allowed state and local election officials to identify a significant number of registered voters who

14

appeared to have changed address. (Ex. 2, p 3).  Any registered voter whose
application was returned as undeliverable was sent a confirmation notice to start
the cancelation process. (Ex. 2, p 3).  Under both the NVRA and Michigan Election
Law, if these registered voters do not respond, vote, or otherwise update their
registration information, their voter registration at that location will be canceled
following the second November federal election. MCL 169.509aa(3).

Between the November 2020 and November 2022 elections approximately
400,000 registered voters were sent notices and slated for cancellation in 2025 after
the state received reliable information of a change of address.  This figure was
higher than other cycles as a result of absentee ballot applications from the 2020
mailing being returned as undeliverable.  (Ex. 2, p 3.)  Some of these individuals
have since been cancelled for other reasons (confirmed change of residency, death,
etc.) or been removed from the cancellation list by confirming residency or engaging
in voting activity.  The remaining individuals will have their voter registration
canceled in 2025 if they do not have any voting activity by the federal November
2024 election or notify the Department of their intent to remain registered at the
current address.  (Ex. 2, p 3.)

Further, the response stated that Michigan uses data received from ERIC to
update voter registrations.  (Ex. 2, p 4.)  Next, the response letter described
Michigan' automatic voter registration law, Mich. Comp. Laws § 168.509aa(5),which
provides that the cancellation process is also initiated if a voter surrenders their
driver's license or moves out of state.  (Ex. 2, p 4.)  Defendants' response also

15

referred to processes involving the cooperation of the State of Michigan, Social Security Administration, local clerks, and ERIC that identify and cancel the names of deceased and duplicate voters.  (Ex. 2, p 4.)

Of particular relevance, the Defendants' response squarely rebutted Plaintiffs' claims about "unusually high" voter registrations and explained that the conclusions in Plaintiffs' letter were not supported by the data.  First, Defendants explained that some of the limitations of using Census data, which "provides a 'snapshot' of where people are currently living but is not necessarily indicative of where they are legally allowed to be registered to vote."  (Ex 2, p 4).  Moreover, the response explained that Plaintiff's methodology for determining the number of registered voters was flawed, and provided accurate percentages:

> Notwithstanding the limitations of using census data to estimate the total eligible population stated above, the total active voter registration number in Michigan is approximately 88 percent of [Plaintiffs'] figure. *Additionally, even using this methodology, and when utilizing the "active" voter registration data available on the Secretary of State's website, none of the counties identified in your letter have active voter registration percentages above 100%.* The actual active voter registration of the counties alleged in your letter to be over 100% is as follows:

| Allegan | 93% | Kalamazoo | 87% | Muskegon | 91% |
|---------|-----|-----------|-----|----------|-----|
| Bay | 92% | Kent | 89% | Oakland | 89% |
| Berrien | 90% | Lapeer | 94% | Ottawa | 89% |
| Calhoun | 91% | Lenawee | 86% | Saginaw | 90% |
| Clinton | 91% | Livingston | 95% | St. Clair | 93% |
| Eaton | 91% | Macomb | 91% | Shiawassee | 94% |
| Genesee | 94% | Marquette | 85% | Van Buren | 90% |
| Grand Traverse | 94% | Midland | 91% | Washtenaw | 83% |
| Jackson | 86% | Monroe | 91% | Wayne | 88% |

> *The numbers used by the Republican National Committee include both active and inactive registered voters.* But the State of Michigan cannot remove inactive voters without following the requirements in both NVRA and HAVA. Following the process established in the Michigan Election Law, in compliance with NVRA, an estimated 521,116 voter registrations will be canceled in 2025.[16]

(Ex 2, p 4-5) (emphasis added) (footnotes omitted).

Despite Defendant's response, on March 13, 2024, Plaintiffs filed this lawsuit. The complaint makes no allegations refuting or contradicting Defendants' description of Michigan's removal program, the steps Michigan has taken and will take to remove ineligible voters from Michigan's QVF or disputing whether the numbers used in Plaintiffs' letter included both active and inactive voters. Rather, Plaintiffs allegations simply mirror the claims made in their December 8, 2023, letter.

## STANDARD OF REVIEW

Whether a party has Article III standing is properly an issue of a court's subject matter jurisdiction under Rule 12(b)(1). *See Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017). Unlike a motion to dismiss for failure to state a claim under Rule 12(b)(6), "where subject matter jurisdiction is challenged under Rule 12(b)(1)[,] ...

---

[16] After the date of their response letter, the Defendants discovered a display error in the Michigan Voter Information Center website that caused all voters on the cancellation countdown (i.e. those slated for cancellation in 2025 or 2027) to display as being slated for cancellation in 2025. The information was always correct in the QVF database but was not correctly displayed on the website. The incorrect number of cancellations slated for 2025 was cited on pages 3 and 5 of Defendants' response. The error on the website has been corrected, and the information currently displayed is accurate. (Source: https://mvic.sos.state.mi.us/VoterCount/Index) (last accessed April 15, 2024).

the plaintiff has the burden of proving jurisdiction in order to survive the motion." *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996) (quoting *Rogers v. Stratton Indus.*, 798 F.2d 913, 915 (6th Cir. 1986)) (emphasis omitted).

When considering a 12(b)(6) motion to dismiss for failure to state a claim, although the Court should presume that all well-pleaded material allegations of the complaint are true, *see Total Benefits Planning Agency v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008), "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotations omitted). Moreover, the court need not accept as true legal conclusions or unwarranted factual inferences. *Total Benefits*, 552 F.3d at 434.

To survive dismissal, the plaintiff's claim must be plausible. *Bell Atl. Corp.*, 550 U.S. at 555. The inquiry as to plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). Thus, in evaluating the sufficiency of a plaintiff's pleadings, this Court may make reasonable inferences in the non-moving party's

favor, "but [this Court is] not required to draw [P]laintiffs' inference." *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005).

## ARGUMENT

**I.   Plaintiffs lack standing to bring their claim that Defendants are in violation of the National Voter Registration Act.**

When plaintiffs lack standing, this Court lacks jurisdiction and dismissal is warranted under Fed. R. Civ. P. 12(b)(1). *Taylor v. KeyCorp.*, 680 F.3d 609, 612-13 (6th Cir. 2012). "[T]he standing requirement limits federal court jurisdiction to actual controversies so that the judicial process is not transformed into a 'vehicle for the vindication of the value interests of concerned bystanders.'" *Coal Operators and Assocs., Inc. v. Babbitt*, 291 F.3d 912, 915-16 (6th Cir. 2002) (quoting *Coyne v. Amer. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999) (internal citations and quotations omitted.)).

A plaintiff can satisfy this requirement only by "clearly … alleg[ing] facts demonstrating" that: (1) he suffered an injury-in-fact; (2) such injury is "fairly traceable to the challenged conduct" of a named-defendant; and (3) such injury is "likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547-48 (2016) (internal quotations omitted). These elements are "not mere pleading requirements," but an "indispensable part of plaintiff's case[.]" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992). The NVRA also includes an additional requirement to invoke this Court's jurisdiction. Specifically, Congress authorized a private cause of action only by a person "aggrieved by a violation of [the NVRA]" and who provides "written notice of the violation to the chief election

official of the State involved." 52 U.S.C. § 20510(b)(1). Where, as here, Plaintiff's allegations fail to satisfy these elements, this Court is "powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Whitmore v. Arkansas,* 495 U.S. 149, 155-56 (1990).

### A. The individual Plaintiffs' alleged election integrity and vote dilution injuries are speculative, generalized non-cognizable grievances.

The complaint is void of any factual allegations supporting a finding that Plaintiffs "personally ha[ve] suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982) (internal quotations and citations omitted). Federal courts have "emphasized repeatedly" that the "injury-in-fact" element requires allegations of an injury that is "distinct and palpable" with respect to the Plaintiff and based on "actual or imminent" alleged harm. *Whitmore*, 495 U.S. at 155-56 (internal citations and quotations omitted). Allegations of a "conjectural, hypothetical or speculative" harm are not sufficient. *Id.* Nor is it sufficient to allege an abstract injury which, if it even materialized, would be shared by all citizens. *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216-17 (1974).

The individual Plaintiffs, Jorritsma and Silvernail, assert only generalized grievances that do not satisfy Article III standing principles. They first allege that they "reasonably fear[ ] that ineligible voters can and do vote in Michigan elections,"

which "undermine[s] their confidence in the integrity of Michigan elections."  (ECF No. 1, Compl., PageID.5, ¶¶ 19, 22.)

This "fear" of unlawful voting, however, is the type of psychic injury that "falls well short of a concrete harm needed to establish Article III standing." *Glennborough Homeowners Ass'n v. United States Postal Serv*, 21 F.4th 410, 415 (6th Cir. 2021); cf.  *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 619–20 (2007) (Scalia, J., concurring) (recognizing that a plaintiff whose only injury is subjective mental angst "lacks a concrete and particularized injury" under Article III).  *See also Ladies Mem'l Ass'n, Inc. v. City of Pensacola, Fla.,* 34 F.4th 988, 993 (11th Cir. 2022) ("purely psychic injuries, like disagreeing with government action, are not concrete, so they do not give rise to standing.") (citing *Diamond v. Charles*, 476 U.S. 54, 67 (1986).); *Santos v. Dist. Council of N.Y.C. & Vicinity of United Brotherhood of Carpenters & Joiners of Am., AFL-CIO,* 547 F.2d 197, 200 (2d Cir. 1977) (explaining that "disappointment" in election results is "an emotional loss insufficient to establish standing" (internal quotation marks and citation omitted)).

Likewise, their subjective fear or concern regarding the integrity of Michigan elections is the type of generalized grievance that inures to all Michigan residents and thus fails to demonstrate a particularized injury for purposes of standing.  *See*, *e.g*, *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam) (a plaintiff who is "claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large ... does not state an Article III case or

21

controversy."); *Johnson v. Bredesen*, 356 F. App'x 781, 784 (6th Cir. 2009) ("The Supreme Court has long held that a plaintiff does not have standing 'to challenge laws of general application where their own injury is not distinct from that suffered in general by other taxpayers or citizens.'"); *Hotze v. Hudspeth*, 16 F.4th 1121, 1124 (5th Cir. 2021) (generalized grievance where "plaintiffs asserted ... that drive-thru voting hurt the 'integrity' of the election process").

Plaintiffs attempt to support their fears with speculative claims about voter fraud.  They cite generic statements concerning voter fraud from courts outside this circuit and the dated Carter-Baker Commission report's statements that inaccurate voter lists could invite fraud.  (ECF No. 1, PageID.8-9, ¶¶ 36-37.)  But Plaintiffs do not relate these cases or statements to Michigan's list maintenance programs or plausibly allege that voter fraud resulting from poor list-maintenance presently exists in Michigan.  Merely invoking "the possibility and potential for voter fraud," based only on "hypotheticals, rather than actual events," does not suffice.  *Donald J. Trump for President, Inc., v. Boockvar*, 493 F. Supp. 3d 331, 406 (W.D. Pa. 2020). Further, none of the handful of fraud cases in Michigan that Plaintiffs cite stem from an invalid voter registration, e.g., an ineligible voter casting a ballot because his or her registration had not been cancelled in a jurisdiction as part of routine list maintenance.  (ECF No. 1, PageID.9, ¶ 38.)[17]

---

[17] *See* Oak Park guardian pleads guilty to voter fraud in 2020 election (detroitnews.com); Attorney General: Macomb County Nursing Home Employee Pleads Guilty in Attempted Election Fraud Case (michigan.gov); Former Sterling Heights candidate admits to falsifying absentee-voter ballots – Macomb Daily (accessed April 15, 2024).

Plaintiffs Jorritsma and Silvernail also profess a fear of having their legitimate votes diluted by those of ineligible voters.  (ECF No. 1, PageID.4-5, ¶¶ 18-19, 21-22.)  But these allegations similarly fail to allege a theory of vote dilution that is particularized to Plaintiffs as opposed to a generalized grievance inuring to any voter in Michigan.  Numerous courts have already rejected such generalized grievances in support of standing.  *See, Wood v. Raffensperger*, 981 F.3d 1307, 1314–15 (11th Cir. 2020) ("Vote dilution in this context is a paradigmatic generalized grievance that cannot support standing." (internal quotation omitted)); *O'Rourke v. Dominion Voting Sys. Inc.*, No. 20-CV-03747-NRN, 2021 WL 1662742, at *9 (D. Colo. Apr. 28, 2021) (collecting cases), *aff'd,* No. 21-1161, 2022 WL 1699425 (10th Cir. May 27, 2022).  This Court should do the same.

Because Jorritsma's and Silvernail's fears regarding election integrity and the possible dilution of their votes fail to set forth a concrete, particularized injury sufficient to support standing, their claims must be dismissed.

### B.    Plaintiff Republican National Committee has not alleged a cognizable diversion-of-resources injury.

Like the individual Plaintiffs, the RNC must also establish the three requisite elements of standing.  *Lujan*, 504 U.S. at 560-61.  Again, allegations of injuries that merely amount to "generalized grievances about the conduct of Government."  *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 217 (1974), or "setback[s] to the organization's abstract social interests," *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), will not suffice.

Plaintiff RNC alleges it has "vital interests in protecting the ability of Republican voters to cast, and Republican candidates to receive, effective votes in Michigan elections," and that it brings this suit "to vindicate its own rights in this regard, and in a representational capacity to vindicate the rights of its members, affiliated voters, and candidates." (ECF No. 1, PageId.3-4, ¶ 15.) The RNC alleges that it and its members are concerned with the integrity of Michigan's elections due to its purported failure to conduct list maintenance, which increases the chance of voter fraud. (*Id.*, PageID.4, ¶ 16.) It further alleges that it relies on voter registration lists to plan its activities, and that inaccurate lists may cause it to misspend money or resources. (*Id.*, ¶ 17.) The RNC further alleges that it "expended considerable time and resources investigating Defendants'" alleged failure to comply with the NVRA. (*Id.*, PageID.6, ¶¶ 24-25.) And that Defendants purported NVRA violations "forced Plaintiffs to allocate additional resources and misallocate their scarce resources in ways they otherwise would not have." (*Id.*, PageID.19, ¶ 95.)

But the RNC's or its members, voters, and candidates' concern over election integrity or vote dilution are just as speculative and generalized as those of Jorritsma's and Silvernail's and fail for the reasons stated above. The RNC can "no more spend its way into standing based on speculative fears of future harm than an individual can." *Shelby Advocates for Valid Elections v. Hargett,* 947 F.3d 977, 982 (6th Cir. 2020) (citation omitted). That is, however, what the RNC is alleging in complaining that it has had to spend time, money, or resources to investigate or counteract Michigan's alleged lax list maintenance. Further, these claims are

generally "only backward-looking costs, not the imminent future injury needed to establish standing for declaratory and injunctive claims like this one." (*Id*.)  A "plaintiff cannot create an injury by taking precautionary measures against a speculative fear." *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 865 (6th Cir. 2020).  The RNC cannot create its own injury based on its decision to spend time and money investigating the state's list maintenance programs based on its speculative concerns of voter fraud and vote dilution.  *See also Online Merchants Guild v. Cameron*, 995 F.3d 540, 547 (6th Cir. 2021) (concluding courts have "rejected assertions of direct organizational standing where an overly speculative fear triggered the shift in organizational resources"); *accord Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (noting a plaintiff "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending").

At best, with respect to future or imminent harm, the RNC alleges that it "*may* spend more resources" on items such as mailers, contacting voters, etc, and that it "*may* misallocate its scarce resources[.]"  (ECF No. 1, PageID.4, ¶17) (emphasis added).  But, like the rest of the RNC's concerns, these speculative allegations are not sufficiently concrete for purposes Article III standing.  *See, Online Merchants Guild*, 995 F.3d at 547.

Because the RNC's fears regarding election integrity and possible vote dilution, and its speculative concern that it will be required to divert resources fail

to set forth a concrete, particularized injury sufficient to support standing, its claims must be dismissed.

## II.   Plaintiffs fail to state a claim against Defendants for a violation of the National Voter Registration Act's list maintenance requirements.

### A.   Plaintiffs fail to state a viable claim that Michigan has failed to conduct a general program that makes a reasonable effort to remove the names of ineligible voters from official lists.

Under the NVRA, a state must "conduct a general program that makes a *reasonable effort* to remove the names of ineligible voters from the official lists of eligible voters by reason of: (A) the death of the registrant; or (B) a change in the residence of the registrant, in accordance with subsections (b), (c), and (d) [of]" 52 U.S.C. § 20507(a)(4)(A)-(B) (emphasis added).

In the sole count of the complaint, Plaintiffs argue that the Defendants have failed to make reasonable efforts to conduct voter list maintenance programs, in violation of Section 8 of the NVRA.  (ECF 1, PageID.19-20, ¶ 96-100.)  Plaintiffs' claims rest on allegations that a comparison of registered voters in 53 counties have voter registrations at or above 100 percent, and another 23 counties have voter registrations rates above 90 percent.  (ECF 1, PageID.11-12, ¶48-49.)  But these allegations are based entirely on a raw comparison of census survey data to the *total* (not active) number of records in Michigan's QVF (which, as discussed further below, is a troubled comparison), leading them conclude that there are more registered voters than the voting-age population in these counties.  But Plaintiffs do

not identify a single voter in any Michigan county that is ineligible to be registered but nonetheless appears as an active voter in the QVF.

On its face, the premise of Plaintiffs' complaint is that they believe Michigan could improve its program to remove ineligible voters.  However, at no point in the complaint do the Plaintiffs appear to contend that Michigan has *no* program to remove ineligible voters, or that Michigan has failed to make an effort to remove ineligible voters.  To the contrary, Plaintiffs' complaint admits that Michigan does have a program for the removal of ineligible voters from the official list of registered voters.  Plaintiffs admit in Paragraph 67 that Michigan sent over 500,000 confirmation notices to voters in a two-year period.  (ECF 1, PageID.14, ¶67.)  Plaintiffs further admit that Michigan cancelled 485,916 registrations in that same two-year period.  (ECF 1, PageID.16, ¶68.)  The essence of Plaintiffs' claim, therefore, is that Michigan's efforts fail to satisfy the statutory requirement of making a "reasonable effort" to remove ineligible voters.

There are few cases in which federal courts have examined what is required for a "reasonable effort" to remove ineligible voters under NVRA, but this Court has decided one of them.  In an opinion issued barely one month ago, this Court recognized that, "Congress did not establish a specific program for states to follow for removing ineligible voters, and the Sixth Circuit has not yet addressed what 'a reasonable effort' entails."  *Public Int. Legal Found. (PILF) v. Benson*, __ F. Supp.3d __ (W.D. Mich., 2024); 2024 WL 1128565 (March 1, 2024).  However, this Court also followed the Eleventh Circuit's holding in *Bellitto v. Snipes*, 935 F.3d 1192, 1204-05

(11th Cir. 2019), which concluded that "a jurisdiction's reliance on reliable death

records, such as state health department records and the Social Security Death

Index, to identify and remove deceased voters constitutes a reasonable effort," and

that "[t]he state is not required to exhaust all available methods for identifying

deceased voters; it need only use reasonably reliable information to identify and

remove such voters." *See PILF*, 2024 WL 1128565 at * 10.  This Court then

concluded that NVRA did not require states to operate perfect or exhaustive

programs to remove ineligible voters:

> Even assuming arguendo that PILF's suggestions have merit, the
> NVRA requires only a "reasonable effort," not a perfect effort, to
> remove registrants who have died. PILF's identification of areas for
> improvement does not serve to demonstrate that Michigan's
> multilateral process for the removal of deceased registrants from the
> QVF does not meet the threshold of a "reasonable effort."

*Id.* at *11.  Notably, in that case, this Court also observed that "federally collected

data shows that Michigan is consistently among the most active states in the

United States in cancelling the registrations of deceased individuals." *Id*. at *4.

Other cases addressing NVRA's removal program requirements also do not

support Plaintiffs' claims here.  In *Pub. Int. Legal Found. v. Boockvar*, the

Pennsylvania District Court denied a motion for preliminary injunction filed by

PILF that sought to compel the removal of over 21,000 "potentially deceased" voters

from the Pennsylvania voter rolls.  495 F. Supp. 3d 354, 356-57 (M.D. Penn., Oct.

20, 2020).  In so holding, the Court concluded, "the NVRA does not require

perfection," and that "[w]ithout allegation, let alone proof, of a specific breakdown in

Pennsylvania's voter registration system, we cannot find that the many procedures currently in place are unreasonable." *Boockvar*, 495 F. Supp 3d at 359.

Plaintiffs here, however, have not alleged any specific breakdown in Michigan's removal program. Indeed, even the complaint's request for relief fails to demand that the Defendants make any specific changes to Michigan's program, opting instead for a request for a vague injunction that the Defendants "develop and implement reasonable and effective registration list-maintenance programs." (ECF 1, PageID.20.) Instead, the essence of Plaintiffs' claim is simply that Michigan's program is imperfect, or that the program could be improved. However, that is insufficient to state a claim that Michigan has not made a "reasonable effort" as required by NVRA. In this respect, Plaintiffs' claim is distinguishable from the complaint filed by PILF where this Court denied Defendant's motion to dismiss. (See *Pub. Int. Legal Found. v Benson*, No. 1:21-cv-929, 2022 WL 21295936 (W.D. Mich, Aug. 25, 2022). In that case, although the Court ultimately found Defendant's program reasonable at summary judgment, the Court denied Defendant's motion to dismiss because plaintiff had purported to provide specific data identifying thousands of "potentially deceased" voters by name and alleging that Michigan had done "nothing about it." *Id*. Plaintiffs here have not alleged that they identified any individual ineligible voters or specific defects in Michigan's program. So, Plaintiffs have failed to state a claim for a violation of NVRA, and the complaint must be dismissed.

But moreover, Plaintiffs' allegations themselves rest entirely on supposition and inferences.  For example, in Paragraph 61, Plaintiffs allege that "several Michigan counties have inactive registration rates of 15% or greater, well above national averages."  (ECF 1, PageID.13, ¶61.)  Plaintiffs then allege that, "Having a high percentage of inactive registrations is an indication that a state or jurisdiction is not removing inactive registrations after two general federal elections."  (ECF 1, PageID.13, ¶62.)  But in order for this allegation to support Plaintiffs' claim, the Plaintiffs would also need to allege—as they have not—that the inactive registrations have not *already* been flagged by the Defendants for cancellation following two federal elections.  But information on the Michigan Department of State website already addresses this very point:

> State and local election officials were able to identity a significant number of registered voters who appeared to have changed address through the statewide mailing of absent voter ballot applications in 2020, the first statewide election mailing in at least a decade. State and local officials used applications that were returned as undeliverable to mark voters as inactive and send notices of cancellation in 2021 and without action by these voters the registrations will be cancelled after the two-federal-election waiting period expires in 2024. Because of this, many more voter registrations were identified and will be cancelled after 2024 than after 2022.[18]

The "high number" of inactive registrations, therefore, are not a reflection of a failure of Michigan's program, but instead were the *result* of Michigan's efforts to identify and slate ineligible voters for removal.

---

[18] *See* Voter registration cancellation procedures, available at https://www.michigan.gov/sos/~/link.aspx?_id=0CA77C36E2D44E0DBCAB875DE16 4507F&_z=z (accessed April 15, 2024).

For purposes of this motion, however, this Court need not decide whether or not Plaintiffs' allegations are incorrect—it suffices merely to recognize that the allegations are little more than legal conclusions and inferences that this Court need not accept as true.  *Total Benefits*, 552 F.3d at 434.  On the face of the complaint, Plaintiffs' allegations are simply insufficient to state a plausible claim for a violation of the NVRA.  Plaintiffs' complaint, therefore, should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

### B.    Defendants' response letter shows that Plaintiffs fail to state a plausible claim for a violation of the National Voter Registration Act.

Generally, when confronted with a 12(b)(6) motion, the court considers only the pleadings, and ordinarily does not consider matters outside the pleadings. *Rondigo, LLC v. Twp. of Richmond*, 641 F.3d 673, 680 (6th Cir. 2011).  However, a court may consider "exhibits attached [to the complaint], public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein," without converting the motion to one for summary judgment. *Id.* (quoting *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008)). Thus, within a Rule 12(b)(6) motion, a defendant may introduce certain documents if the plaintiff fails to do so.  *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997) (citations omitted).  "Otherwise, plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied." *Id.*

31

In the complaint, Plaintiffs admit that they requested a response from the Defendants "fully describ[ing] the efforts, policies, and programs [they] are taking, or plan to undertake before the 2024 general election to bring Michigan into compliance" with Section 8 of the NVRA, and that it asked Defendants to state "what policies are presently in place, or will be put in place, to ensure effective and routine coordination of list maintenance activities," and also "a description of the specific steps [Defendants] intend to take to ensure routine and effective list maintenance on a continuing basis beyond the 2024 election." (ECF 1, PageID.17-18, ¶87-88.)  (ECF 1, PageID.18, ¶88.)  The complaint then alleges that Defendants have "failed to correct" the violations of NVRA described in Plaintiffs' letter.  (ECF 1, PageID.18, ¶90-91.)  The complaint explicitly refers to Plaintiffs' demand for a response to their notice of violations, expressly identifies the information that Plaintiffs demanded to be included in that response and alleges that the Defendants "failed to correct" the violations.  In so doing, they both referred to the Defendants' response and placed that response at the center of their claims.  Moreover, the response includes the information Plaintiffs requested and squarely addresses the Plaintiffs' claims concerning list maintenance, and so the content of that response is central to Plaintiffs' claims here.  So, the Defendants may attach that response letter to this motion and this Court may consider it because it was referred to in the complaint and is central to the claims.  *Bassett*, 528 F.3d at 430.

Even a cursory review of that response, however, reveals that Plaintiffs have failed entirely to state a claim that Michigan's program for the removal of ineligible

voters does not make "a reasonable effort."  First, the response provides a detailed description of Michigan's program for the removal of ineligible voters, with citation to statutes and publicly available resource materials.  (Ex. 2, p 2-3.)  This clearly establishes the existence and structure of Michigan's program.  Next, the response identified several steps Michigan has taken to improve its program and explained that Michigan's efforts had contributed to the cancellation of more than 700,000 registered voters between 2019 and 2023, and more than 500,000 registrations slated for future cancellation.  (*Id.*, p 3.)  The response then specifically pointed to the statewide mailing that allowed state and local election officials to identify registered voters whose election mail was returned as undeliverable, and thereby triggered a cancellation countdown under section 509aa, Mich. Comp. Laws § 168.509aa.  (*Id.*)  This part of the response alone should have alerted Plaintiffs to a flaw in their allegation about a "high percentage" of inactive registrations, but the complaint makes no attempt to reconcile their claims with the statutory process for cancelling registrations.  (*See* ECF 1, PageID.13, ¶62.)

Next, the response discussed Michigan's participation in the ERIC program, which receives updated registration information from other states and can identify voters who have moved out of state, and also the effect of Michigan's automatic registration laws on how registration information is updated.  (Ex. 2, p 4.)  The response then also addressed other means to identify and remove the names of deceased and duplicate voters.  (*Id.*)

Lastly, the response directly responded to Plaintiffs' claims about registration statistics, the Plaintiffs' figures on registration percentages, and that the Plaintiffs appeared to be including both "active" and "inactive" voters when calculating the number of voters in various counties and explained that "inactive" voters could not be removed without following the requirements of federal law.  (*Id.*, p 4-5.)  The response then provided the correct percentages of *active* registered voters in each of the counties identified in the Plaintiffs' letter.  (*Id.*)  None of those counties have voter registrations exceeding 95%.  (*Id.*, p 5.)

In short, Defendants' response established the existence and scope of Michigan's program, identified specific steps taken to improve and expand the program, and explained how Plaintiffs' calculations were erroneous.  But, despite having Defendants' response for over three months before filing this lawsuit, Plaintiffs make no attempt in their complaint to refute—or even address—the factual information provided in Defendants' response.  But Plaintiffs' claims simply cannot be maintained in light of the information provided by Defendants.  The response letter makes it clear that Michigan not only has a comprehensive program to identify and remove the names of ineligible voters from the official list of registered voters, but also that program has removed hundreds of thousands of voters in the past few years and is well on its way towards removing hundreds of thousands more in the next few years.  Again, Plaintiffs have not alleged any specific defect in Michigan's program and have not alleged that they have identified any ineligible voters who remain listed as "active" on Michigan's QVF.  Plaintiffs

have, therefore, failed to make allegations sufficient to state a claim that Michigan's

program has not made a "reasonable effort" as required by the NVRA, and so their

complaint must be dismissed.

## CONCLUSION AND RELIEF REQUESTED

For these reasons, Defendants Secretary of State Jocelyn Benson and

Director of Elections Jonathan Brater respectfully request that this Honorable

Court enter an Order dismissing the complaint in its entirety, together with any

other relief that the Court determines to be appropriate under the circumstances.

Respectfully submitted,

*s/Erik A. Grill*
Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Defendants Benson and Brater
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659
Email:  grille@michigan.gov
(P64713)

Dated:  April 15, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2024, I electronically filed the foregoing paper with
the Clerk of the Court using the ECF system which will send notification of such
filing of the foregoing document as well as via US Mail to all non-ECF participants.

*s/Erik A. Grill*
Heather S. Meingast (P55439)
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659
Email:  grille@michigan.gov
P64713