## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

REPUBLICAN NATIONAL
COMMITTEE, JORDAN JORRITSMA,
and EMERSON SILVERNAIL,

     *Plaintiffs,*

v.

JOCELYN BENSON, *in her official capacity
as Michigan Secretary of State*; JONATHAN
BRATER, *in his official capacity as Director of
the Michigan Bureau of Elections*,

     *Defendants.*

**RESPONSE IN OPPOSITION
TO MOTION TO DISMISS**

Case No. 1:24-cv-00262

### INTRODUCTION

This is not the first time this Court has considered—and rejected—the arguments raised in the State's motion to dismiss. Most recently, in *Public Interest Legal Foundation v. Benson* [*PILF*], this Court denied a motion to dismiss a complaint that, like this one, alleged Defendants had "failed to make reasonable efforts to conduct voter list maintenance programs … in violation of Section 8 of NVRA." No. 1:21-cv-929, 2022 WL 21295936, at *4, *13 (W.D. Mich. Aug. 25, 2022) (Beckering, J.). Before that case, this Court denied another motion to dismiss NVRA claims that relied on some of the same evidence here—high registration rates compared to publicly available census data. *See Daunt v. Benson*, Doc. 376 at 19, No. 1:20-cv-522 (W.D. Mich. Nov. 3, 2020) (Jonker, J.) (oral opinion, attached as Ex. A). This Court is in good company. The Western District of North Carolina denied a motion to dismiss similar NVRA claims

brought by voters in *Green v. Bell*, 2023 WL 2572210, at *7 (W.D.N.C. Mar. 20, 2023). And all of these recent cases rest on a body of precedent discussed in this brief.

This case is *Daunt* Part 2. This case involves similar plaintiffs, raising a nearly identical claim, based on nearly identical evidence, in a nearly identical complaint, following nearly identical pre-suit notice. Indeed, the evidence here indicates that the State's list-maintenance practices are now far worse than alleged in *Daunt*. In 2020, Michigan had one county with registration rates above 100% of the voting-age population. *See* Compl. (Doc. 1) ¶8. That allegation in *Daunt* was enough to raise an inference that Michigan was violating the NVRA. And despite the Secretary's settlement agreement in *Daunt*, Michigan now has 53 counties with registration rates above 100% of the voting-age population. ¶8.

It was also clear in *Daunt* that a voter had standing to challenge Michigan's NVRA violations. *See Daunt*, Ex. A at 18-21. Plaintiffs here satisfy that basis for standing—they are individual voters, plus a political party that represents millions more voters throughout the State. Compl. ¶¶13, 18, 21. Plaintiffs have other bases for standing, too. The RNC, for example, relies on accurate voter registration records for a variety of political and economic activities, which means that bloated rolls harm the RNC's mission and finances. ¶¶16-17, 23-25. The complaint passes muster under 12(b)(1) and 12(b)(6) many times over. Instead of stopping this case before it starts, this Court should follow its own precedent, deny Defendants' motion to dismiss, and allow this case to proceed.

## BACKGROUND

Michigan has stopped maintaining clean and accurate voter rolls. Seventy-six of Michigan's 83 counties have registration rates over 90%. Compl. ¶¶47-49. Although registering 90% of eligible voters is a laudable goal, registration rates across the nation are closer to 70%. ¶¶51-53. Inflated rolls like these are a telltale sign that officials are failing to remove voters who have become ineligible. ¶55. In fact, 53 of the 76 counties with inflated rolls have registration rates over 100%—a mathematical impossibility. ¶48. The Justice Department and others have sued jurisdictions with similarly inflated registration rates, and those jurisdictions quickly admitted liability or agreed to clean up their rolls. ¶¶71-79.

The impossibly high registration rates are not the only indicators that Michigan is failing to maintain its rolls. Several counties have experienced high rates of residency changes in recent years, but they failed to remove voters for residency changes during that period. Compl. ¶64. In addition, the State as a whole reports more inactive voters than the national average, suggesting that Michigan is keeping inactive voters on the rolls rather than removing them. ¶60. Individual counties have rates of inactive voters that are double or triple the national and state averages, which is strong evidence that they are not making a reasonable effort to remove outdated registrations. ¶¶61-62.

Defendants are violating federal law. One of the NVRA's "main objectives" is to force States to "remov[e] ineligible persons from [their] voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1838 (2018). According to the bipartisan Carter-Baker Commission, inaccurate rolls are "the root" cause of "most problems encountered in U.S. elections." Compl. ¶36. Bloated rolls invite unlawful

voting, dilute lawful votes, and decrease voters' confidence in elections. ¶¶36-39. Fraud, in particular, "is a real risk" that "has had serious consequences" in various States. *Brnovich v. DNC*, 141 S. Ct. 2321, 2348 (2021). The NVRA thus requires States to "conduct" a program that makes a "reasonable effort" to "remove the names of ineligible voters" who move or die from the rolls. 52 U.S.C. §20507(a)(4). Congress created a private right of action that allows individuals who serve a pre-suit notice to sue States that violate the NVRA. *Id.* §20510(b). According to Congress, this scheme "ensure[s] that accurate and current voter registration rolls are maintained," which safeguards both the "fundamental right" to vote and the "integrity of the electoral process." *Id.* §20501(a)(1), (b)(3)-(4).

Plaintiffs—the Republican National Committee, Jordan Jorritsma, and Emerson Silvernail—brought this suit to remedy Michigan's violations. The RNC is the national committee of the Republican Party and represents over 30 million registered Republicans throughout the country. Compl. ¶¶12-13. The RNC relies on voter rolls daily. Inflated rolls cause the party to waste resources recruiting and communicating with ineligible voters, which diverts resources from other mission-critical activities. ¶¶15-17. And to fulfill its mission, the Republican Party must monitor States to ensure they are properly maintaining their voter rolls. ¶16. When States such as Michigan fail to maintain their rolls, the RNC is forced to divert resources to combat the presence of ineligible voters on the registration lists. ¶¶17, 23-25.

The RNC is joined in this suit by Jordan Jorritsma and Emerson Silvernail. Both are registered Michigan voters who are active in electoral politics and who vote in local and statewide elections. Compl. ¶18-21. Michigan's sloppy list maintenance undermines

Plaintiffs' confidence in elections and risks diluting the votes of the RNC's members and individual voters such as Mr. Jorritsma and Mr. Silvernail.  To redress their injuries, Plaintiffs sued the Secretary of State and the Director of Elections—the chief election officials responsible for list maintenance in Michigan. Compl. ¶¶26-27.

Before suing, Plaintiffs served Defendants with a pre-suit notice. Compl. ¶¶83-90. The notice was fairly detailed. *See* Notice (Doc. 1-1). It identified the RNC, Mr. Jorritsma, and Mr. Silvernail by name. *Id.* at 3. It reminded Defendants of their obligations under the NVRA. *Id.* at 2. It offered a wide range of statistics, including U.S. census data, to show that voter registration rates in many counties are abnormally or impossibly high. *Id.* at 4-5. It identified those counties by name and alleged that, as a result, Michigan is "violating Section 8 of the NVRA." *Id.* at 3. It addressed "the curative steps needed" to bring the state into compliance and warned that doing so was needed to "avoid litigation." *Id.*

The Secretary and Director responded, denying any liability under the NVRA. When Michigan failed to remedy its violation within the statutory timeframe, Plaintiffs filed this lawsuit. The Secretary and Director now move to dismiss this case under Rules 12(b)(6) and 12(b)(1). *See* Mot. (Doc. 19).

## LEGAL STANDARDS

A motion to dismiss under Rule 12(b)(6) "tests" whether the complaint satisfies Rule 8. *Davis H. Elliot Co. v. Caribbean Utils. Co.*, 513 F.2d 1176, 1182 (6th Cir. 1975). Rule 8 in turn requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Courts must accept the complaint's factual allegations as true, allow all reasonable inferences from those allegations, and

construe the complaint in the light most favorable to the plaintiff. *See Guzman v. DHS*, 679 F.3d 425, 429 (6th Cir. 2012); *PILF*, 2022 WL 21295936, at *9.

After drawing all those inference in Plaintiffs' favor, the question is whether the complaint states a claim that is "'plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausible means a "reasonable inference that the defendant is liable." *Id.* It does not mean that liability is "probable" or even more probable than other explanations. *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011). Even if "Secretary Benson's position" were "equally plausible," that would be "insufficient to warrant dismissal under Rule 12." *PILF*, 2022 WL 21295936, at *10 (collecting cases); *see also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). "Ferreting out the most likely reason for the defendants' actions" is simply "not appropriate at the pleadings stage." *Watson Carpet & Floor Covering*, 648 F.3d at 458.

When assessing a claim's plausibility, courts generally "may not consider matters beyond the complaint." *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 576 (6th Cir. 2008). Courts can consider the face of the complaint "'as well as … documents incorporated into the complaint by reference,'" such as Plaintiffs' pre-suit notice. *Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 794 (6th Cir. 2016). Courts also can take judicial notice of official documents for their existence, but not for their "truth." *Mills v. Barnard*, 869 F.3d 473, 486 (6th Cir. 2017). And in no event can courts judicially notice facts "subject to reasonable dispute," *id.*, or use outside materials to "contradict[]" the factual allegations or inferences in the complaint, *Clark v. Stone*, 998 F.3d 287, 298 (6th Cir. 2021).

The same rules apply to the Rule 12(b)(1) motion. "For purposes of ruling on a motion to dismiss for want of standing," the Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Parsons v. DOJ*, 801 F.3d 701, 710 (6th Cir. 2015) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). At this stage, "general factual allegations of injury resulting from the defendant's conduct may suffice," because the court must "presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up).

## ARGUMENT

### I.     Plaintiffs have plausibly alleged Article III standing.

Standing requires injury, causation, and redressability.[1] Importantly, Congress created a private right of action for violations of the NVRA, including section 8's list-maintenance requirement. *See* 52 U.S.C. §20510(b). Courts evaluating Article III standing "must afford due respect to Congress's decision." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340-41 (2016)). Congress's judgment is "instructive and important" because the legislature is "well positioned to identify intangible harms that meet minimum Article III requirements." *Spokeo*, 578 U.S. at 341. In fact, Congress can "'articulate chains of causation that will give rise to a case or controversy where none existed before.'" *Id.* And Congress can

---

[1] The NVRA allows individuals to sue once the State's chief election official receives "written notice of the violation." 52 U.S.C. §20510(b)(1)-(2). No one disputes that, before filing this lawsuit, Plaintiffs gave Defendants written notice of the violation. Yet Defendants refer to Plaintiff's notice as a "purported notice." Mot. at 21. To the extent Defendants dispute that Plaintiffs' notice fails to satisfy the NVRA's notice requirement, courts (including this one) have consistently rejected that argument and have upheld notices nearly identical to Plaintiffs'. *See, e.g.*, *Green*, 2023 WL 2572210, at *3; *PILF*, 2022 WL 21295936, at *6-9; *ACRU v. Martinez-Rivera*, 166 F. Supp. 3d 779, 795 (W.D. Tex. 2015).

"'elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *TransUnion*, 141 S. Ct. at 2204-05. Plaintiffs have standing under a variety of theories. And because "only one plaintiff needs to have standing in order for the suit to move forward," any one of those bases for standing is sufficient to deny Defendants' motion. *Parsons v. DOJ*, 801 F.3d 701, 710 (6th Cir. 2015).

## A.   The RNC has organizational standing.

There is ordinarily little question that political parties have standing to challenge a State's failure to comply with federal election laws. *See Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251, 1266 (N.D. Ga. 2019) (holding that the "need to divert resources from general voting initiatives or other missions of the organization" establishes standing "[i]n election law cases"). Plaintiffs allege that Defendants' violation of the NVRA inflates the voter rolls and causes the RNC to divert its resources to address the fallout. Compl. ¶¶12-25. "[T]here can be no question" that diversions of resources are an "injury in fact." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). The diversion injures Plaintiff because they "would have spent" their resources on "some other aspect" of their mission had the defendant "complied with the NVRA." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1044 (9th Cir. 2015). It is therefore "sufficient to confer standing" that a defendant's misconduct causes the plaintiff to, for example, spend resources registering additional voters. *Id.*; *Action NC v. Strach*, 216 F. Supp. 3d 597, 616-18 (M.D.N.C. 2016). In these circumstances, courts "have no difficulty concluding that Plaintiffs have adequately alleged that the injury they suffer is attributable to the State." *La Raza*, 800 F.3d at 1041.

Defendants' counterarguments are unavailing. They argue that the resource-diversion allegations are "speculative and generalized." Mot. 24. And they fixate on the complaints' use of "may" in one allegation. Mot. 25. But that overlooks other allegations that explicitly allege that the RNC "would have expended" its resources "on other activities," "[w]ere it not for Defendants' failure to comply with their list-maintenance obligations." Compl. ¶25; *id.* ¶¶23-24. These and other harms "will continue" unless "Defendants are enjoined from violating the law." ¶99. The complaint specifically ties the RNC's harms to Defendants' actions.

In any event, "even when it is 'broadly alleged,'" a diversion-of-resources injury is sufficient "at the pleading stage." *La Raza*, 800 F.3d at 1041; *PILF*, 2022 WL 21295936, at *6 (allegations that the plaintiff organization "diverted resources that could have been expended in other states to address Michigan's alleged voter roll deficiencies" were sufficient); *League of Women Voters of Ariz. v. Reagan*, 2018 WL 4467891, at *4 (D. Ariz. Sept. 18) (allegation that plaintiffs "diverted resources to register voters rather than … other activities … due to Defendant's alleged noncompliance with the NVRA" was "sufficiently plausible to meet the low bar" of alleging standing at the pleading stage (cleaned up)); *Nat'l Press Photographers Ass'n v. McCraw*, 504 F. Supp. 3d 568, 581 (W.D. Tex. 2020) (explaining that the complaint need not identify "man-hours expended or specific activities resources were diverted away from" at the pleading stage (cleaned up)).

Though unnecessary at the pleading stage, the complaint provides significant detail on how Defendants' list-maintenance failures impose "concrete and demonstrable injury to the [RNC]'s activities" and result in a "consequent drain on the

[RNC]'s resources." *Havens*, 455 U.S. at 379. Plaintiffs regularly use "voter registration lists to determine [their] plans and budgets" and to "estimate voter turnout." Compl. ¶17. Political parties rely on accurate registration records to determine "the number of staff" and the "number of volunteers" needed "in a given jurisdiction," as well as how much they "will spend on paid voter contacts." ¶17. Bloated voter rolls cause political parties to "misallocate their scarce resources" in ways that damage their mission. ¶95. The RNC suffers these harms as a direct result Defendants' list-maintenance failures, regardless of whether the RNC were to "spend time, money, or resources to investigate or counteract Michigan's alleged lax list maintenance." Mot. 24. Because those injuries are concrete, money that the RNC expends to avoid those injuries is an independent harm. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

Defendants have no answer to these concrete injuries. Instead, they focus on the RNC's additional expenses to educate voters, increase confidence in the election, monitor Michigan's elections for fraud and abuse, and persuade election officials to improve list maintenance. Mot. 24-25; *see also* Compl. ¶¶23-24. But those activities are also "within-mission organizational expenditures" and thus "establish direct organizational standing." *PILF*, 2022 WL 21295936, at *6. These allegations show "that it is plausible" that Plaintiffs have "suffered injury because of the Defendants' alleged failure to comply with the NVRA and therefore [have] standing to bring [their] List Maintenance Claim." *Judicial Watch, Inc. v. King*, 993 F. Supp. 2d 919, 925 (S.D. Ind. 2012).

Defendants attempt to frame these harms as "'only backward-looking costs.'" Mot. 25. But that overlooks nearly the entire complaint. Plaintiffs explicitly allege that

the RNC's "candidates will appear on the ballot in Michigan for numerous federal and state offices" for the upcoming election. Compl. ¶14. And Plaintiffs allege numerous harms caused by Defendants' "ongoing, systemic problem[s] with its voter list maintenance efforts." ¶69; *see also* ¶¶17, 23-24, 95. Defendants don't claim that they've solved those problems, and the Court couldn't accept such representations at this stage anyway. Thus, "Plaintiffs will continue to be injured by Defendants' violations of the NVRA until Defendants are enjoined from violating the law." ¶99.

Defendants' NVRA violations also directly harm the RNC's mission. This as an independent injury in NVRA cases. *See PILF*, 2022 WL 21295936, at *6 (allegation that the Secretary's "failure to comply with the NVRA impairs [plaintiff's] essential and core mission of fostering compliance with federal election laws and promoting election integrity"). The RNC's core mission includes electing Republican candidates, representing the interests of Republican voters, and maintaining confidence in the integrity of elections. Compl. ¶¶14-15. Ensuring States have clean voter rolls is essential to those goals. ¶¶23, 29, 36. At "this stage," a "plausible allegation" that the RNC's "ability to carry out its mission of cleaning up voter registration rolls has been 'perceptibly impaired' by the Defendants' alleged statutory violation" is sufficient to plead standing. *King*, 993 F. Supp. 2d at 925.

### B.   Voters have standing under the NVRA.

Mr. Jorritsma, Mr. Silvernail, and Republican voters also have independent bases for standing.

***First***, Defendants' violations undermine their "confidence in the integrity of Michigan elections." Compl. ¶¶19, 22, 93. This is not a "psychic injury" as Defendants

claim. Mot. 21. Voter confidence has "'independent significance'" according to the Supreme Court because it "'encourages citizen participation in the democratic process.'" *Jud. Watch, Inc. v. Griswold*, 554 F. Supp. 3d 1091, 1104 (D. Col. 2021) (quoting *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 197 (2008) (op. of Stevens, J.)); *accord Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). Undermining voter confidence thus burdens the right to vote, and "[t]here can be no question that a plaintiff who alleges that his right to vote has been burdened by state action has standing to bring suit to redress that injury." *King*, 993 F. Supp. 2d at 924.

This Court and others have repeatedly recognized this injury as a basis for standing in NVRA cases. *E.g.*, *Green*, 2023 WL 2572210, at *4; *Daunt*, Ex. A at 18-21; *Griswold*, 2021 WL 3631309, at *7; *King*, 993 F. Supp. 2d at 924. This injury is not "generalized" because "there is no indication that undermined confidence and discouraged participation are 'common to all members of the public.'" *Griswold*, 2021 WL 3631309, at *7 (quoting *Lance v. Coffman*, 549 U.S. 437, 440 (2007)). Mr. Jorritsma and Mr. Silvernail are registered voters in Michigan who vote in the very local and statewide elections that are suffering from bloated rolls. *See* Compl. ¶¶18, 20-21. The RNC represents numerous voters like them. ¶13. Their injuries are not "speculative or hypothetical": they "already exist[]" because their "confidence is undermined now." *Griswold*, 2021 WL 3631309, at *7.

If there were any doubt that these injuries are sufficient, this Court should defer to Congress's judgment that inflated rolls undermine the "integrity of the electoral process." 52 U.S.C. §20501(b)(3)-(4). "When Congress 'elevates intangible harms into concrete injuries,' a plaintiff need not allege 'any additional harm beyond the one

Congress has identified.'" *PILF v. Boockvar*, 370 F. Supp. 3d 449, 455 (M.D. Pa. 2019)
(quoting *Spokeo*, 578 U.S. at 341; *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846
F.3d 625, 633 (3d Cir. 2017)). Courts have thus found these congressionally designated
injuries sufficient to satisfy Article III.

     **Second**, Defendants' violations injure individual voters by risking the dilution of
their right to vote. Burdens on the right to vote are concrete, particularized injuries that
support standing. *King*, 993 F. Supp. 2d at 924. That right "'can be denied by a
debasement or dilution of the weight of a citizen's vote just as effectively as by wholly
prohibiting the free exercise of the franchise.'" *Id.* (quoting *Purcell*, 549 U.S. at 4). Courts
thus recognize that "vote dilution can be a basis for standing." *Wood v. Raffensperger*, 981
F.3d 1307, 1314 (11th Cir. 2020). Bloated voter rolls dilute the votes of eligible voters
by facilitating fraudulent or otherwise ineligible votes. Compl. ¶¶19, 22, 93. This injury
is not a generalized grievance, *contra* Mot. 20-23, even though it's suffered by many
Michigan voters, and even though the amount of dilution might be relatively slight. *See
Baker v. Carr*, 369 U.S. 186, 208 (1962); *Spokeo*, 578 U.S. at 339 ("The fact that an injury
may be suffered by a large number of people does not of itself make that injury a
nonjusticiable generalized grievance."). And their injuries are "particularized because
the Plaintiffs allege that *their* votes are being diluted." *Green*, 2023 WL 2572210, at *4.
The "harm of vote dilution is concrete and actual or imminent, not conjectural or
hypothetical." *Kravitz v. Dep't of Com.*, 336 F. Supp. 3d 545, 558 (D. Md. 2018) (cleaned
up).

     This injury is also not "speculative." Mot. 20, 22. While Defendants focus on
intentional voter "fraud," Mot. 22, bloated voter rolls invite all kinds of ineligible

voting—fraudulent, intentional, accidental, and innocent—all of which dilute Plaintiffs' lawful votes. Nor is the link between inflated rolls and voter fraud overly speculative. It has been observed by the Carter-Baker Commission, Compl. ¶36, a well-respected authority relied on by the Supreme Court. *E.g.*, *Crawford*, 553 U.S. at 193-94, 197 (op. of Stevens, J.). Defendants deride the report as "outdated." Mot. 22. But the Supreme Court cited it just three years ago, *Brnovich*, 141 S. Ct. at 2347-48, and the Court cannot weigh evidence at this stage, anyway.

Moreover, Plaintiffs are seeking "forward-looking, injunctive relief," so Article III allows them to sue over not just actual fraud, but also the "risk of" fraud. *TransUnion*, 594 U.S. at 435. "Fraud is a real risk" in Michigan and elsewhere, as courts have reiterated many times. *Brnovich*, 141 S. Ct. at 2348; *see* Compl. ¶¶36-38 (collecting cases). The complaint even details specific, recent instances of voter fraud in Michigan. Compl. ¶38. Defendants would prefer registration fraud instead of voter fraud, Mot. 22, but States and voters are "not obligated to wait" for that "to happen" before acting to deter fraud, *Brnovich*, 141 S. Ct. at 2348. The link between inflated voter rolls and increased risks of illegal voting is not attenuated. It is obvious and well established.

Even if these events would be too speculative in a vacuum, "'Congress has the power'" to make it satisfy Article III, as it did here by enacting a private right of action for violations of the NVRA. *Spokeo*, 578 U.S. at 341. Defendants rely on other, non-NVRA cases questioning vote dilution as speculative at this juncture. Mot. 22 (citing *Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331, 406 (W.D. Pa. 2020)). But those cases did not "arise under a situation like the National Voter Registration Act where Congress has articulated the private right of action." *Daunt*, Ex. A at 20.

Congress's judgment warrants respect, especially because harm to voters under the NVRA bears "a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Green*, 2023 WL 2572210, at *4 (quoting *TransUnion*, 141 S. Ct. at 2213). Plaintiffs "are asserting 'a plain, direct and adequate interest in maintaining the effectiveness of their votes,' not merely a claim of 'the right possessed by every citizen to require that the government be administered according to law.'" *Baker*, 369 U.S. at 208 (quoting *Coleman v. Miller*, 307 U.S. 433, 438 (1939)). Courts have long recognized that vote dilution and losses of voter confidence burden the right to vote. And burdens on constitutional rights are classic examples of "intangible injuries" that satisfy Article III. *Spokeo*, 578 U.S. at 340.

*     *     *

Each of these theories independently demonstrates standing at the pleading stage. Plaintiffs' allegations are even stronger in light of Congress's creation of a private right of action for violations of the NVRA. So long as the Court finds that at least one Plaintiff "has standing," it "need not consider whether the [other parties] also have standing to do so." *Horne v. Flores*, 557 U.S. 433, 446 (2009). This Court has recognized that both organizations and voters have standing to sue under the NVRA. *PILF*, 2022 WL 21295936, at *9; *Daunt*, Ex. A at 18-21. If Defendants were right that Plaintiffs don't have standing, then those decisions were unconstitutional advisory opinions. But this Court is right, and Defendants are wrong. Plaintiffs have standing.

## II.    Plaintiffs have plausibly alleged NVRA violations.

Section 8 of the NVRA "requires States to 'conduct a general program that makes a reasonable effort to remove the names' of voters who are ineligible 'by reason

of" death or change in residence." *Husted*, 138 S. Ct. at 1838 (quoting 52 U.S.C. §20507(a)(4)). The law makes the removal of dead or relocated voters "mandatory." *Id.* at 1842. Plaintiffs plausibly alleged that Michigan is not complying with this duty.

The allegations regarding high registration rates alone raise a reasonable inference of liability. The complaint alleges that at least 76 counties have registration rates that are abnormally or impossibly high compared to the rest of the State and the rest of the country. Compl. ¶¶3-4, 48-54. These "unreasonably high registration rate[s]" create a "strong inference of a violation of the NVRA" that is "sufficient," on its own, to survive a motion to dismiss. *ACRU*, 166 F. Supp. 3d at 805. This Court has already held as much. *Daunt*, Ex. A at 16. And "[o]ther courts" agree that "a registration rate in excess of 100%" indicates that a jurisdiction is "not making a reasonable effort to conduct a voter list maintenance program in accordance with the NVRA." *Griswold*, 2021 WL 3631309, at *10; *e.g.*, *Voter Integrity Proj. NC, Inc. v. Wake Cty. Bd. of Elections*, 301 F. Supp. 3d 612, 620 (E.D.N.C. 2017); *Green*, 2023 WL 2572210, at *5; *ACRU*, 166 F. Supp. 3d at 793.

Although courts have held that Plaintiffs' voter-registration data provides a sufficient basis for a claim, the complaint here does not rest on those numbers alone. The complaint documents examples of six jurisdictions with similarly high registration rates who, after they were sued, essentially agreed that their rolls were inflated. *See* Compl. ¶¶72-77. The complaint also rules out alternative explanations for these inflated rolls. ¶¶55-56. And it details even more data demonstrating that certain counties are not keeping up with residency changes, and not removing voters even after marking them inactive. ¶¶63-69.

Defendants deem these allegations insufficient for three main reasons. First, they fault Plaintiffs for not identifying specific policies that Michigan should change. Mot. 29, 31-34. Second, they dispute the data. Mot. 26, 30-31. And third, they claim their response letter shows that they are now complying with the law. Mot. 31-35. None of these arguments are a reason to dismiss a complaint at the pleading stage. Notably, Defendants' primary authority for why Defendants haven't violated the NVRA are a case that was decided *at trial*, after the court received "extensive expert testimony," *Bellitto v. Snipes*, 935 F.3d 1192, 1207-08 (11th Cir. 2019), and this Court's summary-judgment order in *PILF v. Benson*, No. 1:21-cv-929, 2024 WL 1128565 (W.D. Mich. Mar. 1, 2024) (Beckering, J.). The courts in both cases *denied* the defendants' motions to dismiss, rejecting similar arguments that Defendants make here. *Bellitto v. Snipes*, 221 F. Supp. 3d 1354, 1365 (S.D. Fla. 2016); *PILF*, 2022 WL 21295936, at *9. Defendants also rely on an order denying a motion for a preliminary injunction, *see PILF v. Boockvar*, 495 F. Supp. 3d 354, 356-57 (M.D. Penn., Oct. 20, 2020), in a case that settled before the court ruled on the 12(b)(6) motion, *see* Doc. 44, No. 1:20-cv-1905 (M.D. Penn., Apr. 1, 2021). This Court has already distinguished that case because preliminary injunction motions are "qualitatively different from the motion to dismiss before this Court." *PILF*, 2022 WL 21295936, at *8 n.3.

**First**, Defendants err when they fault Plaintiffs for not alleging "specific changes" the State should use or a policy it should adopt. Mot. 29. The NVRA requires States to "conduct" a list-maintenance program, 52 U.S.C. §20507(a)(4), not to simply "have a program," Mot. 27. Defendants might be able to win at trial if they demonstrate as a "factual" matter that they "reasonably used [the enacted] process." *Bellitto*, 935 F.3d

17

at 1205-06. But merely having a policy on the books does not satisfy the NVRA if the State is not following the policy, or if the State is not ensuring that the counties are following the policy. Plaintiffs allege just that, based on the massively inflated voter rolls in over six dozen counties. Compl. ¶¶3-4, 44-49. The correctness of Plaintiffs' allegations cannot be resolved at this stage. *See Griswold*, 2021 WL 3631309, at *11 ("While it appears undisputed that this is Colorado's [enacted] program, the Court has no information about Colorado's compliance … without 'further development of the record.'"). Defendants' demand for specificity also ignores the nature of section 8 claims. Plaintiffs cannot be expected to plead something beyond what the statute requires. The statute requires reasonable list maintenance, not specific policies, so identifying specific policies that the State must adopt or repeal cannot be part of the plaintiff's pleading burden. *See King*, 993 F. Supp. 2d at 922.

Similarly, Plaintiffs' claim relies on an omission: that the Director is failing to conduct proper list maintenance. "[L]ittle factual detail is necessary or available when a plaintiff is alleging that the defendant failed to act." *Arvizu v. Medtronic Inc.*, 41 F. Supp. 3d 783, 792 (D. Ariz. 2014); *accord Washington v. Baenziger*, 673 F. Supp. 1478, 1482 (N.D. Cal. 1987); *Hobbs v. Powell*, 138 F. Supp. 3d 1328, 1343 (N.D. Ala. 2015). Plaintiffs provided sufficient facts to infer that Defendants have failed to act.

**Second**, Defendants' criticisms of Plaintiffs' data are irrelevant. And even if the evidentiary disputes could be considered at this stage, they are unpersuasive. Defendants complain that Plaintiffs' allegations "are based entirely on a raw comparison of census survey data" to total numbers in Michigan's QVF. Mot. 20. But Plaintiffs' methodology has been repeatedly upheld. Their "census data is reliable," *ACRU*, 166

F. Supp. 3d at 791, especially since Plaintiffs used "the most recent census data available at the time of the filing of [their] complaint," *Voter Integrity Proj. NC*, 301 F. Supp. 3d at 619. Indeed, the U.S. Election Assistance Commission uses the census numbers to estimate voter turnout and registration "because of its availability for the majority of jurisdictions … and because it provides a more accurate picture of the population covered by the [survey]." U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2022 Comprehensive Report* 7 (June 2023), perma.cc/28SQ-T24L (cited at Compl. ¶58). And Michigan self-reported the second-highest active registration rate in the country to the Commission in 2022—one of only three states (including D.C.) with a statewide active registration rate above 95%. *Id.* at 162-66.

Defendants' evidentiary dispute is also just plain wrong. They assert that Plaintiffs compare census data to "the *total* (not active) number of records in Michigan's QVF" to arrive at artificially high numbers. Mot. 26. That's false. The complaint repeatedly compares "the most up-to-date count of *registered active voters* available from the Michigan Bureau of Elections" to conclude that six dozen counties "have suspiciously high rates of active voter registration." Compl. ¶47 (emphasis added). Defendants' response letter made the same mistake. *See* Mot. Ex. 2 (Doc. 19-3) at 5-6. To be sure, Michigan also has problems with failing to remove inactive voters from the rolls, as shown by the high number of inactive registrations. *See* ¶¶57-62. Defendants claim those high numbers are "the result of Michigan's efforts to identify and slate ineligible voters for removal." Mot. 30. But that makes no sense. At most, high inactive rates reveal that Michigan is *almost* canceling registrations but is failing to actually remove those voters from the rolls. In other words, a "high 'inactive registration rate'"

is evidence that a State may "not actually be implementing" the NVRA's removal requirements. *Griswold*, 554 F. Supp. 3d at 1097, 1108.

The Democratic National Committee as *amicus curiae* also quibbles with Plaintiffs' use of the five-year census estimate instead of the one-year estimate. DNC Br. (Doc. 24-2) at 6-7. But the Census Bureau says that five-year estimate is the "[m]ost reliable" of the American Community Surveys. U.S. Census Bureau, *When to Use 1-year or 5-year Estimates* (Sept. 2020), perma.cc/LJ8K-WJYQ. In contrast, the one-year estimate is more "current" but "[l]less reliable," and it only has "[d]ata for areas with populations of 65,000+," *id.*, which excludes about half of Michigan's counties. To the extent there is disagreement about which data is the best measure, "the fact-intensive dispute about the accuracy and significance of the Plaintiffs' statistics must be resolved at the summary-judgment stage or at trial." *Green*, 2023 WL 2572210, at *5.

**Third**, Defendants' response letter cannot negate the plausible claims in the complaint. As an initial matter, the Court "may not consider matters beyond the complaint" when deciding a motion to dismiss. *Winget*, 537 F.3d at 576. The response letter was not "incorporated into the complaint by reference," as Plaintiffs' pre-suit notice was. *Solo*, 819 F.3d at 794. Even if it were referenced in the complaint, the Defendants' unilateral response is not "central to the claims" in this case in a way a contract signed by both parties is "central" to a breach-of-contract claim. *Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir. 1997) (considering "plan documents" and "services agreements" between the plaintiff and the defendant). And even if the Court could consider the response, it cannot use the response to "contradict[]" the factual allegations or inferences in the complaint. *Clark*, 998 F.3d at 298.

Regardless, Defendants' response letter largely rehashes the evidentiary disputes in the motion to dismiss. They appear to assert that Plaintiffs' data is wrong because the State has already "flagged" numerous registrations that "'will be cancelled after the two-federal-election waiting period expires in 2024'" if these voters take no action. Mot. 30. But even if the already-flagged registrations were responsible for some inflation of the rolls—and Defendants do not say how much—that does not exclude the plausibility that deficient list-maintenance is responsible for the rest. In fact, Defendants don't even argue that the problematic counties identified in the complaint were the ones slating registrations for removal.

As this Court has held before, even if "Secretary Benson's position is perhaps equally plausible, that argument, at the pleading stage, is insufficient to warrant dismissal under Rule 12." *PILF*, 2022 WL 21295936, at *10. To the extent there is "a potentially reasonable explanation for the high registration rate, … the validity of that explanation is not appropriate for determination at this early stage of the litigation, where the court views the factual allegations and inferences drawn therefrom in favor of [Plaintiffs]." *Voter Integrity Proj. NC*, 301 F. Supp. 3d at 619. This Court cannot dismiss the complaint even if it suspects that the "registration numbers may not be unreasonably high in context or there may be a reasonable explanation for them." *Griswold*, 2021 WL 3631309, at *11. At "the motion to dismiss stage, the Court does not 'weigh potential evidence that the parties might present'" in this manner. *Id.* Defendants' disputes about Plaintiffs' data thus cannot defeat "a 'reasonable inference' that the defendant is liable." *Green*, 2023 WL 2572210, at *5. Plaintiffs plausibly state a claim with a plethora of allegations approved by this Court and numerous other courts.

The purpose of the notice requirement is to permit the State an opportunity to *correct* the violation. If "the violation is not corrected," Plaintiffs can sue. 52 U.S.C. §20510(b)(2). Defendants don't assert they've corrected any violation. Throughout their response letter and motion, they deny that they've violated the NVRA. But the allegations in the complaint reveal otherwise, and the Court must accept those allegations as true.

*      *      *

Although Defendants do not raise timing issues, the DNC does. *See* DNC Br. 9-10. Those arguments are wrong, so it is no surprise Defendants didn't raise them. The DNC argues that Plaintiffs' "requested relief" would "violate both the NVRA and HAVA." *Id.* at 9. That's self-refuting: the complaint requests a "permanent injunction barring Defendants from violating section 8 of the NVRA." Compl. at 20. Plaintiffs also request an "order instructing Defendants to develop and implement reasonable and effective registration list-maintenance programs" and to "ensure that ineligible registrants are not on the voter rolls." Compl. at 20.

The DNC appears to believe that the *only way* to implement that relief would be to immediately remove large swaths of voters during the 90 days before an election. DNC Br. 9. But the DNC's speculations about the timing of relief are irrelevant at the pleading stage. Whether injunctive relief is appropriate during the 90 days before the next election—and what form it should take—has no bearing on the motion to dismiss. Even if this Court denies the motion to dismiss; the parties proceed through discovery, motions practice, and potential trial; and the Court is poised to enter final judgment within 90 days of the election, the DNC's argument is wrong. The Court can order a

variety of forms of relief during that 90-day period that would not offend the NVRA's blackout window: it could order that inactive voters are properly marked as inactive; that dead voters are removed from the rolls; that cancellation notices are sent to voters who moved to another jurisdiction; that voters who have received cancellation notices are *actually removed* from the rolls after two general election cycles; or that Defendants have "reasonable" systems and checks in place to ensure NVRA compliance. Neither the NVRA nor HAVA prohibit any of those actions at any time.

## **CONCLUSION**

The court should deny the motion to dismiss.

Respectfully submitted,

Dated: May 20, 2024

*/s/ Thomas R. McCarthy*

Thomas R. McCarthy
Gilbert C. Dickey
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com

*Counsel for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

This document was prepared using Microsoft Word Version 16.83. According to that software, the word count for this motion is 6,687 words, which complies with Local Rule 7.2(b).

*/s/ Thomas R. McCarthy*
Counsel for Plaintiffs

**CERTIFICATE OF SERVICE**

I certify that on May 20, 2024, I filed this document via the ECF system, which will serve everyone requiring notice.

*/s/ Thomas R. McCarthy*
Counsel for Plaintiffs