# Exhibit A

```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3      _____

 4      ANTHONY DAUNT,

 5                          Plaintiff,

 6

 7                                          DOCKET NO. 1:20-cv-522
        vs.
 8
        JOCELYN BENSON, in her official
 9      capacity as Michigan Secretary of
        State; JONATHAN BRATER, in his
10      official capacity as Director of
        the Michigan Bureau of Elections;
11      SHERYL GUY, in her official
        capacity as Antrim County Clerk;
12      DAWN OLNEY, in her official
        capacity as Benzie County Clerk;
13      CHERYL POTTER BROWE, in her
        official capacity as Charlevoix
14      County Clerk; KAREN BREWSTER, in
        her official capacity as
15      Cheboygan County Clerk; SUZANNE
        KANINE, in her official capacity
16      as Emmet County Clerk; BONNIE
        SCHEELE, in her official capacity
17      as Grand Traverse County Clerk;
        NANCY HUEBEL, in her official
18      capacity as Iosco County Clerk;
        DEBORAH HILL, in her official
19      capacity as Kalkaska County
        Clerk; JULIE A. CARLSON, in her
20      official capacity as Keweenaw
        County Clerk; MICHELLE L.
21      CROCKER, in her official capacity
        as Leelanau County Clerk;
22      ELIZABETH HUNDLEY, in her
        official capacity as Livingston
23      County Clerk; LORI JOHNSON, in
        her official capacity as Mackinac
24      County Clerk; LISA BROWN, in her
        official capacity as Oakland
25      County Clerk; SUSAN I. DEFEYTER,
        in her official capacity as
```

1   Otsego County Clerk MICHELLE
    STEVENSON, in her official
2   capacity as Roscommon County
    Clerk; and LAWRENCE KESTENBAUM,
3   in his official capacity as
    Washtenaw County Clerk,
4
5                   Defendants.
6   _____/
7
8        TRANSCRIPT OF HEARING ON MOTION TO DISMISS AND
9              RULE 16 SCHEDULING CONFERENCE
10     BEFORE THE HONORABLE ROBERT J. JONKER, CHIEF JUDGE
11                  GRAND RAPIDS, MICHIGAN
12                    October 27, 2020
13
14  Court Reporter:          Glenda Trexler
                             Official Court Reporter
15                           United States District Court
                             685 Federal Building
16                           110 Michigan Street, N.W.
                             Grand Rapids, Michigan 49503
17
18  Proceedings reported by stenotype, transcript produced by
19  computer-aided transcription.
20
21
22
23
24
25

```
 1    A P P E A R A N C E S:

 2    FOR THE PLAINTIFF:

 3         MR. CAMERON THOMAS NORRIS
           CONSOVOY MCCARTHY, PLLC
 4         1600 Wilson Boulevard, Suite 700
           Arlington, Virginia 22209
 5         Phone:  (865) 257-0859
           Email: cam@consovoymccarthy.com
 6
      FOR THE DEFENDANTS SECRETARY OF STATE JOCELYN BENSON AND
 7    DIRECTOR OF ELECTIONS JONATHAN BRATER:

 8         MS. ELIZABETH R. HUSA BRIGGS
           MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
 9         525 West Ottawa Street
           P.O. Box 30758
10         Lansing, Michigan 48909
           Phone:  (517) 335-7603
11         Email:  briggse1@michigan.gov

12    FOR INTERVENOR DEFENDANTS PHILIP RANDOLPH AND RISE, INC.:

13         MS. EMILY BRAILEY
           PERKINS COIE, LLP
14         700 13th Street, N.W., Suite 800
           Washington, DC 20005
15         Phone:  (202) 654-6200
           Email: ebrailey@perkinscoie.com
16
           MS. SARAH S. PRESCOTT
17         SALVATORE PRESCOTT, PLLC
           105 East Main Street
18         Northville, Michigan 48167
           Phone:  (248) 679-8711
19         Email: prescott@spplawyers.com

20    FOR THE INTERVENOR DEFENDANT LEAGUE OF WOMEN VOTERS:

21         MR. GEORGE B. DONNINI
           BUTZEL LONG, PC
22         150 West Jefferson Avenue, Suite 100
           Detroit, Michigan 48226
23         Phone:  (313) 225-7042
           Email: donnini@butzel.com

24

25
```

```
 1                                    Grand Rapids, Michigan

 2                                    October 27, 2020

 3                                    3:57 p.m.

 4                    P R O C E E D I N G S

 5            THE COURT:  All right.  We're here on the case of

 6   Daunt against Benson, 1:20-cv-522, at the Rule 16.  There are

 7   motions to dismiss pending from the State defendants as well as

 8   one of the intervenors.

 9            Let's start with appearances and we'll go from there.

10   For the plaintiff?

11            MR. NORRIS:  Good afternoon, Your Honor, Cam Norris

12   for the plaintiff, Mr. Daunt.

13            THE COURT:  All right.  Thank you.

14            And for the defendants?

15            MS. BRIGGS:  Good afternoon, Your Honor,

16   Assistant Attorney General Elizabeth Husa Briggs on behalf of

17   Secretary of State Jocelyn Benson and Director of Elections

18   Jonathan Brater.

19            THE COURT:  All right.  Thank you.

20            For our intervenors who do we have?

21            MS. BRAILEY:  Emily Brailey on behalf of

22   Philip Randolph and Rise, Inc.

23            THE COURT:  Thank you.

24            MS. PRESCOTT:  Good afternoon, Your Honor,

25   Sarah Prescott, local counsel for the same.
```

```
 1          MR. DONNINI:  And good afternoon, Your Honor,
 2    George Donnini from Butzel Long on behalf of the intervenor
 3    defendant League of Women Voters.
 4          THE COURT:  All right.  Thank you.
 5          For today's purposes if you use the microphone right
 6    in front of you, you're probably going to be best off.
 7    Especially if you want to stay masked, which is fine.  It will
 8    be easier for us to hear.  Just sit down, pull the microphone
 9    close.  If anybody can't sit down in court -- and I get that,
10    lawyers are not used to sitting down in court -- feel free to
11    walk over to the podium and use the microphone there.  Either
12    way.
13          We're here for the Rule 16, and, of course, that's a
14    scheduling conference.  You know, I did want to hear from the
15    parties, especially the moving parties, on the motion to
16    dismiss.  We had the original motion to dismiss directed to the
17    initial Complaint.  At that time it wasn't clear to me anyway
18    whether the plaintiff would be seeking relief in advance of
19    next Tuesday's election or whether it was simply seeking relief
20    down the road in the fullness of time so to speak.
21          If I'm understanding it right, Mr. Norris, your
22    relief is directed to, you know, down the road and nothing
23    specific to next Tuesday.  Is that right?
24          MR. NORRIS:  Correct, Your Honor.
25          THE COURT:  Okay.  Then there was an
```

1   Amended Complaint and another response.  The reason I bring it

2   up is because, you know, I had reviewed the briefing and case

3   law in that first round, and, of course, now again in the

4   second round, I know the briefing isn't complete, but I have to

5   say it doesn't seem like a hard standing case to me.  It seems

6   like somebody like this plaintiff has standing, and if this

7   plaintiff doesn't, I don't know who does under a National

8   Voting Rights Act kind of claim.  And, frankly, I think the

9   only National Voting Rights Act case I saw in the briefing from

10  any of the moving parties is one that granted standing

11  ultimately.  It was the Texas case.  So I want to make sure I

12  understand where the moving parties are going on that, but I'm

13  not inclined, from what I've seen so far, to think that there's

14  much chance of a standing dismissal, at least on Rule 12.

15          So let me go to Ms. -- is it Ms. Briggs?

16          MS. BRIGGS:  That's fine, Your Honor.

17          THE COURT:  Okay.  Pull that forward and make sure I

18  understand at least the essence of where you are on it, and

19  then we'll talk to any of the moving parties on the intervening

20  side who want to address it as well.  Go ahead.

21          MS. BRIGGS:  Well, Your Honor, we do believe that

22  Mr. Daunt has not established standing.  And I would point

23  you -- I mean, if you're focusing on the Texas case in

24  particular, Mr. Daunt is not -- Mr. Daunt is an individual.

25  He's not --

```
 1              THE COURT:  Well, let me start out with do you have
 2    any National Voting Rights Act case other than the American
 3    Civil Rights Union case?
 4              MS. BRIGGS:  I don't believe so, Your Honor, but we
 5    do have cases definitely dealing with --
 6              THE COURT:  I get that, but under the NVRA that's the
 7    only one I saw.  At least that's the only one you can think of
 8    right now.
 9              MS. BRIGGS:  Okay.
10              THE COURT:  And at the end of the day, at least some
11    plaintiffs had standing in that case, right?
12              MS. BRIGGS:  Not individuals, Your Honor.
13              THE COURT:  I said at least some plaintiffs had
14    standing in that case, right?
15              MS. BRIGGS:  Only the organizations.
16              THE COURT:  So some plaintiffs had standing in that
17    case.
18              MS. BRIGGS:  The organizations, but they did not have
19    the --
20              THE COURT:  Did some plaintiff have standing in that
21    case or not?
22              MS. BRIGGS:  Yes, but not as individuals.
23              THE COURT:  Okay.  So if Mr. Daunt joined an
24    organization he could have standing?  Is that the position?
25              MS. BRIGGS:  Well, the organization would have to be
```

```
 1    the plaintiff.

 2              THE COURT:  All right.  Anything else on the standing

 3    argument from the State defendants?

 4              MS. BRIGGS:  Well, we've also argued that we do not

 5    believe his letter, the February 26th letter, is sufficient.

 6    That he doesn't give sufficient notice as to what his actual --

 7    he doesn't identify any policy or procedure or any -- basically

 8    any reason by which the Secretary of State or the director --

 9    why Michigan's general program are not sufficient under the

10    NVRA.

11              THE COURT:  All right.  Anything else on the State

12    side?

13              MS. BRIGGS:  Well, we don't believe that a

14    generalized -- we believe basically what he's shown is that --

15    and what he's alleged is that this is just a generalized

16    grievance.  He's just appearing just on behalf as a Michigan

17    voter and there's nothing specific.  He's not even alleging to

18    be representative or involved in any politics with respect to

19    the specific counties at issue or that he alleges are showing

20    erroneous, for lack of a better word, erroneous voter

21    registration numbers, so . . .

22              And Article III standing, Your Honor, does require

23    more than just a generalized grievance about an alleged problem

24    with government activity.  It does require a concrete and

25    direct injury.  And it does require something that could be
```

1    fairly redressable from this Court.

2         Mr. Daunt is not associated even or does not even

3    allege to be associated with many of the counties that he

4    claims the data showing that there's a problem with.  Under the

5    case law, Your Honor, as we briefed, that's a -- standing is a

6    threshold issue, and he's not established standing.

7         THE COURT:  Okay.

8         MS. BRIGGS:  Thank you.

9         THE COURT:  Thank you.

10        From the intervenors, I don't think that there was a

11   motion from the League of Women Voters, but there were from

12   some of the others.  So I don't know who would like to speak on

13   behalf of the moving parties on the intervenor side.

14        MS. BRAILEY:  Your Honor, I can speak.  This is

15   Emily Brailey on behalf of Philip Randolph and Rise.

16        THE COURT:  Okay.  Thank you.

17        MS. BRAILEY:  We largely agree with what Ms. Briggs

18   has stated.  We agree with everything in that motion to

19   dismiss, including about the generalized grievance issue and

20   that plaintiff doesn't have standing.

21        And I'll add that we also don't think there is an

22   injury in fact about -- related to voter fraud or vote

23   dilution.

24        THE COURT:  Or dilution?  Okay.

25        MS. BRAILEY:  Or vote dilution.  I think that -- you

1    know, we rest on the cases we cited in our brief.  There's a

2    lot of recent precedent where their complaints can't stand on

3    such small evidence of or no evidence of voter fraud.

4              *THE COURT:*  Do you have any National Voter Rights Act

5    case?  I don't think you cited the Texas case, but --

6              *MS. BRAILEY:*  That's correct, Your Honor.

7              *THE COURT:*  But do you have any other National Voter

8    Rights Act case --

9              *MS. BRAILEY:*  No, Your Honor, but I am happy to

10   provide --

11             *THE COURT:*  -- on voter registration?  Go ahead.

12             *MS. BRAILEY:*  I'm sorry.  I'm happy to provide

13   additional briefing if you would like us to do that.

14             *THE COURT:*  Do you know if there is any case?

15             *MS. BRAILEY:*  Not off the top of my head right now.

16             *THE COURT:*  All right.  Thank you.

17             *MS. BRAILEY:*  And in addition, you know, we also

18   think the remaining factors of standing including causation and

19   redressability cannot be met here.

20             And on top of that, I mean, I guess you're only

21   asking about standing right now, but we also have the 12(b)(6)

22   failure to state a claim.

23             *THE COURT:*  Yeah, go ahead.  You can touch on that

24   too if you want to.

25             *MS. BRAILEY:*  So, again, this goes back to vote

1    dilution and whether that can even be recognized as a claim in

2    this context.  And really it's only been addressed in the

3    reapportionment cases.  And even if it is recognized outside of

4    those contexts, the plaintiff would need to show at least that

5    he's part of a group that is purportedly having its votes

6    diluted, and that just doesn't appear in this Complaint.

7              And finally, we echo a lot of what the State has in

8    their motion to dismiss regarding the current list maintenance

9    program and that there's just no evidence in that Complaint

10   that Michigan is not already implementing a reasonable and

11   adequate maintenance program.

12             *THE COURT:*  All right.  Thank you.

13             I don't know if -- I can't remember, Ms. Prescott,

14   are you representing the League of Women Voters or are you

15   representing the same groups or --

16             *MS. PRESCOTT:*  The same groups, Your Honor.

17             *THE COURT:*  Okay.  Do you want to add anything on

18   their behalf?

19             *MS. PRESCOTT:*  No, I don't.  Thank you.

20             *THE COURT:*  All right.  And from Mr. Donnini, I

21   didn't see a motion from your clients.  Do you want to have

22   anything to say on this?  And just stay seated if you do.

23             *MR. DONNINI:*  Sure, Your Honor.  It is a habit of

24   mine.

25             Your Honor, we did file an Answer.  I would just

1    point out that we believe also -- we believe the arguments in

2    the motions to dismiss that were filed are meritorious.  We

3    don't think that this states a valid claim upon which relief

4    can be granted.  And that is in our Answer.  However, we did

5    file an Answer and we are prepared to move forward if it does

6    survive, but for the arguments that have been made in court and

7    in the briefing, we agree that this case does not state a claim

8    and ought to be dismissed.

9            *THE COURT:*  All right.  I know your time to respond

10   hasn't fully run yet from the plaintiff's side, Mr. Norris, but

11   do you want to be heard at all today on where you're going with

12   that?  I know you touched in your earlier response on the

13   notice letter, not really on the other issues.

14           *MR. NORRIS:*  Thank you, Your Honor.  Just briefly.

15   Your Honor is correct that there have been NVRA cases in the

16   past filed under Section 8, and those cases have been litigated

17   past the 12(b) stage.  These are not cases that are normally

18   dismissed for lack of standing.

19           And one point that I would add to the prior case law,

20   I believe all the NVRA-specific cases that have been cited all

21   predate the Supreme Court's decision in Spokeo, which

22   Your Honor, I'm sure, is familiar with.  And in Spokeo the

23   Supreme Court made very clear as a holding for the first time

24   that Congress can actually affect how the Article III inquiry

25   works.  And here we have an express cause of action from

 1    Congress that allows individuals to bring claims under

 2    Section 8 of the NVRA.  That statute says individuals.  It

 3    allows people like Mr. Daunt to sue if they file the requisite

 4    presuit notice letter, as he did.

 5            And as the Court explained in Spokeo, Congress can

 6    elevate theories of causation and types of injuries that might

 7    not otherwise satisfy Article III and by recognizing those

 8    theories can make them satisfy Article III.  And we think

 9    that's precisely the case with the NVRA.

10            But even aside from Spokeo, even pre-Spokeo these

11    types of claims are cognizable and plaintiffs have standing to

12    bring them, like Mr. Daunt does.

13            *THE COURT:*  All right.

14            *MS. BRIGGS:*  May I respond, Your Honor?

15            *THE COURT:*  Go ahead.  Sure.

16            *MS. BRIGGS:*  The private cause of action authorized

17    under the NVRA is only available to a person who has been

18    aggrieved, and Mr. Daunt has not shown any way in which he's

19    been aggrieved.  Or at least there's not any factual allegation

20    even in the Complaint as amended that supports that.

21            Secondly, I would point you to page 17 in the State's

22    brief, page ID 320, where we identify and distinguish cases in

23    which -- we distinguish Mr. Daunt's allegations from those in

24    which the Sixth Circuit and the other circuits have found

25    standing in the context of the NVRA.  And so we have addressed

```
 1   that as well, Your Honor.

 2         Mr. Daunt's allegations in his Complaint even as

 3   amended don't rise to that level.  He's not shown that he's

 4   aggrieved.

 5         THE COURT:  All right.  And anything else,

 6   Ms. Brailey?

 7         MS. BRAILEY:  Yes, Your Honor.  We agree that he has

 8   not alleged that he's aggrieved, but on top of that, as we

 9   mentioned in our brief on page 3, we also argue that

10   Article III standing is a requirement in and of itself in

11   addition to being aggrieved under the statute.  And I would

12   also like to note that, you know, after the response we would

13   like the opportunity to have a reply and we can provide an

14   NVRA-focused brief if that would be helpful to the Court.

15         THE COURT:  All right.  Well, I don't think any

16   additional briefing is needed at this stage, to tell you the

17   truth.  And, of course, a ruling on a motion under Rule 12

18   doesn't mean it's the end of the issue.  Rule 56 is always

19   there.  But for Rule 12 purposes I don't think there's any

20   reason to go forward with further briefing because I think the

21   motions as they stand need to be denied.

22         I think there's clear standing established as a

23   matter of allegations here and at least a plausible claim

24   stated, which is all that needs to be happening at this stage

25   of the case.  And I'll just briefly articulate why I think
```

1    that's the case.

2         The parties are, of course, correct in their briefing

3    that you need under 52 U.S.C. § 2510 a person aggrieved, and

4    then, of course, under Article III of the Constitution somebody

5    is aggrieved that still satisfies the constitutional

6    requirements of standing.

7         In addition, under the National Voter Registration

8    Act you'd also have to show that the individual involved or the

9    person aggrieved satisfied the notice requirement.  I think

10   they are all established here.  At least as a matter of

11   pleading.  Which doesn't mean that the plaintiff ultimately

12   prevails but does, I think, mean that the plaintiff gets to go

13   beyond where they are right now.

14        With respect, first of all, to the notice letter, the

15   notice letter is attached to the First Amended Complaint, and

16   it's, in my view, a fairly detailed statement of why the

17   plaintiff thinks that there's a problem with the Michigan voter

18   registration lists and in particular that the defendants

19   haven't followed through on their obligation to come up with

20   under Section 8 an appropriate general program to remove voters

21   that don't belong on the registration list because they have

22   moved or because there has been a death.  And I don't think

23   it's incumbent on the plaintiff in a notice letter to say "Here

24   is the existing program of the state and here are the

25   particular flaws in it."  I think it is simply incumbent on the

1    plaintiff to say "Here is why I think there's a problem and why

2    I don't think whatever program you're using, if any, is up to

3    the task."

4            And certainly on the face of things, at least in

5    Leelanau County if you have more registered voters than

6    eligible voters living, at least based on the census data, a

7    reasonable inference, or at least a plausible inference is

8    there's a problem with the system that's been used to address

9    the voter registration list.  And there's additional specific

10   examples given.  I don't know if those numbers are going to

11   hold up.  I don't know if that's going to be explained in some

12   other fashion.  But I do think for purposes of a notice letter

13   as well as the allegations of the First Amended Complaint which

14   largely repeat that detail, there's at least a plausible case

15   for a problem with the Section 8 obligation.  And whether or

16   not the State has a program, whether or not it's implemented a

17   program, and whether or not it's reasonable, those are merits

18   issues that, of course, aren't decided today and the plaintiff

19   may ultimately not prevail, but I think they have done enough

20   to get that far.

21           What the plaintiff's First Amended Complaint includes

22   in addition to what's in the notice letter is additional

23   factual basis that the plaintiff says illustrates the reasons

24   for their concern in terms of the I think it was about 500,000

25   or so returns that came back when the Secretary of State sent

1    out the absentee applications earlier.  It was after the notice
2    letter but before the First Amended Complaint.  And I think
3    that adds to the plausibility for purposes of the 12(b)(6) and
4    also gets into where we'll go next which is whether or not
5    Mr. Daunt is an aggrieved person under the statute and
6    sufficiently pleading a basis for standing with Article III.
7               I think that Mr. Daunt in the First Amended Complaint
8    really relies on three main categories of injury that he says
9    are concrete and particularized.  He is a voter in the state of
10   Michigan.  He is concerned about the possibility that his vote
11   would be diluted.  But he's not only focused on that.  He's
12   also concerned about the general cloud on the outcome of an
13   election if the registration lists aren't properly purged and
14   reflecting somebody -- or a list that's complied with the
15   Section 8 requirement.  And he's concerned that he has to spend
16   extra time and effort policing the efforts of the secretary and
17   the director of elections to make sure these lists are where
18   they need to be and to make sure that the voting is coming off
19   properly.  And I don't think that matters that he's doing so or
20   alleging his interest in doing so as an individual as opposed
21   to an organization.  The fact that he is expressing the same
22   kind of concern that the organization did in the American Civil
23   Rights Union case from the Western District of Texas is, I
24   think, fundamentally the point.  And he alleges a plausible
25   basis for why he as an individual voter in the state and active

1    in Republican politics in his case would be interested and

2    concerned about that, and for purposes of alleging injury I

3    think that's sufficient.

4              The point that the plaintiff makes about Spokeo and

5    the statutory cause of action is, I think, also important.

6    You know, I think so many of us, both at the bench and the bar,

7    from the Supreme Court point of view look at Spokeo as a case

8    that denied standing on a statutory claim or at least found it

9    inadequate as presently alleged and wanted to go back and have

10   the lower courts review it under the new standard.  And so it's

11   easily cited and I think to some extent potentially

12   misunderstood as a case that makes standing unusually difficult

13   for a plaintiff seeking to enforce a private right of action

14   under a congressional statute.  But in fact, as the

15   Ninth Circuit found on remand in Spokeo, 867 F.3d. 1108 in

16   2017, the fact that Congress makes a decision to create a

17   private right of action is something that the Court is

18   obligated under the Supreme Court's decision and then as

19   interpreted now by the circuits, Second Circuit, Ninth Circuit,

20   when the Congress says "We have the following interests," and

21   here we have a variety of interests at issue in the Voter

22   Registration Act, but two of them certainly are concerned with

23   exactly what Mr. Daunt says he's concerned with, the integrity

24   of the electoral process in ensuring that accurate and current

25   voter registration roles are maintained, when Congress lays

1    those out and says here is a private right of action for a

2    person aggrieved to enforce it, and that person, Mr. Daunt in

3    this case, comes forward, that's close to almost -- I won't say

4    a slam dunk -- but close to saying if not Mr. Daunt, then who?

5    This is exactly the kind of person that Congress had in mind to

6    protect these interests for the reasons that Mr. Daunt

7    articulates in the First Amended Complaint.

8         The intervenors are here, and I thought their claim

9    for intervention was clear enough because they are concerned

10   with also making sure that the other interests of the

11   National Voter Registration Act are recognized and enforced and

12   that we don't unduly purge voter roles, making it more

13   difficult for eligible citizens to register or to participate

14   in elections.  They are both sides of the same coin, and I

15   think this is exactly the way Congress thought the interests

16   would be vindicated and protected on all sides.  So for me when

17   you have a congressionally created private right of action like

18   this to address exactly the interests that Mr. Daunt says he's

19   suffering from a fear of losing, you have intervenors on the

20   other side who want to make sure things don't go off the rails

21   in removing people who deserve to be there or discouraging them

22   from registering, we have exactly the interests aligned that I

23   think Congress, first of all, had in mind and that the

24   Supreme Court in Spokeo and the circuits following Spokeo have

25   recognized as part and parcel of what's involved in a statutory

1     cause of action.

2            I already touched on the American Civil Rights Union

3     case which I think -- we might have missed something -- but I

4     think it's the only National Voter Registration Act case I saw

5     cited by anybody on the standing issue, did result in standing

6     for the plaintiff, albeit not on every theory advanced but

7     at least on multiple theories.  And the only other cases that I

8     saw outside of the NVRA context that talked about general

9     dilution or fear of dilution I think are all readily

10    distinguishable and that none of those arise under a situation

11    like the National Voter Registration Act where Congress has

12    articulated the private right of action and reasons for it.

13           The other case that I think was referenced of

14    interest in probably the State briefing, it might have been the

15    intervenors, was the Buchholz case from our circuit under the

16    Fair Debt Collection Practices Act where standing was not

17    recognized, but that's a perfect example of where the interests

18    that the party plaintiff was talking about was not within the

19    scope of the cause of action that Congress had set up, and I

20    think in that case the trial court here, Judge Quist, and then

21    the Sixth Circuit affirming him said, "No, that's not right.

22    We don't have Article III standing here even though you might

23    have a technical issue under the statute."  And that's because

24    in Buchholz the complaint was that the lawyers were harassing

25    the plaintiff by writing him letters, telling him he had to pay

1    on a debt that he didn't contest.  And undoubtedly that may

2    have created anxiety, but not the kind of anxiety that was at

3    the root of the Fair Debt Collection Practices Act.

4         And I think in this case the situation is quite

5    different.  The concerns that Mr. Daunt articulates around

6    potential for dilution, potential for a cloud on the election,

7    and potential for extra work and resources policing the

8    validity and propriety of the election are exactly interests

9    that are within the scope of the NVRA, just as the interests

10   the intervenors intend to protect are other interests on the

11   other side of the NVRA coin.  So from my perspective there is

12   proper notice in advance.  There is at least a plausible basis

13   for a cause of action alleged under the National Voter

14   Registration Act and a plausible basis for standing articulated

15   under Article III.  So for those reasons I'm going to deny the

16   pending motions to dismiss.

17        Of course, the parties remain free to raise all these

18   issues as the record develops in addition to the merits, and

19   that's what we'll litigate going forward.  But the motions I'm

20   denying today.

21        The schedule is really not something the parties

22   disagree about very much.  At least once the motions are

23   decided.  So let me do this:  I'll articulate deadlines that I

24   would propose and then see if anybody has comments or

25   objections to that or concerns about it or anything else that

1   we need to address.

2           From a scheduling point of view I'd start with

3   paragraph 5 of your Joint Status Report on joinder, and rather

4   than have a specific date, which is pretty early in any case,

5   I'm simply going to say do that by motion if and when a party

6   thinks there's a need to do that, or a stipulation if everybody

7   agrees, but I won't give you a separate date for that.

8           For discovery overall I'm going to propose June 30 of

9   next year, which is a little longer than you're thinking but I

10  think appropriate.  And I'd key a series of expert disclosures

11  off that.  If you're going to use an expert on an issue where

12  you have the burden of proof, disclose with reports by

13  March 31.  Any other expert you're using disclose by April 30.

14  And if you need a rebuttal expert after that, something

15  surprises you in the April 30 disclosure, disclose with reports

16  by May 15.

17          We'd give you a motion cutoff of July 31, and then I

18  would set a second Rule 16 sometime after the motions are filed

19  so we can get together, find out what's going to be litigated

20  substantively in those motions, whether there's room at that

21  point for ADR, maybe there is, maybe there isn't, and what else

22  needs to be happening from a scheduling point of view.  So

23  those would be the overall deadlines I'd be prepared to set

24  today.

25          For discovery limits my inclination would be to do

1    just the generic discovery limits at this point under the rules

2    which would be 10 depositions per side as the current limit

3    with the seven-hour presumptive limit, 25 interrogatories.  I

4    think the parties want to limit it to 25 requests for

5    admission.  That's fine with me too.

6              So let me start with the plaintiff, Mr. Norris,

7    concerns, questions, or other things we need to take up from

8    your perspective?

9              MR. NORRIS:  Thank you, Your Honor.  I think the only

10   disputed question in the status report was the number of

11   depositions.

12             THE COURT:  Right.

13             MR. NORRIS:  We initially sued several county

14   defendants because that's, you know, the data we have, and the

15   Complaint suggests problems at the county-wide level.  And we

16   would like to be able to depose all the county defendants.

17   However, we don't feel strongly about an initial 10

18   depositions.  Perhaps the county defendants are not fruitful

19   avenues for discovery, and maybe we'll find that out.  As long

20   as -- I think my colleagues have already expressed to me that

21   if we need additional depositions we can raise that by motion

22   later and they would be accommodating.

23             THE COURT:  Okay.  Let's go to Ms. Briggs for the

24   defendants.

25             MS. BRIGGS:  Your Honor, Mr. Norris is correct, we do

1    believe that 10 depositions is plenty.  And with respect to the
2    counties, based on your September order he can submit
3    interrogatories and requests for admission to the counties, and
4    I don't -- it seems to me that whatever information he may need
5    to get from them could be gotten from them in that way.  So
6    from our perspective 10 depositions is plenty given this case.
7            *THE COURT:*  Okay.  Ms. Brailey.
8            *MS. BRAILEY:*  We also agree that 10 depositions is
9    plenty, and we also agree that the federal rule set these
10   limits and we think it's fair to abide by them.  And, again, we
11   agree that if we need to reassess down the road we would be
12   amenable to conferencing.
13           *THE COURT:*  Okay.  Ms. Prescott, anything you want to
14   add?
15           *MS. PRESCOTT:*  No, Your Honor.
16           *THE COURT:*  All right.  Mr. Donnini.
17           *MR. DONNINI:*  Your Honor, we agree as well, but I
18   don't have anything further to add.
19           *THE COURT:*  Okay.  Well, I'm going to go ahead with
20   the deadlines that I outlined, then, and the discovery limits.
21   It doesn't preclude a motion down the road if the plaintiff
22   says "Hey, I need depositions that go beyond that," or it
23   doesn't preclude the parties from agreeing to that if they see
24   it the same way by that time.  But I do think that for starting
25   purposes the presumptive limits make sense here.  Even from the

1    allegations that the plaintiff has in the First Amended

2    Complaint, there's going to be some counties that are more the

3    focus of interest than others.  And beyond that, as Ms. Briggs

4    indicates, there are opportunities short of deposition to get

5    information that may satisfy what the parties need or at least

6    provide a basis for the Court down the road to say "Well, I

7    think some additional depositions are needed" or not.

8            So that's what I'm going to do is stick with the

9    presumptive limits for now.  But, of course, anybody is free to

10   either seek protective orders limiting that or adding to that

11   if the facts develop on the ground differently.

12           From any party's perspective are there other things

13   that should be addressed today?  Plaintiff?

14           *MR. NORRIS:*  No, Your Honor.

15           *THE COURT:*  Or defense?

16           *MS. BRIGGS:*  No, Your Honor.

17           *THE COURT:*  Or intervenors?

18           *MS. BRAILEY:*  No, Your Honor.

19           *MR. DONNINI:*  No, Your Honor.

20           *THE COURT:*  Okay.  Thank you all.  See you next time.

21           *MS. BRIGGS:*  Thank you.

22           *THE CLERK:*  Court is adjourned.

23       *(Proceeding concluded at 4:29 p.m.)*

24                    *   *   *   *   *

25

1          I certify that the foregoing is a correct transcript

2     from the record of proceedings in the above-entitled matter.

3          I further certify that the transcript fees and format

4     comply with those prescribed by the court and the Judicial

5     Conference of the United States.

6

7     Date:   November 3, 2020

8

9                              **/s/ Glenda Trexler**

10                             _____

                               Glenda Trexler, CSR-1436, RPR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25