UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

REPUBLICAN NATIONAL COMMITTEE,
et al.,

       Plaintiffs,                           Case No. 1:24-cv-262

v.                                     HON. JANE M. BECKERING

JOCELYN BENSON, et al.,

       Defendants.

_____/

## OPINION AND ORDER

The Republican National Committee (RNC) and two individual voters—Jordan Jorritsma and Emerson Silvernail—initiated this case under the National Voter Registration Act (NVRA), 52 U.S.C. § 20507, against Defendants Jocelyn Benson in her official capacity as Michigan's Secretary of State and Jonathan Brater in his official capacity as Director of the Michigan Bureau of Elections. Plaintiffs seek declaratory and injunctive relief for an alleged violation of § 8 of the NVRA, which requires States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(a)(4). Now pending before the Court is Defendants' Motion to Dismiss (ECF No. 18). For the following reasons, the motion to dismiss is properly granted.[1]

---

[1] The Detroit/Downriver Chapter of the A. Philip Randolph Institute (APRI) and the Michigan Alliance for Retired Americans (MiARA) moved to intervene in this case (ECF No. 8, as amended by ECF No. 9), and Defendants moved for an extension of time to respond (ECF No. 14). The League of Women Voters of Michigan also filed a motion to intervene (ECF No. 12). Given the Court's resolution of Defendants' motion to dismiss, the motions to intervene and the related motion for an extension of time will be dismissed as moot.

## I.  BACKGROUND

### A.  Legal Context

**1.  The NVRA & the HAVA**

In 1993, Congress enacted the NVRA, Pub. L. No. 103−31, 107 Stat. 77 (codified as amended at 52 U.S.C. §§ 20501−20511), to establish procedures that would "increase the number of eligible citizens who register to vote in elections for Federal office;" "enhance[ ] the participation of eligible citizens as voters in elections for Federal office;" "protect the integrity of the electoral process;" and "ensure that accurate and current voter registration rolls are maintained."  52 U.S.C. § 20501(b)(1)−(4).  The NVRA requires states to offer voter registration by mail, by application in person at all offices in the state providing public assistance or administering state-funded programs that primarily provide services to persons with disabilities, and by application in person while applying for a motor vehicle driver's license.  *Ass'n of Cmty. Organizations for Reform Now v. Miller*, 129 F.3d 833, 835 (6th Cir. 1997).  The NVRA also sets forth requirements for removing registrants from the voter registration roll because of the death of the registrant or a change in the residence of the registrant.  *Id.* (citing the predecessor to 52 U.S.C. § 20507(a)(4)(A), (B)).

As other circuits have observed, the NVRA's objectives—easing barriers to registration and voting, while at the same time protecting electoral integrity and the maintenance of accurate voter rolls—can sometimes be in tension with one another.  *See Bellitto v. Snipes*, 935 F.3d 1192, 1198 (11th Cir. 2019); *Am. C.R. Union v. Philadelphia City Comm'rs*, 872 F.3d 175, 178 (3d Cir. 2017).  "On the one hand, maintaining clean voter rolls may help ensure election integrity, but on the other hand, purging voters from the rolls requires voters to re-register and hinders participation in elections." *Am. C.R. Union, supra.*

Section 8 of the NVRA, which is the section at issue in this case, prohibits the removal of a name of a registrant except in the following three narrow circumstances:  (1) at the registrant's request, (2) "by reason of criminal conviction or mental incapacity"; and (3) through a "general program that makes reasonable efforts to remove" the names of voters rendered ineligible either by death or upon a change in residence.  52 U.S.C. § 20507(a)(3), (4).  Section 8 generally restricts states from removing ineligible registrants from the voter rolls within 90 days of an election.  52 U.S.C. § 20507(c)(2)(A).[2]  The NVRA provides for a civil enforcement action by the Attorney General, 52 U.S.C. § 20510(a), and a civil action for "declaratory or injunctive relief" by a "person who is aggrieved by a violation" of the NVRA, *id.* § 20510(b).

In 2002, building on the reforms in the NVRA, Congress enacted the Help America Vote Act (HAVA), Pub. L. No. 107−252, 116 Stat. 1668 (codified as amended at 52 U.S.C. §§ 20901−21145).  The HAVA requires states to maintain, "in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State."  52 U.S.C. § 21083(a)(1)(A). Under the HAVA, "[t]he computerized list shall serve as the single system for storing and managing the official list of registered voters throughout the State," shall "contain[ ] the name and registration information of every legally registered voter in the State," and "shall serve as the official voter registration list for the conduct of all elections for Federal office in the State."  52 U.S.C.  § 21083(a)(1)(A)(i), (ii), (viii).   The HAVA requires that list maintenance "shall be

---

[2] For example, Defendants indicate that for this election cycle, the ninetieth day before the August 6, 2024 primary is May 8, 2024; and the ninetieth day before the November 5, 2024 general election is August 7, 2024 (ECF No. 19 at PageID.274 n.2).  Hence, systematic removals were required by law to cease by May 8, 2024 until after the November 2024 election (*id.*).

conducted in a manner that ensures that . . . only voters who are not registered or who are not eligible to vote are removed from the computerized list."  52 U.S.C. § 21083(a)(2)(B)(*ii*). Specifically, the HAVA provides that "the State election system shall include provisions to ensure that voter registration records are accurate and are updated regularly, including . . . safeguards to ensure that eligible voters are not removed in error from the official list of eligible voters."  52 U.S.C. § 21083(a)(4)(B).  The HAVA provides that "if an individual is to be removed from the computerized list, such individual shall be removed in accordance with the provisions of the National Voter Registration Act of 1993."  *Id.* § 21083(a)(2)(A)(i).

## 2.  Michigan's Election Law

Secretary Benson is the chief election official of Michigan and is responsible for coordination of Michigan's responsibilities under the NVRA, the HAVA, and Michigan's Election Law.  52 U.S.C. § 20509; MICH. COMP. LAWS § 168.509n.  *Cf. Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018) (describing the NVRA as "a complex superstructure of federal regulation atop state voter-registration systems") (citation omitted).  Secretary Benson is responsible for the overall operation of the Michigan Department of State, including the Bureau of Elections (BOE), which is headed by Director Brater.  By law, Director Brater is "vested with the powers and shall perform the duties of the secretary of state under . . . her supervision, with respect to the supervision and administration of the election laws."  MICH. COMP. LAWS § 168.32(1).  In compliance with the HAVA, Michigan created the qualified voter file (QVF) as the State's computerized statewide voter registration list.  *See generally* MICH. COMP. LAWS §§ 168.509m(1)(a), 168.509o, 168.509p, 168.509q, 168.509r.

### a. Deceased Voters

With respect to the deaths of registered voters, Michigan law requires the Secretary of State to—

> develop and utilize a process by which information obtained through the United States Social Security Administration's death master file that is used to cancel an operator's or chauffeur's license . . . or an official state personal identification card . . . of a deceased resident of this state is also used at least once a month to update the qualified voter file to cancel the voter registration of any elector determined to be deceased.

MICH. COMP. LAWS § 168.509o(4). On a weekly basis, the BOE cancels the voter registrations of all registered voters who appear on the Social Security Administration's Master Death Index report.[3] The BOE also uses death information received from the Electronic Registration Information Center (ERIC), a bipartisan group of states and Washington, D.C., who share voter registration data with each other for the purpose of keeping voter rolls complete, up to date, and accurate.[4]

Secretary Benson must also "make the canceled voter registration information . . . available to the clerk of each city or township to assist with the clerk's obligations under section 510." MICH. COMP. LAWS § 168.509o(4). Under § 510, "[a]t least once a month, the county clerk shall forward a list of the last known address and birth date of all persons over 18 years of age who have died within the county to the clerk of each city or township within the county. The city or township clerk shall compare this list with the registration records and cancel the registration of all deceased electors." MICH. COMP. LAWS § 168.510(1). County clerks act as the local registrar for purposes

---

[3] *See generally* Michigan Department of State, Bureau of Elections, Voter registration cancellation procedures (michigan.gov) (last visited 10/18/2024).
[4] *Id.*

of maintaining vital records and statistics, such as deaths.  MICH. COMP. LAWS §§ 333.2804(4),

333.2815(2), 333.2833.

Last, a local "clerk may conduct a program . . . to remove names of registered voters who

are no longer qualified to vote in the city or township from the registration records of that city or

township."  MICH. COMP. LAWS § 168.509dd(1).  Such program must be uniformly administered

and must comply with the NVRA, including the requirement that any program be concluded 90

days or more before a federal election, except for removals conducted at the request of a voter,

upon the death of a voter, or upon notice that the voter has moved and applied for registration in a

different jurisdiction.  MICH. COMP. LAWS § 168.509dd(1), (2)(a)–(c).  A local clerk may conduct

a house-to-house canvass, send a general mailing to voters for address verifications, participate "in

the national change of address program established by the postal service," or use "[o]ther means

the clerk considers appropriate" to conduct a removal program.   MICH. COMP. LAWS

§ 168.509dd(3).

This Court recently examined in detail Michigan's program for removing deceased voters

from the QVF, concluding that the multilateral process was "reasonable" and rejecting a challenge

that it violated the NVRA.  *See Public Int. Legal Found. v. Benson*, __ F. Supp. 3d __ (W.D. Mich.,

2024); 2024 WL 1128565 (March 1, 2024), appeal docketed, No. 24-1255 (6th Cir.).

### b.  *Voters Who Change Addresses*

As for changes of address of residents or former residents of a clerk's city or township,

Michigan law requires the Secretary to notify each clerk when a "[d]river license or state personal

identification card changes of address [is] received by the secretary of state, and whether the person

submitted an application for the new address."  MICH. COMP. LAWS § 168.509z(a).  The Secretary

must also provide the "names and addresses in this state of persons who have been issued a driver

license in another state."  MICH. COMP. LAWS § 168.509z(b). These requirements are consistent

with § 509o(5), which concomitantly requires the Secretary to "participate with other states in 1

or more recognized multistate programs or services . . . to assist in the verification of the current

residence and voter registration status of electors."  MICH. COMP. LAWS § 168.509o(5).  The

Secretary must "follow the procedures under section 509aa(5) with regard to any electors affected

by information obtained through any multistate program or service."  *Id*.  As with deceased voters,

the Department of State receives information from ERIC when a voter has registered in another

state, and the Department uses this information to begin the cancellation process for that voter's

registration in Michigan.[5]

A clerk may also use "change of address information supplied by the United States Postal

Service or other reliable information received by the clerk that identifies registered voters whose

addresses may have changed as provided in this section."  MICH. COMP. LAWS § 168.509aa(1).

Michigan law clearly instructs how a clerk must proceed if the clerk receives "reliable information"

that a voter has "moved his or her residence" either "within the city or township," § 509aa(2)(a)–

(c), or "to another city or township," § 509aa(3)(a)–(c).  In both cases, the voter must be sent a

notice that requests the voter to verify or correct the address information within 30 days before the

next election.  *Id*.  If notices are returned as undeliverable to the issuing clerk under either

§ 509aa(2) or (3), then the clerk shall identify the voter's registration record as "challenged[.]"

MICH. COMP. LAWS § 168.509aa(4).  Similarly, subsection 509aa(5) provides that "[i]f the

department of state receives notice that a registered voter has moved out of state by receiving a

surrendered Michigan driver license of that registered voter, the secretary of state shall send" to

---

[5] *See generally* Michigan Department of State, Bureau of Elections, Voter registration cancellation procedures (michigan.gov) (last visited 10/18/2024).

the voter notice that requests the voter to verify or correct the address information within 30 days before the next election.  MICH. COMP. LAWS § 168.509aa(5).  For voters who receive notices under either § 509aa(3) (in-state move to another jurisdiction) or § 509aa(5) (out-of-state move), the voters must receive information that their registrations will be cancelled after "the second November general election" after which the notice was sent.  MICH. COMP. LAWS §§ 168.509aa(3)(c)(*i*), (5)(c).

Additionally, § 509r requires the Secretary to create and maintain "an inactive voter file." MICH. COMP. LAWS § 168.509r(4).  Voters who fail to vote for six years or confirm residency information must be placed in the inactive file.  MICH. COMP. LAWS § 168.509r(5).  The registration record of that elector must remain in the inactive voter file until one of the following occurs:  "(a) The elector votes at an election[;] (b) The elector responds to a notice sent under section 509aa[;] [or] (c) Another voter registration transaction involving that elector occurs."  *Id.* "While the registration record of an elector is in the inactive voter file, the elector remains eligible to vote and his or her name must appear on the precinct voter registration list."  MICH. COMP. LAWS § 168.509r(6).  If a voter on the inactive voter file "votes at an election by absent voter ballot, that absent voter ballot must be marked in the same manner as a challenged ballot . . . ."  MICH. COMP. LAWS § 168.509r(7).

Last, as described *supra*, local clerks are authorized to conduct programs to remove names from the QVF to correct address information, programs that, with some exceptions, must conclude 90 days or more before a federal election.  *See* MICH. COMP. LAWS § 168.509dd.

### c. Cancellations

The Michigan Department of State indicates that as of March 2024, more than 800,000 voter registrations have been cancelled since 2019.[6]   The cancellations include 532,513 registrations of deceased voters; 273,609 registrations of voters who received the required notice under the NVRA; and 16,716 registrations of voters who requested to have their own records cancelled.[7]   Additionally, as of March 2024, there are more than 550,000 voter registrations scheduled for cancellation in 2025 or 2027.[8]  The projected number of cancellations is higher than prior years in part because Secretary Benson sent election mail to every registered voter in 2020, and for those whose mail was returned undeliverable, Michigan sent a notice of cancellation before the 2022 election.[9]  Specifically, Defendants represent that as of April 15, 2024, another 360,228 voters are slated for cancellation in 2025, and 201,805 voters are slated for cancellation in 2027 (ECF No. 19 at PageID.283).

### B.  Factual Background & Procedural Posture

On December 8, 2023, Plaintiffs mailed a statutory notice letter to Secretary Benson and Director Brater, notifying them of 78 Michigan counties that Plaintiffs believed were in violation of NVRA § 8 and formally requesting that Defendants correct the violations within 90 days (Compl. [ECF No. 1] ¶ 83, citing Pls. Ex. A [ECF No. 1-1]).  Specifically, Plaintiffs claimed that they had determined that "55 counties have more registered active voters than adult citizens over the age of 18" and that "another 23 counties that have voter registration rates that exceed 90 percent of adult citizens over the age of 18" (ECF No. 1-1 at PageID.23).  Plaintiffs opined that the number

---

[6] *See generally* Michigan Department of State, Bureau of Elections, Voter registration cancellation procedures (michigan.gov) (last visited 10/18/2024).
[7] *Id.*
[8] *Id.*
[9] *Id.*

of registered voters is "impossibly high" (*id.* at PageID.26).  Plaintiffs concluded that their "evidence shows that your office and county, city, and township clerks in these counties are not conducting appropriate list maintenance to ensure that the voter registration roll is accurate and current, as required by federal law" (*id.* at PageID.23).  Plaintiffs requested that Defendants "respond in writing within 45 days of the date of this letter," "fully describ[ing] the efforts, policies, and programs [they] are taking, or plan to undertake before the 2024 general election to bring Michigan into compliance with Section 8," as well as when they "plan to begin and complete each specified measure and the results of any programs or activities [they] have already undertaken" (Compl. ¶ 87).

Less than three weeks later, on December 28, 2023, Director Brater did respond to Plaintiffs' letter, detailing for Plaintiffs the Department's compliance with the NVRA and the HAVA (12/28/23 Letter, Defs. Ex. 2, ECF No. 19-3 at PageID.316–320, 320).  Director Brater stated that as of December 27, 2023, the State of Michigan has "8.2 million *total* registered voters," and that of those 8.2 million, "approximately 7 million are *active* registered voters" (*id.* at PageID.319) (emphases in original).  Director Brater indicated that by law, Michigan must maintain a list of inactive voters (*id.*, citing MICH. COMP. LAWS § 168.509r(5)).  Additionally, Director Brater explained that "the State of Michigan cannot remove inactive voters without following the requirements in both NVRA and HAVA" (*id.* at PageID.320).

Director Brater stated that it appeared that Defendants were relying on the 2022 Census American Community Survey (ACS) as support for their allegations that Michigan is violating the NVRA and HAVA (*id.* at PageID.319).  Director Brater explained that the ACS census data "provides a 'snapshot' of where people are currently living but is not necessarily indicative of where they are legally allowed to be registered to vote" (*id.*).  Director Brater indicated that "the

total active voter registration number in Michigan is approximately 88 percent of this figure" (*id.*). According to Director Brater, when utilizing the "active" voter registration data available on the Secretary of State's website, "none of the counties identified in [Defendants'] letter have active voter registration percentages above 100%" (*id.* at PageID.319–320).  Director Brater also explained that largely because of a statewide mailing of absent voter ballot applications in 2020, which was the first statewide election mailing in at least a decade, state and local election officials were able to identify a significant number of registered voters who appeared to have changed address (*id.* at PageID.318).  According to Director Brater, state and local officials used the applications that were returned as undeliverable to mark voters as "inactive" and send notices of cancellation in 2021 (*id.*).  Director Brater indicated that without action by these voters, their registrations will be cancelled after the two-federal-election waiting period expires in 2024 (*id.*). Indeed, Director Brater indicated that following the process established by law, an estimated 521,116 voter registrations are slated for cancelation (*id.* at PageID.320).

Plaintiffs acknowledged receipt of "updated comparisons based on recently available data" (Compl. ¶ 84).  Plaintiffs indicated that they also "researched statements made by Defendants in their correspondence" (*id.* ¶ 24).  According to Plaintiffs, the data nonetheless reveals that "nearly all Michigan counties are in violation of section 8" (*id.* ¶ 84).

On March 13, 2024, Plaintiffs filed this suit, alleging that "Michigan has failed to live up to the NVRA's requirements" and reiterating their same claim that "[a]t least 53 Michigan counties have more active registered voters than they have adult citizens who are over the age of 18" and "[a]n additional 23 counties have active-voter registration rates that exceed 90 percent of adult citizens over the age of 18" (*id.* ¶¶ 2–4).  Plaintiffs again opined that the number of registered voters is "impossibly high" (*id.* ¶ 3).  According to Plaintiffs, "[h]aving a high percentage of

inactive registrations is an indication that a state or jurisdiction is not removing inactive registrations after two general federal elections" (*id.* ¶ 62).

On April 15, 2024, Defendants filed the motion to dismiss at bar (ECF No. 18).  On April 16, 2024, without expressing any view as to the merits of the motion, this Court issued an Order affording Plaintiffs the opportunity to cure their allegedly inadequate pleading by granting Plaintiffs leave to file an amended complaint, as allowed by Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure (ECF No. 22).  This Court's Order indicated that if Plaintiffs did not timely file an amended complaint, then Plaintiffs must file a response to the motion to dismiss, and the Court would decide the motion (*id.*).  Plaintiffs did not amend their Complaint; rather, on May 20, 2024, Plaintiffs filed a response in opposition to Defendants' motion (ECF No. 27).  On June 17, 2024, Defendants filed a reply to the response (ECF No. 30).  The Court also accepted an amicus brief from the Democratic National Committee (ECF No. 24-2).  Having considered the submissions, the Court concludes that oral argument is unnecessary to resolve the issues presented.  *See* W.D. Mich. LCivR 7.2(d).

## II.  ANALYSIS

### A.  Motion Standards

#### 1.  Rule 12(b)(1)

Defendants' motion to dismiss is filed pursuant to Federal Rule of Civil Procedure 12(b)(1) (lack of subject-matter jurisdiction) and 12(b)(6) (failure to state a claim upon which relief can be granted).  Whether a party has standing is an issue of the court's subject-matter jurisdiction under Rule 12(b)(1).  *See Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017); *Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir. 2013); *Roberts v. Hamer*, 655 F.3d 578, 580–81 (6th Cir. 2011).

In questioning the sufficiency of a plaintiff's pleadings about standing, a defendant launches a "facial attack" on subject-matter jurisdiction. *Primus Grp., LLC v. Smith & Wesson Corp.*, 844 F. App'x 824, 826 (6th Cir. 2021). "In a facial attack, a 'movant accepts the alleged jurisdictional facts as true and 'questions merely the sufficiency of the pleading' to invoke federal jurisdiction.'" *Polselli v. United States Dep't of the Treasury–Internal Revenue Serv.*, 23 F.4th 616, 621 (6th Cir.) (citations omitted), aff'd sub nom. *Polselli v. Internal Revenue Serv.*, 598 U.S. 432 (2023). "In reviewing a facial attack to a complaint under Rule 12(b)(1) for lack of standing, '[courts] must accept the allegations set forth in the complaint as true' while drawing all inferences in favor of the plaintiff[.]" *Hile v. Michigan*, 86 F.4th 269, 273 (6th Cir. 2023) (citation omitted).

## 2. Rule 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint if it "fail[s] to state a claim upon which relief can be granted[.]" FED. R. CIV. P. 12(b)(6). Specifically, a complaint must present "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557, 570 (2007). The court views the complaint in the light most favorable to the plaintiff, accepting as true all well-pled factual allegations and drawing all reasonable inferences in favor of the plaintiff. *Gavitt v. Born*, 835 F.3d 623, 639–40 (6th Cir. 2016). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting FED. R. CIV. P. 8(a)(2)).

When considering a motion to dismiss for failure to state a claim, the Court generally does not consider matters outside the pleadings unless the Court treats the motion as one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  *Gavitt*, 835 F.3d at 640; *see also* FED. R. CIV. P. 12(d) ("If, on a motion under Rule 12(b)(6) …, matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").  However, a court may, as the Court does here, consider "exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt, supra.  See also Bailey v. City of Ann Arbor*, 860 F.3d 382, 386 (6th Cir. 2017) ("[A] court ruling on a motion to dismiss '*may* consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice.'") (citation omitted) (emphasis in original).  Indeed, courts are "not required to accept as true factual allegations that are contradicted by those records."  *Clark v. Stone*, 998 F.3d 287, 298 (6th Cir. 2021) (citation omitted).[10]

## B.  Discussion

Without subject-matter jurisdiction, this Court lacks power to consider the merits of a plaintiff's claims.  *See Bell v. Hood*, 327 U.S. 678, 682 (1946) (explaining that motion to dismiss for failure to state a claim may be decided only after establishing subject-matter jurisdiction because determination of the validity of the claim is, in itself, an exercise of jurisdiction); *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990) ("[W]e are bound to

---

[10] In a significant misstatement, Plaintiffs represent that *Clark*, 998 F.3d at 298, stands for the opposite proposition—that courts may *not* "use outside materials to 'contradict[]' the factual allegations or inferences in the complaint" (Pls. Resp., ECF No. 27 at PageID.400).

consider the 12(b)(1) motion first, since the Rule 12(b)(6) challenge becomes moot if this court lacks subject-matter jurisdiction.").  "To succeed on the merits, a party must first reach the merits, and to do so it must establish standing."  *Online Merchants Guild v. Cameron*, 995 F.3d 540, 547 (6th Cir. 2021).  Therefore, standing is the threshold topic, which the Court examines first as to the Individual Plaintiffs and then as to Plaintiff RNC.

## 1.  Standing

### a.  Individual Plaintiffs

In support of their request for dismissal under Rule 12(b)(1), Defendants first argue that Plaintiffs Jorritsma and Silvernail lack standing to bring their NVRA claim because the Complaint is devoid of any factual allegations supporting a finding that the individual Plaintiffs personally suffered some actual or threatened injury as a result of Defendants' putatively illegal conduct (ECF No. 19 at PageID.290).  According to Defendants, Jorritsma and Silvernail assert only generalized grievances that do not satisfy Article III standing principles because a mere "fear" of unlawful voting is the type of psychic injury that "falls well short of a concrete harm needed to establish Article III standing" (*id.* at PageID.290–291).  Moreover, Defendants argue that the individual Plaintiffs' subjective fear or concern regarding the integrity of Michigan elections, including their professed fear of having their legitimate votes diluted by those of ineligible voters, is the type of generalized grievance that inures to all Michigan residents and thus fails to demonstrate a particularized injury for purposes of standing (*id.* at PageID.291–293).

In response, Plaintiffs argue that the undermining of the individual Plaintiffs' confidence in the integrity of Michigan elections is not speculative or merely a "psychic injury" but a proper basis for standing, as evidenced by the creation of a private cause of action in the NVRA (ECF No. 27 at PageID.405–409, citing *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197

15

(2008)).    Plaintiffs also argue that the injury suffered by the individual Plaintiffs is not a "generalized" grievance, even though the injury is suffered by many Michigan voters (*id.* at PageID.407–408, citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016), as revised (May 24, 2016) ("The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance.")).

Defendants' argument has merit.

Article III, § 2 of the United States Constitution provides that the judicial power of the federal courts extends only to "Cases" and "Controversies."  "'[S]tanding,' by itself, traditionally has referred to whether a plaintiff can satisfy Article III's case-or-controversy requirement[.]" *Roberts*, 655 F.3d at 580 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979)).  Standing "ensure[s] that federal courts do not exceed their authority" and "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo*, 578 U.S. at 338.

The doctrine of standing requires federal courts to satisfy themselves that "the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)).  "Article III standing is 'not merely a troublesome hurdle to be overcome if possible so as to reach the 'merits' of a lawsuit which a party desires to have adjudicated; it is a part of the basic charter promulgated by the Framers of the Constitution at Philadelphia in 1787.'" *United States v. Texas*, 599 U.S. 670, 675 (2023) (citation omitted).

The United States Supreme Court has held that "the irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560.  The plaintiff must have suffered "(1) a concrete and particularized injury-in-fact which (2) is traceable to the defendant's conduct and

(3) can be redressed by a favorable judicial decision." *Dickson v. Direct Energy, LP*, 69 F.4th 338, 343 (6th Cir. 2023). Contrary to Plaintiffs' reliance on the private cause of action provided in the NVRA, "[n]o matter what Congress provides by statute, the plaintiff must still satisfy Article III's standing prerequisites, including the injury-in-fact requirement." *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 867 (6th Cir. 2020) (citing *Spokeo*, 578 U.S. at 339 ("Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.")).

The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing the elements. *Spokeo*, 578 U.S. at 338. "A plaintiff must prove Article III standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1022 (6th Cir. 2024) (quoting *Lujan*, 504 U.S. at 561). Where, as here, a case is at the pleading stage, the plaintiff must "clearly ... allege facts demonstrating" each element. *Spokeo, supra.*

The standing analysis in this case turns on the injury-in-fact requirement, a requirement that establishes a plaintiff's "personal stake in the outcome of the controversy." *Kareem*, 95 F.4th at 1022 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). In their Complaint, the individual Plaintiffs first allege that they "reasonably fear[ ] that ineligible voters can and do vote in Michigan elections" (Compl. ¶¶ 19 & 22). Plaintiffs Jorritsma and Silvernail also express concerns that their legitimate votes will be "diluted" by those of ineligible voters, which "undermine[s] [their] confidence in the integrity of Michigan elections" (*id.* ¶¶ 18–19, 21–22, & 93). The Court considers both allegations in turn.

First, the "fear" upon which the individual Plaintiffs rely is an insufficient basis for properly invoking federal-court jurisdiction. The Court of Appeals for the Sixth Circuit has

instructed that "a psychic injury falls well short of a concrete harm needed to establish Article III standing." *Glennborough Homeowners Ass'n v. United States Postal Serv.*, 21 F.4th 410, 415 (6th Cir. 2021) (citing *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 619–20 (2007) (Scalia, J., concurring) (recognizing that a plaintiff whose only injury is subjective mental angst "lacks a concrete and particularized injury" under Article III)). *See also Diamond v. Charles*, 476 U.S. 54, 62 (1986) (holding that a plaintiff's mere disagreement with agency action "however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements").

Plaintiffs' reliance on language in the Supreme Court's decision in *Crawford* that "[v]oter confidence has 'independent significance'" (ECF No. 27 at PageID.406), does not compel a different conclusion. *Crawford* concerned a suit brought by the Indiana Democratic Party and the Marion County Democratic Central Committee (collectively, "the Democrats") seeking a judgment declaring that an Indiana Voter ID law was invalid and enjoining its enforcement. *Id.* at 186. The case was consolidated with another suit filed by two elected officials and several nonprofit organizations, seeking the same relief. *Id.* at 186–87. The Supreme Court upheld the Indiana law, opining, in relevant part, that "public confidence in the integrity of the electoral process has independent significance because it encourages citizen participation in the democratic process." *Id.* at 197. The Supreme Court expressly declined to analyze the issue of standing, indicating in a footnote that it agreed that the Democrats had standing to challenge the validity of the law and that there was therefore "no need to decide whether the other petitioners also have standing." *Id.* at 189, n.7. Plaintiffs' cherry-picked phrase from *Crawford* does not ameliorate general standing principles.

Second, turning to the remaining allegation relevant to the individual Plaintiffs, Jorritsma and Silvernail's subjective concern about the integrity of Michigan elections, including their

professed concern about vote dilution, is the type of generalized grievance common to all Michigan residents.  These concerns are not "particularized" to Jorritsma and Silvernail.  "For an injury to be 'particularized,' it must affect the plaintiff in a personal and individual way."  *Spokeo*, 587 U.S. at 339.

In responding to Defendants' motion, Plaintiffs isolate one sentence by the Supreme Court in *Spokeo*—"The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance"—as supporting the proposition that Jorritsma and Silvernail's professed injury is "not a generalized grievance … even though it's suffered by many Michigan voters, and even though the amount of dilution might be relatively slight" (Pls. Resp., ECF No. 27 at PageID.407).  As a threshold matter, Plaintiffs do not identify the location of the quoted sentence as a footnote in *Spokeo,* 587 U.S. at 339, n.7.  More importantly, Plaintiffs do not quote the second sentence in the Supreme Court's footnote, where the Supreme Court stated that "[t]he victims' injuries from a mass tort, for example, are widely shared, to be sure, but each individual suffers a particularized harm."  *Id.*  The complete text of the footnote clearly indicates that the Supreme Court was in no way diminishing the importance of the first element of "the irreducible constitutional minimum of standing" discussed in the body of its seminal opinion, i.e., that a plaintiff must have suffered "a concrete and particularized injury-in-fact."  *Id.* at 338 (citing *Lujan*, 504 U.S. at 560–61).

Hence, the United States Supreme Court has "consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy."  *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam).  The Sixth Circuit has

likewise held that "[a]n 'undifferentiated, generalized grievance about the conduct of government' cannot give him standing."  *Mason v. Adams Cnty. Recorder*, 901 F.3d 753, 757 (6th Cir. 2018) (quoting *Lance*, 549 U.S. at 442).  *See also Johnson v. Bredesen*, 356 F. App'x 781, 784 (6th Cir. 2009) ("The Supreme Court has long held that a plaintiff does not have standing 'to challenge laws of general application where their own injury is not distinct from that suffered in general by other taxpayers or citizens.'").  *Cf. Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 83 (2019) (Gorsuch, J., concurring in the judgment) ("Who, after all, would have trouble recasting a generalized grievance about governmental action into an 'I-take-offense' argument for standing?").

Because Plaintiffs' Complaint fails to sufficiently demonstrate that Jorritsma and Silvernail suffered either a concrete or a particularized injury-in-fact, the Court holds that Plaintiffs have not borne their burden of establishing that the individual Plaintiffs have standing to bring their NVRA claim.  However, "only one plaintiff needs to have standing in order for the suit to move forward." *Boone Cnty. Republican Party Exec. Comm. v. Wallace*, No. 24-5783, ___ F.4th ___, 2024 WL 4048630, at *5, n.3 (6th Cir. Sept. 5, 2024) (quoting *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 710 (6th Cir. 2015) (citing *Horne v. Flores,* 557 U.S. 433, 446–47 (2009) ("[T]he critical question is whether at least one petitioner has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction.")).  Therefore, the Court turns to determining whether Plaintiffs have borne their burden of demonstrating Plaintiff RNC's standing to bring this claim.

### b. *Plaintiff RNC*

Defendants argue that the concerns of Plaintiff RNC (or its members, voters, and candidates' concerns) over election integrity or vote dilution are just as speculative and generalized as the concerns alleged by Jorritsma and Silvernail and therefore fail for the same reasons (ECF

No. 19 at PageID.294).  Defendants opine that the RNC cannot "create its own injury based on its decision to spend time and money investigating the state's list maintenance programs based on its speculative concerns of voter fraud and vote dilution" (*id.* at PageID.295).

In response, Plaintiffs argue that there is "little question" that political parties have standing to challenge a State's failure to comply with federal election laws where the need to divert resources from general voting initiatives or other missions of the organization are an "injury in fact" (ECF No. 27 at PageID.402–405).

Defendants' argument has merit.

"An organization can satisfy Article III's standing requirements by suing on its own behalf, called 'organizational standing,' or by suing on behalf of its members, called 'associational' or 'representative' standing." *Children's Health Def. v. United States Food & Drug Admin.*, No. 21-6203, 2022 WL 2704554, at *2 (6th Cir. July 12, 2022) (citing *Online Merchants*, 995 F.3d at 547; *Ass'n of Am. Physicians & Surgeons v. United States Food & Drug Admin.*, 13 F.4th 531, 537 (6th Cir. 2021) ("*AAPS*")).

In their Complaint, Plaintiffs reference both types of standing.  Plaintiffs allege that the RNC brings its NVRA claim "to vindicate its own rights in this regard, and in a representational capacity to vindicate the rights of its members, affiliated voters, and candidates" (Compl. ¶ 15). However, in responding to Defendants' motion to dismiss, Plaintiffs do not develop any argument addressing the elements of associational or representative standing, *see generally AAPS*, 13 F.4th at 537, and focus instead on only organizational standing.  *See* Pls. Resp., ECF No. 27 at PageID.402–405) ("The RNC Has Organizational Standing").  Accordingly, the Court's analysis assumes the same focus.

In *Havens Realty Corporation v. Coleman*, 455 U.S. 363 (1982), the Supreme Court held that an organization may have standing to sue in its own right to challenge action that causes it direct injury, and the Supreme Court indicated that the inquiry is "the same inquiry as in the case of an individual," to wit:  whether the plaintiff has "'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction."  *Id.* at 378–79 (citation omitted).  The Supreme Court held that the plaintiff-organization in *Havens* had sufficiently alleged standing based upon the following claim in its complaint: "Plaintiff HOME has been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services. Plaintiff HOME has had to devote significant resources to identify and counteract the defendant's [sic] racially discriminatory steering practices."  *Id.* at 379 (alteration in original).  The Supreme Court held that perceptible impairment to an organization's "activities" or a "drain on the organization's resources" qualify as concrete and demonstrable injuries for standing purposes.  *Id.* at 379.

Consistent with *Havens*, the Sixth Circuit has similarly applied the diversion-of-resources theory in its standing cases.  *See Online Merchants*, 995 F.3d at 549 (organizational standing where the Online Merchants Guild alleged that it "diverted resources that could have been expended elsewhere to address the Attorney General's price-gouging investigations"); *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 576 (6th Cir. 2013) (organizational standing where the fair housing center alleged that it "had to divert its resources, its staff time and energy to identify the ad and then to bring the ad to the attention of the appropriate authorities").  *Cf. Fair Elections Ohio v. Husted*, 770 F.3d 456, 459–60 (6th Cir. 2014) (no organizational standing where premised on activities that would have happened anyway at a "single regularly scheduled meeting").

However, as recently summarized by the Sixth Circuit, two legal developments since *Havens* was decided in 1982 "clarified its narrow domain." *Tennessee Conf. of the NAACP v. Lee*, 105 F.4th 888, 902 (6th Cir. 2024). "Development One" is that the Supreme Court in *Alliance for Hippocratic Medicine* "clarified" that *Havens*'s "unusual" facts do "not support a categorical rule allowing standing whenever 'an organization diverts its resources in response to a defendant's actions.'" *Id.* (quoting *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024)). The Supreme Court in *Alliance for Hippocratic Medicine* indicated that that categorical rule "would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." 602 U.S. at 395.

As for "Development Two," the Sixth Circuit indicated that "[e]ven before *Alliance for Hippocratic Medicine*, we had recognized other limits on *Havens.*" *Tennessee Conf. of the NAACP*, 105 F.4th at 903. The Sixth Circuit described two such limits. The Sixth Circuit pointed out that the Supreme Court had decided *Havens* at a time when a complaint's "general allegations" sufficed to state a claim, i.e., pre-*Iqbal/Twombly*. *Id.* (citing *AAPS*, 13 F.4th at 543 (acknowledging that the Supreme Court retired the "old" "lenient" pleading test in favor of a "plausibility" test)). The Sixth Circuit also pointed out that *Havens* addressed standing to seek damages, which might be supported by a past injury, but *Havens* did not address standing to seek an injunction, which requires a plaintiff to show that the same kind of injury is "certainly impending" in the future. *Id.* at 903–04 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). In light of these legal developments, *Havens* no longer supports an expansive theory of standing for organizations.

Against this backdrop of Supreme Court and Sixth Circuit precedent, the Court turns to examining the allegations within Plaintiffs' Complaint that are relevant to assessing Plaintiff

RNC's claim of standing under a diversion-of-resources theory.  There are two sets of allegations. First, in paragraphs 16 and 17 of their Complaint, Plaintiffs allege that the RNC "monitors state and local election officials' compliance with their NVRA list maintenance obligations through publicly available records from jurisdictions across the nation" and that the RNC "relies on voter registration lists to determine its plans and budgets [and] estimate voter turnout, which informs the number of staff the RNC needs in a given jurisdiction, the number of volunteers needed to contact voters, and how much the RNC will spend on paid voter contacts" (Compl. ¶¶ 16–17).  These allegations merely describe activities in which the RNC normally engages.  While Plaintiffs further allege in paragraph 17 that the RNC "may" spend more resources and/or "may misallocate its scarce resources" if voter registration lists "include names of voters who should no longer be on the list" (*id.* ¶ 17), this allegation describes only a speculative harm to which resources might be devoted.  Unlike the within-mission resources diverted in *Havens* to identify and counteract racially discriminatory steering practices, the resources diverted in *Online Merchants* to address price-gouging, and the resources diverted in *Miami Valley* to counteract discriminatory advertising, Plaintiff RNC alleges only the *potential* of a diversion of resources.  Particularly in this case, where Plaintiffs have sought declaratory and injunctive relief to remedy the alleged "injury," the Court concludes that these allegations are not sufficiently concrete to show a "certainly impending" injury for purposes of Article III standing.

The second set of allegations also fails to help Plaintiffs satisfy their burden.  Plaintiffs allege that the RNC has "expended substantial time and resources investigating Defendants' failure to comply with their list-maintenance obligations," "communicated with Michigan officials and concerned members about Defendants' failures," and "researched statements made by Defendants in their correspondence" (*id.* ¶ 24).  According to Plaintiffs, "[w]ere it not for Defendants' failure

to comply with their list-maintenance obligations, the RNC would have expended those resources on other activities or would not have expended them at all" (*id.* ¶ 25). *See also* ¶ 95 ("Defendants' inaccurate voter rolls have forced Plaintiffs to allocate additional resources and misallocate their scarce resources in ways they otherwise would not have").

These allegations do not describe a personal stake in the outcome of a controversy as to warrant invocation of federal-court jurisdiction. Unlike the resources in *Havens*, *Online Merchants*, and *Miami Valley*, which were diverted to ameliorate and counteract the challenged practices, the resources expended by Plaintiff RNC were made to discover whether any controversy exists. The Supreme Court has held that a plaintiff "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416 (2013).[11] Relying on *Clapper*, the Sixth Circuit has likewise held that "an organization can no more spend its way into standing based on speculative fears of future harm than an individual can." *Shelby Advocs. for Valid Elections v. Hargett*, 947 F.3d 977, 982 (6th Cir. 2020) (per curiam). *See also Memphis A. Philip Randolph Inst.*, 978 F.3d at 386–89 (holding that the plaintiffs failed to make a substantial showing of standing because they "failed to demonstrate that they are facing an actual, concrete, particularized, and imminent injury" where they did not "cite with certainty or specification any past erroneous rejection of an absentee ballot").

In sum, applying Supreme Court and Sixth Circuit precedent, neither the allegations about activities in which the RNC normally engages nor the allegations about RNC resources having

---

[11] In *Clapper*, 568 U.S. at 416, the Supreme Court indicated that under contrary reasoning, a respondent could, "for the price of a plane ticket, ... transform their standing burden from one requiring a showing of actual or imminent ... interception to one requiring a showing that their subjective fear of such interception is not fanciful, irrational, or clearly unreasonable."

been diverted to address speculative fears of future harm are sufficient to establish that Plaintiff RNC has standing to pursue its NVRA claim.  Because no Plaintiff has standing in this case, the Court lacks subject-matter jurisdiction, and dismissal under Rule 12(b)(1) is warranted.  *See State by & through Tenn. Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499, 507 (6th Cir. 2019).  Consequently, the Court "need not" decide whether Plaintiffs failed to state a claim upon which relief can be granted.  *See id.*  The Court nonetheless briefly addresses the topic, *infra*, and holds that Plaintiffs' allegations also do not state a plausible claim for relief.

## 2.  Failure to State a Plausible Claim

In support of their request for dismissal under Rule 12(b)(6), Defendants point out that Plaintiffs' allegations are based entirely on a comparison of census survey data to the *total* (not active) number of records in Michigan's QVF, leading Plaintiffs to inaccurately conclude that there are more registered voters than the voting-age population in these counties (ECF No. 19 at PageID.296–297).  Defendants also point out that Plaintiffs do not identify a single voter in any Michigan county who is ineligible to be registered but nonetheless appears as an active voter in the QVF (*id.*).  Defendants emphasize that as they set forth in their response to Plaintiffs' statutory notice, the "high number" of inactive registrations is not a reflection of a failure of Michigan's program but is instead the *result* of Michigan's efforts to identify and slate ineligible voters for removal (*id.* at PageID.302–304).

In response, Plaintiffs argue that they have alleged a plausible NVRA violation because "[t]he allegations regarding high registration rates alone raise a reasonable inference of liability" (ECF No. 27 at PageID.410).  Plaintiffs emphasize that they are not required to allege specific changes Defendants should make and that Defendants' assessment of the merits of their claim is not properly analyzed at the motion-to-dismiss stage (*id.* at PageID.411–415).

In reply, Defendants opine that Plaintiffs appear to be resorting to "some variation of *res ipsa loquitur*—something *must* be wrong with the Defendants' program, but Plaintiffs do not know what it is" (ECF No. 30 at PageID.462).

Defendants' argument has merit.

Section 8 of the NVRA prohibits states from removing registered voters from official voter lists unless such removal is "at the request of the registrant," "provided by State law," or "provided under paragraph (4)." 52 U.S.C. § 20507(a)(3)(A)–(C). Paragraph (4), in turn, requires in relevant part that "each State shall … conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of—(A) the death of the registrant; or (B) a change in the residence of the registrant[.]" 52 U.S.C. § 20507(a)(4). Congress did not establish a specific program for states to follow for removing ineligible voters. Indeed, the Supreme Court has instructed that "[r]equiring additional" processes not mandated by the NVRA "not only second-guesses the congressional judgment embodied in [the NVRA's] removal process, but it also" improperly "second-guesses the judgment of" state legislatures. *Husted*, 584 U.S. at 774.

In the sole count of their Complaint, Plaintiffs allege that Defendants have failed to make reasonable efforts to conduct voter list maintenance programs, in violation of § 8 of the NVRA (Compl. ¶ 97). Plaintiffs compare 2022 population data to 2024 voter-registration rates to conclude that certain Michigan counties have either "impossibly" or "suspiciously" high rates of registered voters relative to the population (Compl. ¶¶ 47–55). Plaintiffs also allege that Michigan is not canceling registrations quickly enough because Michigan canceled fewer voter registrations from 2020 to 2022 than the number of residents who changed residences during that same time

(*id.* at ¶¶ 64–65).  Plaintiffs posit that "[t]he only explanation for these discrepancies is substandard list maintenance" (*id.* ¶ 55).

As Defendants emphasize, Plaintiffs have not alleged any specific breakdown in Michigan's removal program, nor have Plaintiffs requested any specific relief.  Plaintiffs' claim is merely that Defendants' list maintenance program is "not reasonable."  *See* Compl. ¶ 9 ("Defendants are failing to make a reasonable effort to conduct appropriate list maintenance as required by the NVRA."); ¶ 57 ("[T]he State's general program does not make a reasonable effort to remove outdated registrations."); and ¶ 97 ("Defendants have failed to make reasonable efforts to conduct voter-list maintenance[.]").  And for "relief," Plaintiffs request that this Court order Defendants to "develop and implement reasonable and effective registration list-maintenance programs" (*id.* ¶ 100(C)).

Conclusory assertions that merely parrot the language of a statute do not state a plausible claim.  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.  Plaintiffs would need to allege some factual context to "nudge" their statutory violation claim "across the line from conceivable to plausible."  *See id.* at 683 (quoting *Twombly*, 550 U.S. at 570).

For example, in the NVRA case brought by the Public Interest Legal Foundation ("PILF"), where this Court denied Secretary Benson's motion to dismiss, PILF alleged that over 25,000 deceased registrants remain on Michigan's QVF and that thousands of these registrants had remained on the active rolls for decades.  *Pub. Int. Legal Found. v. Benson*, No. 1:21-cv-929, 2022 WL 21295936, at *10 (W.D. Mich. Aug. 25, 2022).[12]  PILF relied on a spreadsheet identifying the

---

[12] Following discovery, this Court granted Secretary Benson's motion for summary judgment, concluding that even after "nine months of discovery into the many facets of Michigan's program for the removal of deceased registrants, PILF ha[d] identified no genuine issue for trial regarding

voter ID numbers of the registrants it had identified and indicated that PILF had compared registrants against the Social Security Death Index and matched full names, full dates of birth, Social Security Numbers, and credit address history information, which revealed "27,000 records of concern," with the remainder matching "other verifiable death record sources." *Id.* at *3.  PILF also alleged that it subsequently performed additional data comparisons, with similar results.  *Id.*

Plaintiffs' census data alone, even assuming its reliability, does not plausibly indicate that Michigan is violating the NVRA.  The NVRA prohibits states from removing voters suspected of moving until at least two federal general elections have passed since those voters failed to respond to an official notice.  52 U.S.C. § 20507(d)(1)(B)(*ii*) (Removal of names from voting rolls).  *See also* 52 U.S.C. § 21083(a)(2)(A)(*i*) (corresponding HAVA provision); MICH. COMP. LAWS § 168.509aa(3) (corresponding state-law provision).  Hence, even assuming certain Michigan counties canceled fewer than "2% of [registrations] for residency changes" from 2020 to 2022 despite population data showing that anywhere from 12 percent to 23.5 percent of residents changed houses during that time (Compl. ¶¶ 64–66), that cancellation rate over a short period of time would not offend the NVRA.  Indeed, Plaintiffs admit that Michigan's 2022 inactive registration rate of 11.3 percent is just "slightly above the national average of 11.1%," except for ten counties (out of 83) that were slightly higher (*id.* ¶ 60).  And Plaintiffs themselves admit that "[t]here is no evidence that" the counties they identify "experienced above average voter participation compared to the rest of the country or State" (*id.* ¶ 55).

According to Plaintiffs, this Court should order Defendants to "ensure that ineligible registrants are not on the voter rolls" (*id.* ¶ 100(C)).  Plaintiffs' requested relief, in telling fashion,

---

its claim that the program" violates federal law.  *Pub. Int. Legal Found.*, 2024 WL 1128565, at *12 (W.D. Mich. Mar. 1, 2024), *appeal docketed*, No. 24-1255 (6th Cir.).

flips the statutory mandate on its head.  The NVRA obligates Michigan to "ensure" that "any *eligible* applicant is registered to vote," 52 U.S.C. § 20507(a)(1) (emphasis added), and to make a "reasonable effort" to remove the names of ineligible voters, 52 U.S.C. § 20507(a)(4).  As described *supra*, the NVRA purposes to both protect electoral integrity and protect against unlawful voter disenfranchisement.  Absent Plaintiffs' legal conclusions and unwarranted factual inferences, which this Court is not required to accept as true, *Clark*, 998 F.3d at 298, there is no content in Plaintiffs' Complaint that states a plausible claim under the NVRA.  Therefore, even assuming arguendo that one of the Plaintiffs at bar has standing to bring this claim, the quality of the pleading does not permit the Court to infer more than a mere possibility of misconduct.  Plaintiffs' Complaint has alleged—but it has not shown—that they are entitled to relief.  Accordingly, dismissal under Rule 12(b)(6) would also be warranted.

### III.  CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss (ECF No. 18) is GRANTED.

**IT IS FURTHER ORDERED** that the motions to intervene (ECF No. 8, as amended by ECF No. 9; and ECF No. 12) and the related motion for an extension of time (ECF No. 14) are DISMISSED as moot.

Because this Opinion and Order resolves the sole pending claim, the Court will also enter a Judgment to close this case.  *See* FED. R. CIV. P. 58.

Dated:  October 22, 2024

/s/ Jane M. Beckering
JANE M. BECKERING
United States District Judge